UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS, REV. NICHOLAS STAMOS,
DANIEL SCHONBRUN, ELCHANAN PERR and
MAYER MAYFELD,

                                        *Plaintiffs*,                    20-CV-00651

                        -against-                                        (GTS)(DJS)

ANDREW M. CUOMO, Governor of the State of New
York, in his official capacity, LETITIA JAMES, Attorney
General of the State of New York in her official capacity,
and BILL DE BLASIO, Mayor of the City of New York, in
his official capacity,

                                        *Defendants*.

---

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY PRELIMINARY INJUNCTIVE RELIEF

                        LETITIA JAMES
                        Attorney General of the State of New York
                        Attorney for Defendants Andrew M. Cuomo
                                and Letitia James
                        The Capitol
                        Albany, New York  12224

Adrienne J. Kerwin
Assistant Attorney General
Bar Roll No. 105154
Telephone:  (518) 776-2608
Fax:  (518) 915-7738 (Not for service of papers)                    Date: June 15, 2020

**Table of Contents**

TABLE OF AUTHORITES ............................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL HISTORY……………………………………………………………2

EXECUTIVE ORDERS LIMITING GATHERINGS AND REQUIRING PHYSICAL
DISTANCING……………………………………………………………………………2

FACTS AS ALLEGED BY THE PLAINTIFFS……………………………………………6

ARGUMENT………………………………………………………………………...8

       POINT I………………………………………………………………………...8

           PLAINTIFFS FAIL TO ESTABLISH
           THAT THEY ARE LIKELY TO SUCCEED
           ON THE MERITS OF THEIR CLAIMS………………………………8

                A. FREE EXERCISE……………………………………………10

                B. FREE SPEECH, EXPRESSIVE ASSOCIATION
                   AND ASSEMBLY……………………………………………14

                C. EQUAL PROTECTION……………………………………...17

                D. LACK OF STATE AUTHORITY……………………………19

       POINT II…………………………………………………………………23

           PLAINTIFFS FAIL TO ESTABLISH THAT
           THEY WILL SUFFER IRREPARABLE HARM IF A
           TEMPORARY RESTRAINING ORDER IS NOT
           GRANTED DURING THE PENDENCY OF THEIR
           MOTION FOR A PRELIMINARY INJUNCTION……………………..23

       POINT III………………………………………………………………...25

           THE EQUITIES BALANCE IN FAVOR OF THE
           STATE'S EFFORTS TO PROTECT THE PUBLIC
           HEALTH DURING THE EXISTING PANDEMIC,
           AND ISSUANCE OF A TRO IS NOT IN THE
           PUBLIC INTEREST…………………………………………………25

CONCLUSION…………………………………………………………………………..25

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Amato v. Elicker,*
   2020 U.S. Dist. LEXIS 87758 (D. Conn. May 19, 2020) .............................................. passim

*Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg,*
   111 F.Supp.3d 459 (S.D.N.Y. 2015) ...................................................................................11

*Bourquin v Cuomo,*
   85 N.Y.2d 781 (1995) .........................................................................................................22

*Boy Scouts of America v. Dale,*
   530 U.S. (2000) ..................................................................................................................15

*Bronx Household of Faith v. Bd. of Educ.,*
   331 F.3d 342 (2d Cir.2003) ...............................................................................................23

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
   508 U.S. 520 (1993) ...........................................................................................................11

*City of Cleburne v. Cleburne Living Center,*
   473 U.S. 432 (1985) ...........................................................................................................18

*Clark v Cuomo,*
   66 N.Y.2d 185 (1985) .........................................................................................................22

*Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health,*
   186 U.S. 380 (1902) ...........................................................................................................19

*CompassCare v. Cuomo,*
   2020 U.S. Dist. LEXIS 98930 (N.D.N.Y. June 5, 2020) .......................................................23

*Congregation of Rabbinical College of Tartikov, Inc. v. Vill. of Pomona,*
   915 F.Supp.2d 574 (S.D.N.Y. 2013) ...................................................................................10

*District of Columbia v. Brooke,*
   214 U.S. 138 (1909) ...........................................................................................................20

*Elrod v. Burns,*
   427 U.S. 347, 373 (1976) ...................................................................................................23

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
   494 U.S. 872 (1990) ...........................................................................................................11

*Fairfield Cty. Med. Ass'n v. United Healthcare of New England,*
   985 F. Supp. 2d 262 (D. Conn. 2013) ...................................................................................8

iii

*Fighting Finest v. Bratton,*
    95 F.3d 224 (2d Cir. 1996)............................................................15

*Fortress Bible Church v. Feiner,*
    694 F.3d 208 (2d Cir 2012)............................................................14

*Friends of Devito v. Wolf,*
    2020 Pa. LEXIS 1987 (PA Sup. Ct., Apr. 13, 2020) ......................................19, 20

*Geller v. De Blasio,*
    2020 U.S. Dist. LEXIS 87405 (S.D.N.Y. May 18, 2020) ......................................8

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824)............................................................19

*In re Abbott,*
    954 F.3d 772 (5th Cir. 2020) ............................................................20

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905)............................................................16, 17, 19

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts,*
    852 F.3d 178 (2d Cir. 2017)............................................................15

*Lawton v. Steele,*
    152 U.S. 133 (1894)............................................................20

*Lee v. Trump,*
    2020 U.S. Dist. LEXIS 49860 (S.D.N.Y. March 23, 2020) ......................................8

*Legacy Church, Inc. v. Kunkel,*
    2020 U.S. Dist. LEXIS 68415 (D.N.M. Apr. 17, 2020) ......................................19, 20

*Lyng v. Intl. Union,*
    485 U.S. 360 (1988)............................................................15

*Matter of New York State Health Facilities Assn. v Axelrod,*
    77 N.Y.2d 340 (1991) ............................................................22

*Morgan S.S. Co. v. La. Bd. of Health,*
    118 U.S. 455 (1886)............................................................19

*New York State Club Assoc. v. Citv of New York,*
    487 US 1 (1988)............................................................18

*Papineau v. Parmley,*
    465 F.3d 46 (2d Cir. 2006)............................................................16

iv

*Pennhurst State Sch. v. Halderman*,
    465 U.S. 89 (1984) .................................................................. 19

*Phillips v. City of New York*,
    775 F.3d 538 (2d Cir. 2015) ............................................. 10, 17

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ......................................................... 17, 19

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) .................................................................. 15

*Rossi v. Fischer*,
    2014 U.S. Dist. LEXIS 158064 (S.D.N.Y. Sept. 11, 2014) .................... 23

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .................................................................... 14

*Saratoga County Chamber of Commerce v. Pataki*,
    100 N.Y.2d 801 (2003) .......................................................... 22

*Sessions v. Morales-Santana*,
    137 S.Ct. 1678, 198 L. Ed. 2d 150 (2017) ............................... 13

*Smith v. Avino*,
    91 F.3d 105 (11th Cir. 1996) ................................................ 20

*South Bay United Pentecostal Church v. Newsom*,
    2020 U.S. LEXIS 3041 (May 29, 2020) .......................... passim

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d Cir. 2007) .................................................... 15

*Tigner v. State of Texas*,
    310 U.S. 141 (1940) ............................................................... 18

*Warth v. Seldin*,
    422 U. S. 490, 499 (1975) .................................................... 13

*West Virginia State Bd. of Ed. v. Barnette*,
    319 U.S. 624 (1943) ............................................................... 14

*WTC Families for a Proper Burial, Inc. v. City of New York*,
    567 F.Supp.2d 529 (S.D.N.Y. 2008) ................................... 11

**FEDERAL CONSTITUTION**

First Amendment ....................................................................... passim

Fourteenth Amendment ........................................................................................ 2-3, 18

Tenth Amendment .................................................................................................. 21-22

**STATE CONSTITUTION**

N.Y. Const. art. III, § 1 ............................................................................................... 22

N.Y. Const. art. IV, §1 ................................................................................................ 22

N.Y. Const. art. VI ...................................................................................................... 22

**FEDERAL STATUTES**

28 U.S.C. § 1367(c)(3)…………………………………………………………………………...19

**STATE STATUTES**

N.Y. Exec. Law
    Art. 2-b.................................................................................................................... 20

    § 20(2)(a) ............................................................................................................... 21

    § 20(2)(b) ............................................................................................................... 21
    § 28 (1) ................................................................................................................... 21

    § 28 (3) ................................................................................................................... 21
    § 29........................................................................................................................... 2

**STATE EXECUTIVE ORDERS**

EO 202 ................................................................................................................. 2, 3, 21

EO 202.3 ...................................................................................................................... 12

EO 202.4 ...................................................................................................................... 12

EO 202.5 ...................................................................................................................... 12

EO 202.6 ...................................................................................................................... 12

EO 202.7 ...................................................................................................................... 12

EO 202.8 ...................................................................................................................... 12

EO 202.10 .................................................................................................................... 13

EO 202.17 ...................................................................................................................... 3

EO 202.31 ............................................................................................13

EO 202.32 ..........................................................................................3, 13

EO 202.33 ..........................................................................................3, 13

EO 202.38 ..............................................................................................9

**RULES**

FRCP 65(b) ...........................................................................................8

## PRELIMINARY STATEMENT

Plaintiffs, two Catholic priests and three practitioners of the Orthodox Jewish faith, seek an order exempting them from complying with the gathering limitations imposed by New York State in an unprecedented effort to protect New Yorkers from the spread of COVID-19. Due to COVID- 19, New York has been in a state of emergency since March 7, 2020. The limitations and precautions implemented by New York are aimed solely at responding to the COVID-19 pandemic and dramatically slowed the spread of the virus.  To continue to protect public health and avoid a resurgence of COVID-19 in New York, Governor Cuomo, with the guidance and assistance of health experts, designed and adopted a four-phase re-opening plan that slowly and methodically modifies gathering limitations, and responds to the continuous evaluation of real-time evolving medical data and the evolving understanding of the transmission of the disease. As regions of the State progress through the phases, more businesses have been permitted to open, people have been permitted to engage in more activities and gathering limitations have relaxed. The restrictions, and the four-phase re-opening plan, target COVID-19, not religion or any viewpoint.  Both on their face, and as applied, the Executive Orders, and associated guidance and physical distancing protocols ("protocols") challenged by plaintiffs are content neutral and generally applicable, and exist solely to protect public health.

For the reasons discussed below, plaintiffs' application for temporary preliminary injunctive relief should be denied.  First, plaintiffs fail to satisfy their heavy burden to establish entitlement to such relief.  Second, consistent with well establish legal principles, the State is accorded great deference in responding to a public health emergency and cannot be hamstrung in its ability and efforts to continue to evaluate and address the continued dangers of COVID-19 to protect the lives of New Yorkers. Third, the equities balance in favor of protecting public health and continuing New York's efforts to save lives in the wake of the ongoing pandemic. The risk

to do otherwise cannot be overstated.  Finally, issuance of a temporary restraining order ("TRO") relaxing limitations on mass gatherings contrary to current medical knowledge would not be in the public interest. That New York appears to be responding well to the extreme measures undertaken to combat the pandemic does not mean the danger has abated.

## PROCEDURAL HISTORY

On June 10, 2020, plaintiffs commenced this action by filing a complaint against defendants Governor Andrew M. Cuomo, Attorney General Letitia James (collectively the "State defendants") and New York City Mayor Bill deBlasio alleging that various Executive Orders and physical distancing protocols relating to congregate religious services and gatherings violate plaintiffs' First Amendment rights to freedom of exercise, speech, assembly, and expressive association, and their Fourteenth Amendment right to equal protection, and constitute ultra vires state action in violation of federal rights. Dkt. No. 1. Plaintiffs seek declaratory and injunctive relief.

On June 11, 2020, plaintiffs filed an application seeking an order:

> [r]estraining Defendants from enforcing any gathering limits on Plaintiffs' religious gatherings, or, in the alternative, from enforcing any gathering limits on Plaintiffs' religious gatherings greater than Defendants have imposed on essential retail businesses and the mass demonstrations approved by Defendants Cuomo and de Blasio.

Dkt. No. 7.  The court thereafter issued a text order denying plaintiffs' TRO motion to the extent that it applied to religious services on June 12 and 14, and directed defendants to file a response to plaintiffs' application by 12 p.m., on June 15, 2020, and scheduled a hearing on June 17, 2020. Dkt. at 6/11/2020, 3:41pm.

## EXECUTIVE ORDERS LIMITING GATHERINGS AND REQUIRING PHYSICAL DISTANCING

On March 7, 2020, in order to combat the burgeoning COVID-19 pandemic, pursuant to

New York State Executive Law § 29, Governor Cuomo issued Executive Order ("EO") 202, implementing the State Comprehensive Emergency Management Plan and declaring a statewide disaster emergency until September 7, 2020. Kerwin Decl., Exh. 0. By Executive Order No. 202, the Governor suspended all state and local laws, rules, and regulations to the extent necessary to cope with the COVID-19 disaster emergency. Id. Following the issuance of EO 202, Governor Cuomo issued several supplemental EOs, continuing the temporary suspension and modification of certain laws relating to the state of emergency. To date, the Governor has issued over thirty additional EOs (Nos. 202.1 through 202.40) related to the COVID-19 disaster emergency, each of which suspends or modifies specified legal provisions and makes declarations related to the disaster emergency. Kerwin Decl., Exhs. 0-40. For purposes of the instant motion, only the current status of gathering limitations and physical distancing protocols are specifically discussed below.

Phase 1[1]

Pursuant to Executive Orders 202.32 and 202.33, in regions eligible for Phase 1 reopening, gatherings of ten or fewer individuals are permitted, provided that individuals adhere to physical distancing[2] and cleaning and disinfection protocols required by the New York Department of Health. Kerwin Decl., Exhs. 32, 33. Additionally, any drive-in or remote religious service may continue in excess of the 10-person limit so long as there is no in-person contact between participants. Outdoor congregations of groups for any purpose, including religious service or ceremony, in excess of ten in-person participants remain prohibited under

---

[1] New York City, where plaintiffs Schonbrun, Perr and Mayerfeld attend synagogue, is in Phase 1.

[2] Effective April 17, 2020, the Governor issued EO 202.17, which requires any individual who is over age two and able to medically tolerate a face-covering to cover his or her nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance. Kerwin Decl, Exh. 17. This EO remains in effect.

Phase 1 protocols. Businesses permitted to open in Phase 1[3] must comply with physical distancing protocols.[4]

Phase 2

In regions that have reached Phase 2, pursuant to Executive Order 202.38, religious gatherings of 25 percent of a house of worship's maximum indoor capacity are permitted, provided that social distancing and cleaning and disinfection protocols required by the Department of Health are followed. Kerwin Decl., Exh. 38.

Under the EO, the following must remain closed during Phase 2: (1) any indoor common portions of retail shopping malls with 100,000 or more square feet of retail space available for lease; (2) indoor on-premise restaurant and bar service; (3) large gathering/event venues, including but not limited to, establishments that host concerts, conferences, or other in-person performances or presentations in front of an in-person audience; (4) gyms, fitness centers, and exercise classes, except for remote or streaming services; (5) video lottery and casino gaming facilities; (6) indoor movie theaters; and (7) places of public amusement, whether indoors or outdoors, including, but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, arcades, fairs, children's play centers, funplexes, theme parks, bowling alleys, family and children's attractions. Hutton Decl. at ¶53. Retail businesses

---

[3] Businesses in the following industries are permitted to re-open in Phase 1: (1) construction; (2) agriculture, forestry, fishing, and hunting; (3) retail limited to curbside or in-store pickup/drop off; (4) manufacturing; and (5) wholesale trade. Hutton Decl. at ¶46.

[4] These protocols include, but are not limited to, (1) 6-foot distance between personnel; (2) limiting indoor workforce presence to no more than 50% of the maximum occupancy for a particular area set by the certificate of occupancy, inclusive of customers picking up an order who must maintain 6 feet of space from others or wear an acceptable face covering; and (3) wearing of acceptable face covering when personnel are less than 6 feet apart from one another or a customer and without a physical barrier (e.g., plexiglass). Hutton Decl. at ¶48.

4

opening in Phase 2 must comply with physical distancing requirements similar to those required in Phase 1.  Id. at ¶55.

Phase 3[5]

In Phase 3, restaurants and personal care service businesses are added to the non-essential businesses permitted to resume operation.  Food service businesses must limit indoor capacity to no more than 50 percent of maximum occupancy, exclusive of employees, and limit outdoor capacity to the number of tables that can be safely and appropriately arranged, such that each table is a minimum of 6 feet away from another.  Hutton Decl. at ¶57.  Additionally, all indoor and outdoor tables with seating for customers must be separated by a minimum of 6 feet  in all directions. Wherever distancing is not feasible between tables, physical barriers must be erected between such tables.  Id.

Regardless of physical distance, employees must wear an acceptable face covering at all times, and patrons must wear face coverings at all times, except while seated.  Individuals seated at the same table must be members of the same party, with a maximum of 10 people per table. Seating in bar areas and communal tables is only permitted if at least 6 feet can be maintained between parties.  Id.

Personal care businesses must also limit workforce and customer presence to no more than 50 percent of the maximum occupancy, inclusive of customers, who must maintain 6 feet of separation from others, except during the service.  Id. at ¶58.  Customers may only be permitted entry if wearing an acceptable face covering.  Id.  Six feet of distance must be maintained between individuals at all times, unless safety or the core activity requires a shorter distance (e.g.

---

[5] As of June 12, 2020, the North Country, where plaintiffs Soos and Stamos perform religious services, is in Phase 3.  Hutton Decl. at ¶46.

performing a piercing/tattoo, providing a massage, performing a manicure/pedicure). Id. Employees must wear face coverings any time they interact with customers, and any time they come within 6 feet of another person. Id. Customer seating must allow customers to maintain 6 feet of distance from all others except for the employee providing service, unless a physical barrier is in place in accordance with OSHA guidelines. Id.

Additionally, employees at appointment desks or cash registers must maintain 6 feet of distance from others, unless there is a physical barrier between them, or the employee is wearing a face covering. Id. However, even with a barrier, employees must wear a face covering any time they interact with a customer. Id. All waiting rooms must remain closed. Id.

## FACTS AS ALLEGED BY THE PLAINTIFFS

Plaintiffs allege that New York's 10-person outdoor gathering limit and the Phase 2 limitation on indoor religious services at 25 percent capacity violate their constitutional rights to participate in congregate religious activities.

Plaintiffs Soos and Stamos are Catholic priests who perform religious services and ceremonies to congregations in Glens Falls, Massena and Nicholville, all located in New York's North Country Region. Dkt. No. 1 at ¶¶77-81. These plaintiffs allege that the 25 percent capacity limitation of EO 202.38 required them, on June 7, to offer five masses at one of their churches, instead of the "normal" two. Id. at ¶93. Also on June 7, plaintiff Stamos had to offer three drive-in Masses for another congregation, rather than the four in-person Masses that would have otherwise been held. Id. at ¶94.

Plaintiffs Soos and Stamos also allege that the "drive-in masses" permitted by EO 202.32 "involve major and unjustified burdens" on plaintiffs Soos and Stamos and their congregations., id. at ¶97, because, inter alia, the drive-in services (1) prevent worshippers from

kneeling; (2) require people to be uncomfortable in vehicles; (3) require the administration of Holy Communion two worshippers at a time instead of in a kneeling row; and (4) expose priests and altar servers to bad weather.  Id. at ¶97.

Plaintiffs Sconburn, Perr and Mayerfeld are practitioners of the Orthodox Jewish faith who attend synagogues in Brooklyn.  Dkt. No. 1 at ¶103.  The complaint alleges that the Orthodox Jewish faith requires that synagogue prayers take place by a "minimum quorum of ten adult males (thirteen or older), called the "minyan," and several congregants, a few times a week."  These prayers require a close gathering around, and reading from, the Torah.  Id. at ¶¶104, 106.  Further, since the minyan must be present in the same room, the separate-car concept of permitted drive-in services is not possible.  Id. at ¶109.  Additionally, "any type of operation of a vehicle is prohibited on the Sabbath, which is the day the main weekly service takes place."  Id. at ¶110.

Plaintiffs allege that the 10-person gathering limit applicable in New York City in Phase 1, and the drive-in services, permitted by EOs 202.32 and 202.33 impose several burdens. Id. at ¶107.  For instance, plaintiffs claim that, if services are limited to only a minyan, no one else can attend, including (1) women, (2) a young man intending to attend his own Bar Mitzvah, (2) "a bride-to-be at her own wedding," or (3) "a newborn and his own circumcision."  Id. at ¶¶108, 111-112.  Additionally, plaintiff Schonbrun alleges that his son, who is not old enough to be part of a minyan, has been precluded from attending synagogue because of the 10-person gathering limit.  Id. at ¶129.  Plaintiff Perr alleges that, because of the 10-person gathering limit, his son's Bar Mitvah, could not be held on May 2 at his synagogue, id. at ¶148, and his wife and six children have been unable to attend services.  Id.  Plaintiff Mayerfeld's wife and daughter also cannot attend services.  Id.

**ARGUMENT**

To establish entitlement to temporary preliminary relief under FRCP 65(b), a plaintiff must satisfy a very heavy burden.[6]  Specifically, plaintiffs here must establish (1) the likelihood of success on the merits; (2) that they will suffer irreparable harm if a TRO is not issued; (3) that the equities balance in their favor; and (4) that the TRO is in the public interest.  Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, *7 (D. Conn. May 19, 2020) (applying this standard to an application for a TRO challenging Executive Orders issued during the COVID-19 pandemic). See also Geller v. De Blasio, 2020 U.S. Dist. LEXIS 87405, *6 (S.D.N.Y. May 18, 2020) (applying this standard to challenge of Executive Order relating to non-essential gatherings during the COVID-19 pandemic); Lee v. Trump, 2020 U.S. Dist. LEXIS 49860, *1 (S.D.N.Y. March 23, 2020) (applying this standard to challenge of travel ban during the COVID-19 pandemic). Plaintiffs cannot satisfy any of these elements.

POINT I

PLAINTIFFS FAIL TO ESTABLISH
THAT THEY ARE LIKELY TO SUCCEED
ON THE MERITS OF THEIR CLAIMS

The TRO sought here must be denied based on the Supreme Court's May 29, 2020 decision in South Bay United Pentecostal Church v. Newsom, 2020 U.S. LEXIS 3041 (May 29, 2020).  The plaintiffs in South Bay challenged an EO issued by the Governor of California that limits "attendance at places of worship to 25% of building capacity or a maximum of 100

---

[6] In this Circuit, the standard that must be met is the same as the standard governing the issuance of a preliminary injunction.  Fairfield Cty. Med. Ass'n v. United Healthcare of New England, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd as modified sub nom, Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc., 557 F. App'x 53 (2d Cir. 2014).

attendees." Id. at *1.  Concurring with the court's denial of plaintiffs' application for

preliminary injunctive relief, Chief Justice Roberts stated as follows:

> Although California's guidelines place restrictions on places of worship, those
> restrictions appear consistent with the Free Exercise Clause of the First
> Amendment.  Similar or more severe restrictions apply to comparable secular
> gatherings, including lectures, concerts, movie showings, spectator sports, and
> theatrical performances, where large groups of people gather in close proximity
> for extended periods of time.  And the [Executive] Order exempts or treats more
> leniently only dissimilar activities such as operating grocery stores, banks, and
> laundromats, in which people neither congregate in large groups nor remain in
> close proximity for extended periods.

Id. at *2.

The same is true in New York.  As stated above, although places of worship in Phase 2

and Phase 3 regions may operate at 25 percent capacity under Executive Order 202.38, Kerwin

Decl at Exh. 38, other places where large groups of people gather in close proximity for extended

periods of time remain closed such as (1) indoor shopping malls; (2) large gathering/event

venues such as establishments that host concerts, conferences, or other in-person performances

or presentations in front of an in-person audience; (3) in person gyms, fitness centers, and

exercise classes; (4) video lottery and casino gaming facilities; (5) indoor movie theaters; and (6)

places of public amusement, whether indoors or outdoors, including but not limited to, locations

with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, arcades, fairs,

children's play centers, funplexes, theme parks, bowling alleys, family and children's attractions.

Hutton Decl. at ¶53.

As noted by Justice Roberts, when explaining the deference that must be accorded to

state officials responding to a pandemic,

> [t]he precise question of when restrictions on particular social activities should be
> lifted during the pandemic is a dynamic and fact-intensive matter subject to
> reasonable disagreement.  Our Constitution principally entrusts "[t]he safety and
> the health of the people" to the politically accountable officials of the States to

"guard and protect." [Citation omitted]  When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." [Citation omitted]  Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. [Citation omitted]

South Bay at **2-3.  Governor Cuomo is entitled to this deference in connection with the protocols at issue here.

As applicable to all of plaintiffs' constitutional claims discussed below, the EOs and protocols are supported by a rational basis and are entitled to deference by the court.  The government must be afforded considerable deference in dealing with the health and safety of its citizens, particularly in times of the outbreak of disease.  South Bay at **2-3.  See also Phillips v. City of New York, 775 F.3d 538, 543 (2d Cir. 2015) (the "right to practice religion freely does not include liberty to expose the community…to communicable disease or…ill health or death").  Protection of the public from a deadly, fast-spreading disease with no vaccine or cure is certainly a significant state interest, Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, **28029 (D. Conn. May 19, 2020), and the EOs and protocols have a "'real and substantial relation' to the state's goal of curbing the spread of the virus." Id. at *30.  Accordingly, the EOs and protocols satisfy rational basis review.

For the reasons set forth below, plaintiffs, like the plaintiffs in South Bay, cannot establish that they are likely to succeed on the merits of any of their claims, their application for a TRO should be denied.

**A.  Free Exercise**

To "state a free exercise claim, a plaintiff generally must establish that 'the object of [the challenged] law is to infringe upon or restrict practices because of [its] religious motivation,' or that the law's 'purpose…is the suppression of religion or religious conduct.'"  Congregation of

Rabbinical College of Tartikov, Inc. v. Vill. of Pomona, 915 F.Supp.2d 574, 619 (S.D.N.Y. 2013) (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 533 (1993)). The right of the free exercise of religion does not relieve an individual or entity of the obligation to comply with a "valid and neutral law of general applicability." Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872 (1990).  As a result, where an alleged limitation on the exercise of religion "is not the object ... but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."  Id. at 878.  See also Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F.Supp.3d 459, 484 (S.D.N.Y. 2015) (stating that a "law or regulation that is neutral and of general applicability is constitutional even if it has an incidental effect on religion").  Therefore, a law that only incidentally imposes a burden on the exercise of religion need only be supported by a rational basis.  WTC Families for a Proper Burial, Inc. v. City of New York, 567 F.Supp.2d 529, 539-540 (S.D.N.Y. 2008) (quoting Leebart v. Harrington, 332 F.3d 134, 143 (2d Cir. 2003)).

Plaintiffs' free exercise claim should be dismissed because the EOs limiting gatherings, and associated physical limiting protocols and guidelines, do not target religion, are neutral and generally applicable, and any burden on religion is merely incidental. Both on their face, and when considered in connection with the ongoing pandemic, the EOs and protocols protect the entire public at large. Accordingly, they are generally applicable.

They are also neutral.  The neutrality of a law is determined by the consideration of relevant factors, including, inter alia, "the historical background of the decision under challenge," and "the specific series of events leading to the enactment or official policy in question." Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. at 540.  Religious beliefs are not targeted by the EOs or protocols, and their "object" is plainly not to interfere with plaintiffs', or anyone's, exercise

of religion.  Id. at 533 ("if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.").  Rather, the plain text of the EOs, as well as the series of events leading to their enactment and physical distancing protocols, establish that the object of the EOs and protocols is to stop the spread of COVID-19.  Their purpose is to protect public health.

Plaintiffs fail to offer any record evidence to support a finding that the EOs and protocols unconstitutionally disfavor religion.  Rather, they mischaracterize the EOs in an attempt to distract the court from the fact that the adopted protocols were carefully calibrated to respond to the distinctive environments they address based upon the risk of transmission.

For example, gatherings of up to 50 people, including religious gatherings, were permitted under EO 202.3, even though that EO ordered various businesses, such as restaurants, video lottery and casino gaming facilities, gyms, fitness centers and movie theaters, to close.  Kerwin Decl. at Exh. 3. Gatherings, including religious gatherings, were permitted to continue up to 50 people when schools were closed by EO 202.4.  Id. at Exh. 4. They also continued to be permitted when indoor malls, and all places of public amusement, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, arcades, fairs, children's play centers, funplexes, theme parks, bowling alleys, family and children's attractions were closed by EO 202.5.  Id. at Exh. 5.

Gatherings of up to 50 people continued to be permitted when the Governor ordered the reduction of the in-person workforce by 50 percent by EO 202.6.  Id. at Exh. 6.  They continued to be permitted when all personal care services businesses were ordered to close, and the in-person workforce was reduced by 75 percent by EO 202.7. Id. at Exh. 7. When EO 202.8 reduced the in-person workforce by 100 percent, gatherings up to 50 people continued to be permitted.

EO 202.10 prohibited all gatherings "of any size for any reason." Id. at Exh. 10. Thereafter, EO 202.31 permitted gatherings for religious and Memorial Day services up to 10 people. Id. at Exh. 31.  Gatherings up to 10 people were later permitted by EO 202.33 for any purpose.  Id. at Exh. 33.  Thereafter, notwithstanding the 10-person gathering limit applicable to all gatherings, drive-in religious services were allowed to take place in Phase 1 regions without a gathering limit so long as there was no contact between participants. Id. at Exhs. 32, 33. In Phase 2, notwithstanding that all other large-capacity venues must remain closed, places of religious worship may open up to 25 percent capacity.

This evolution of the closing and opening of New York demonstrates that, at no time, has religion been disfavored or targeted in any way. But, for some unascertainable reason, plaintiffs point to this careful consideration as unconstitutional "targeting" of religion.

In any event, any limitations on religion caused by the EOs or protocols are merely incidental.  As the complaint demonstrates, plaintiffs Soos and Stamos can, and have been, holding masses in the North Country churches that they serve. Dkt. No. 1 at ¶¶94, 97. That the services cannot take place at the times, with the frequency, and groups sizes that they prefer are merely incidental burdens not protected by the First Amendment. Id. at ¶¶89-97. Similarly, plaintiffs Schonbrun, Perr and Mayerfeld may attend services as part of a minyan.[7] Id. at ¶¶128, 148, 150,

---

[7] While plaintiffs Schonbrun, Perr and Mayerfeld allege that their wives and children cannot attend services, they lack standing to assert any challenges on behalf of their wives, and are not alleged in the complaint to be bringing representative claims on behalf of their children. Typically, "a party 'must assert his own legal rights' and 'cannot rest his claim to relief on the legal rights . . . of third parties.'" Sessions v. Morales-Santana, 137 S.Ct. 1678, 198 L. Ed. 2d 150, 162 (2017) (quoting Warth v. Seldin, 422 U. S. 490, 499 (1975)).  As the complaint does not allege that the wives of plaintiffs are "hindered" in any way in bringing their own lawsuit, id. (stating that hindrance must  "stem[] from disability," not "disinterest,"), and plaintiffs did not assert representative claims on behalf of minor children, the claims are theirs alone.

160-161. Since gatherings up to 10-people are permitted – unlike at the times that they encountered police intervention – they are not unlawful and may proceed.

Since they are both generally applicable and neutral, the EOs and protocols need only be supported by a rational basis. See Fortress Bible Church v. Feiner, 694 F.3d 208, 220 (2d Cir 2012). As discussed above, they are so supported. Accordingly, plaintiffs cannot establish that they are likely to succeed on the merits of their free exercise claim.

**B. Free Speech, Expressive Association and Assembly**

In both their complaint, Dkt. No. 1, and memorandum of law in support of their TRO application, Dkt. No. 2-4, plaintiffs discuss the freedoms of speech, expressive association and assembly as a single concept and one cause of action. Dkt. No. 1 at ¶¶178-186; Dkt. No. 2-4 at pp. 19-22. While plaintiffs may wish to conflate the issues to avoid appropriate constitutional analysis, considerations of each First Amendment freedom are necessary to determine whether plaintiffs are likely to succeed on the merits of their claim.

*1. Freedom of Speech*

First, the First Amendment guarantee of free speech protects the right to be free from government-compelled speech or expressive conduct. Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 61 (2006); West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 642 (1943)). It "prohibits the government from telling people what they must say," not what they must do. Rumsfeld, 547 U.S. at 61. Nothing in the EOs or protocols dictates what plaintiffs may or may not say. Instead, they dictate how many people may congregate in a single space at one time, and the distances people must maintain while doing so. Because they regulate conduct, and not speech, the EOs and protocols do not implicate the right to free speech.

*2. Freedom of Expressive Association*

Second, the First Amendment right to expressive association protects the "'right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" Boy Scouts of America v. Dale, 530 U.S. at 640, 647 (2000) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984)).  However, the freedom of association "is not absolute." Id. at 648.  Incidental burdens on associational interests do not violate the First Amendment. Indeed, unless the burden on expressive association rights is "severe," the law need only be supported by a rational basis. Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts, 852 F.3d 178, 191 (2d Cir. 2017).

Here, any burden on expressive association rights resulting from the EOs or protocols are merely incidental. "Mere incidental burdens on the right to associate do not violate the First Amendment; rather, to be cognizable, the interference with plaintiffs' associational rights must be direct and substantial or significant." Tabbaa v. Chertoff, 509 F.3d 89, 101 (2d Cir. 2007) (internal quotation and alteration from original omitted); accord Fighting Finest v. Bratton, 95 F.3d 224, 228 (2d Cir. 1996) (citing Lyng v. Intl. Union, 485 U.S. 360, 367 & n.5 (1988)). For the same reasons, discussed above, that any burden on plaintiffs' free exercise of religion is incidental, so is any burden on plaintiffs' expressive association rights.  Plaintiffs are not precluded from associating for religious purposes; their groups must just be smaller and people must maintain safe physical separation. The burdens alleged by plaintiffs are precisely the type of incidental burdens that the First Amendment does not protect.

For the same reasons discussed above in connection with plaintiffs' free exercise claim, the gathering limits, guidance, and physical distancing protocols are rationally related to the State's interests in protecting the public health during the COVID-19 pandemic.

*3. Freedom of Assembly*

Third, the "right of the people to peaceably assemble" is protected by the First Amendment. U.S. Const. Amend. I. "However, courts have long held that the constitutional right to assembly…is not absolute." Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, **27-28 (D. Conn. May 19, 2020). Public gatherings may be stopped if they pose, *inter alia*, a "threat to public safety." Papineau v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006).

When distilled to the facts as alleged by plaintiffs, plaintiffs' actual argument appears to be that the EOs limiting gatherings, and associated protocols, prevent them from assembling for congregate religious purposes in locations of their choosing, in unlimited groups, without maintaining safe physical distance. Plaintiffs cannot succeed on the merits of this claim, and, therefore, the TRO sought by plaintiffs should be denied for the same reasons that the TRO was recently denied by the court in Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758 (D. Conn. May 19, 2020).

In Amato, the restaurant owner plaintiffs challenged an EO limiting gatherings in Connecticut to six people in light of the COVID-19 pandemic. Id. at **1, 12. Like the court in South Bay, the court in Amato relied heavily on the Supreme Court decision in Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905), and stated

> while the power of state governments during an epidemic is, of course, not limitless [citation omitted], Jacobson requires that courts refrain from second guessing state governments' responses unless there is "no real or substantial relation" between the actions and the public health and safety or the action is 'beyond all questions, a plain, palpable invasion of rights.

Amato, 2020 U.S. Dist. LEXIS 87758 at **28-29. The court further stated that "[e]ven constitutional rights, including First Amendment rights, are subject to 'reasonable conditions' to preserve public health." Id. at *29.

Applying this standard[8] to the 6-person gathering limitation, the court held that the "COVID-19 pandemic constitutes the sort of public health crisis—or 'epidemic of disease which threatens the safety of [a community's] members'—contemplated by the Jacobson court, and the Executive Order "has a 'real and substantial relation' to the state's goal of curbing the spread of the virus."[9] Id. at *30.

The same result is required here. The gathering limits challenged by plaintiffs are "not 'arbitrary,' not 'unreasonable,' and not 'beyond all question, a plain, palpable invasion of rights.'" Id. at *31. While the EOs limit the size of gatherings, they do "not altogether prohibit [p]laintiffs from assembling with other people, nor [do they] limit with whom [p]laintiffs may assemble. Courts have upheld more extreme measures taken in response to public health needs, including quarantines, which limit a person's right to assemble with *any* other person." Id. (emphasis in original).

For these reasons, plaintiffs cannot succeed on the merits of their freedom of assembly claim, and, therefore, plaintiffs' request for a TRO should be denied. Id. at **32, 39.

## C. Equal Protection

Plaintiffs appear to challenge a perceived distinction between "essential gatherings

---

[8] The court stated: "I find that the standard articulated in Jacobson applies here. The decision has never been overturned…Since the outbreak of the COVID-19 pandemic, courts around the country have applied Jacobson's standards to state orders intended to combat the virus. [Citations omitted.]" Amato at **29-30. See also Phillips v. City of New York, 775 F.3d 538, 543 (2d Cir. 2015) ("'The right to practice religion freely does not include liberty to expose the community . . . to communicable disease . . . .'") (quoting Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944)).

[9] The court noted that the EO was "imposed in light of recommendations from the CDC and the Connecticut Department of Public Health to implement 'community mitigation strategies to increase containment of the virus'…" Amato at *31.

without gathering-size limitations" and non-essential gatherings subject to "unique burdens." Dkt. No. 2-4 at p. 21. While difficult to comprehend, it appears that plaintiffs claim that religious services are subject to different gathering limits than businesses and other activities. Id. at p. 22. See also Dkt. No. 1 at 187-197. As noted above, the Supreme Court has recognized that such distinctions are rational. South Bay at *2.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV. Its command is essentially a direction that all persons similarly situated should be treated alike. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). An equal protection claim cannot be maintained unless a plaintiff shows that it is not being treated the same as similarly situated individuals. New York State Club Assoc. v. City of New York, 487 US 1, 17-18 (1988); Tigner v. State of Texas, 310 U.S. 141, 147 (1940) (the Equal Protection Clause "does not require things which are different in fact or opinion to be treated in law as though they were the same").

Like those in South Bay, the gathering restrictions applicable to other large-capacity indoor-gatherings are either the same, or stricter, than those applicable to places of worship. South Bay at *2. Places in which larger gathering limits are permitted involve "dissimilar activities, such as…grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods." Id. Accordingly, to the extent that plaintiffs allege that the EOs and protocols permit higher gathering limits for dissimilar locations or activities, the Equal Protection clause is not implicated because the comparators are not similarly situated. Additionally, because the gathering limits are rationally related to the State's interests in protecting the public health, plaintiffs cannot establish that they are likely to succeed on the merits of their equal protection claim.

**D. Lack of State Authority**

Since plaintiffs will not be able to succeed on the merits of their federal claims, the court should decline to exercise pendent jurisdiction over plaintiffs' state claims pursuant to 28 U.S.C. § 1367(c)(3).   Additionally, the Eleventh Amendment prohibits federal courts from ordering state officials to conform their conduct to state law. Pennhurst State Sch. v. Halderman, 465 U.S. 89 (1984).  As a result, plaintiffs cannot establish that they are likely to succeed on the merits of their state claims.

In addition, the EOs were issued in accordance with state and federal law. The power to impose quarantines and other public health measures in response to a pandemic is among the most fundamental police powers reserved to the states by the Tenth Amendment to the United States Constitution. Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905); Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health, 186 U.S. 380, 387 (1902); Morgan S.S. Co. v. La. Bd. of Health, 118 U.S. 455, 460 (1886); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203 (1824). "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson, 197 U.S. at 27. Accordingly, "when [a] state faces a major public health threat…its Tenth Amendment police and public health powers are at a maximum." Legacy Church, Inc. v. Kunkel, 2020 U.S. Dist. LEXIS 68415, **97-98 (D.N.M. Apr. 17, 2020) (citing Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease….")).

The standard of review accorded to a state's exercise of its emergency police powers is highly deferential. An action taken pursuant to those police powers must only be "reasonably necessary" to respond to a public health emergency to survive constitutional scrutiny. Friends of

Devito v. Wolf, 2020 Pa. LEXIS 1987, *39 (PA Sup. Ct., Apr. 13, 2020) (relying on Lawton v. Steele, 152 U.S. 133 (1894)). See also In re Abbott, 954 F.3d 772, 784 (5th Cir. 2020); Smith v. Avino, 91 F.3d 105, 109 (11th Cir. 1996) ("the scope of review is limited to . . . determin[ing] whether" state "actions were taken in good faith and whether there is some factual basis" for them); Legacy Church, Inc., 2020 U.S. Dist. LEXIS 68415 at *122. The details of the response represent a "policy choice" within the governor's discretion. Friends of Devito, 2020 Pa. LEXIS 1987 at *39. See also In re Abbott, 954 F.3d at 791. Thus, invalidation of reasonable emergency measures promulgated pursuant to the state's police power to respond to a global pandemic "would usurp the functions of another branch of government." Jacobson, 197 U.S. at 28.

Far more intrusive measures than those at issue here fall within a state's police power to respond to a public health emergency. See, e.g., id. at 26, 31 (state may compel vaccination against smallpox on pain of criminal prosecution); cf. Legacy Church, Inc., 2020 U.S. Dist. LEXIS 68415 (emergency order restricting places of worship to five individuals or fewer within state's police power); In re Abbott, 954 F.3d at 787-788 (holding that temporary ban on all "non-essential" abortions did not violate United States Constitution). In sum, emergency measures in the face of a pandemic are "the most essential of powers, at times the most insistent, and always one of the least limitable powers of government." District of Columbia v. Brooke, 214 U.S. 138, 149 (1909).

### 1. New York Statutory Law

Consistent with the constitutional exercise of the State's police power to respond to imminent threat to the health of the citizenry, the Executive Law gives the governor broad power to respond to a disaster such as COVID-19. See generally N.Y. Exec. Law Art. 2-b ("State and Local Natural and Man-Made Disaster Preparedness"). "Whenever the governor, on his [or her]

own initiative or pursuant to a request from one or more chief executives, finds that a disaster has occurred or may be imminent for which local governments are unable to respond adequately, he shall declare a disaster emergency by executive order." N.Y. Exec Law § 28(1). A "disaster" is any "occurrence or imminent, impending or urgent threat of wide spread or severe damage, injury, or loss of life or property resulting from any natural or man-made causes, including, but not limited to . . . disease outbreak . . . ." Id. at § 20(2)(a).

The EO declaring a state disaster emergency "shall include a description of the disaster, and the affected area." Id. at § 28(3). The state disaster emergency starts on the date of the declaration and ends "upon the termination" of the disaster declaration. Id. at § 20(2)(b). The initial state disaster emergency declaration cannot exceed six months, but "[t]he governor may issue additional orders to extend the state disaster emergency for additional periods not to exceed six months." Id. at § 28(3).

The EOs issued to address the COVID-19 pandemic, Kerwin Decl. at Exhs. 0-40, are in compliance with these standards.  As mentioned above, on March 7, 2020, Governor Cuomo issued EO 202. Supporting the executive order, the Governor found "that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately." Kerwin Decl., Exh. 0. Accordingly, the Governor declared a "state disaster emergency for the entire state of New York," to be in effect until September 7, 2020. Id. EO 202, and each subsequent EO, references the current state disaster emergency.

Since the EOs were issued in accordance with the Executive Law, plaintiffs cannot demonstrate that they are likely to succeed on the merits of their claim that the EOs were issued in excess of the Governor's statutory authority.

## 2. *New York Constitution*

Plaintiffs allege that the EOs and protocols violate the separation of powers doctrine derived from New York's Constitution. Dkt. No. 1 at 203-205 (alleging violations of art. III, § 1; art. IV, § 1; art. VI). Contrary to plaintiffs' assertions, legislative action as not required to implement the EOs and associated protocols.

"Article III of the State Constitution vests the Senate and the Assembly with the legislative power of the State, while article IV vests the executive power in the Governor and article VI vests the court system with the judicial power." Saratoga County Chamber of Commerce v. Pataki, 100 N.Y.2d 801, 821 (2003) (citing N.Y. Const. art. III, § 1; art. IV, § 1; art. VI, § 1). The Court of Appeals has recognized that these "'separate grants of power to each of the coordinate branches of government' imply that each branch is to exercise power within a given sphere of authority." Id. (quoting Clark v Cuomo, 66 N.Y.2d 185, 189 (1985). See also Bourquin v Cuomo, 85 N.Y.2d 781, 784 (1995); Matter of New York State Health Facilities Assn. v Axelrod, 77 N.Y.2d 340, 349 (1991).

Since, as described above, the EOs were issued in accordance with the authority granted to the Governor by the New York Legislature through the enactment of Article 2-b of the Executive Law, plaintiffs cannot establish that the EOs were issued in excess of the Governor's authority.

Since plaintiffs have failed to make the requisite showing that they are likely to succeed on any of their causes of action, their motion for a TRO must be denied. However, even if, *arguendo*, the court finds that likelihood of success has been sufficiently proven, plaintiffs' application for temporary injunctive relief should nevertheless be denied because plaintiffs

cannot establish that (1) they will suffer irreparable harm in the absence of a TRO, (2) the

equities balance in their favor, or (3) the issuance of TRO is in the public interest

POINT II

PLAINTIFFS FAIL TO ESTABLISH THAT
THEY WILL SUFFER IRREPARABLE HARM IF A
TEMPORARY RESTRAINING ORDER IS NOT
GRANTED DURING THE PENDENCY OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION

"Although 'the loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury,'" courts "have not consistently presumed

irreparable harm in cases involving allegations of the abridgement of First Amendment rights[.]"

Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349 (2d Cir.2003) (quoting Elrod v.

Burns, 427 U.S. 347, 373 (1976)).  See also CompassCare v. Cuomo, 2020 U.S. Dist. LEXIS

98930, *30 (N.D.N.Y. June 5, 2020).  A movant is entitled to the presumption that a loss of First

Amendment freedoms constituted irreparable harm only when he or she "alleges injury from a

rule or regulation that *directly limits*" a First Amendment right. Bronx Household of Faith, 331

F.3d at 349 (emphasis added).  See also Rossi v. Fischer, 2014 U.S. Dist. LEXIS 158064, *40

(S.D.N.Y. Sept. 11, 2014).

In this case, irreparable harm should not be presumed because, as discussed above,

plaintiffs are not being prohibited from exercising their rights; instead, the manner in which they

may exercise them has changed – including the size of the groups in which they may congregate.

Plaintiffs devote only two paragraphs of their memorandum of law to the issue of irreparable

harm, relying only on an expectation that such harm should be presumed simply because

plaintiffs have alleged violations of First Amendment rights in their complaint.  Dkt. No. 2-4 at

23

p. 23-24. By doing so, plaintiffs have ignored the reality of the limitations imposed by the EOs and protocols, and the fact that they may still exercise their rights.

Specifically, the complaint alleges that plaintiffs Soos and Stamos can perform and attend Sunday masses. Dkt. No. 1 at ¶¶94, 97. The complaint also alleges that worshippers of at churches served by plaintiffs Soos and Stamos can work within the 25% limitation capacity. Id. at 93, 94. It simply is not unconstitutional to require priests to work more, or differently, than they prefer. Similarly, the discomfort associated with attending services in vehicles, id. at 97, and the logistical difficulties associated with performing drive-in services, id., are not irreparable harms that preliminary injunctive relief is designed to prevent.

Plaintiffs Schonbrun, Perr and Mayerfeld have failed to allege, must less prove or support, any irreparable harm at all. They are all permitted to participate in a minyan. Nothing about the EOs currently in effect may prevent it. Plaintiffs' claims about alleged harms they suffered in March and April are completely irrelevant to whether they will suffer irreparable harm before a decision is issued on plaintiffs' motion for a preliminary injunction.

Additionally, speculative harm is not sufficient to entitle a party to a TRO. The complaint alleges that the Nicholville church may exceed gathering limits when children return to school. Since children are not now in school, any harms associated with school days is irrelevant to whether plaintiffs will suffer irreparable harm in the short period before the court issues a decision on plaintiff's motion for a preliminary injunction. Similarly, speculation about weddings, Dkt. No. 1 at ¶96, or burial services, id. at ¶101, that may occur in the future is precisely the type of "harm" that is insufficient to support a finding of irreparable harm necessary to justify a TRO.

Additionally, plaintiffs have not submitted any declarations from any plaintiff, or any

other member of plaintiffs' churches or synagogues, to demonstrate that the EOs have, in fact, hindered anyone's ability to assemble and participate in congregate religious services. In fact, the allegations of the complaint, itself, document that masses are still being held and attended in the North Country churches served by plaintiffs Soos and Stamos, and the plaintiffs living in Brooklyn may, and are, attending services. In light of this record, plaintiffs necessarily cannot establish that they will suffer irreparable harm in the short period before their preliminary injunction motion is heard and decided.

POINT III

### THE EQUITIES BALANCE IN FAVOR OF THE STATE'S EFFORTS TO PROTECT THE PUBLIC HEALTH DURING THE EXISTING PANDEMIC, AND ISSUANCE OF A TRO IS NOT IN THE PUBLIC INTEREST

Because plaintiffs cannot establish the likelihood of success on the merits of their claims, or irreparable harm, the court need not consider "the public's interests in a temporary restraining order or the balance of the equities." Amato at **38-39. In any event, and critically, the equities balance in favor of continuing the State's aggressive response to a deadly pandemic, in accordance with the State's thoroughly informed, complex paradigm based upon a "dynamic and fact intensive" analysis, without the interference of the courts that lack such expertise. South Bay at *3. Moreover, the risk of resurgence countenances against any short relief requested by plaintiffs. For these reasons, a TRO would not be in the public interest and would, in fact, run counter to the public intertest in stopping the spread of the virus.

**CONCLUSION**

For the reasons discussed above, and in the declaration of Brad Hutton submitted herewith and incorporated herein, and the facts supported by the exhibits annexed to the Hutton

declaration and the declaration of Adrienne J. Kerwin, plaintiffs' application for temporary

preliminary injunctive relief should be denied in its entirety.

Dated: Albany, New York
June 15, 2020

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants Andrew M. Cuomo
      and Letitia James
The Capitol
Albany, New York  12224

By: *s/ Adrienne J. Kerwin*
Adrienne J. Kerwin
Assistant Attorney General
Bar Roll No. 105154
Telephone:  (518) 776-2608
Fax:  (518) 915-7738 (Not for service of papers)
Email: Adrienne.Kerwin@ag.ny.gov

TO:    Christopher A. Ferrara, Esq. (via ECF)
       148-29 Cross Island Parkway
       Whitestone, NY  11357

       Melanie V. Sadok (via ECF and email)
       Senior Counsel
       NYC Law Department
       100 Church Street
       New York, NY 10007