IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REV. STEVEN SOOS, | ) |
| REV. NICHOLAS STAMOS, | ) |
| DANIEL SCHONBRUN, | ) |
| ELCHANAN PERR and | ) |
| MAYER MAYERFELD | ) |
| Plaintiffs, | ) Case No.  1:20-cv-0651 |
| v. | ) |
| ANDREW M. CUOMO, Governor of the State of New York, in his official capacity, | ) |
| LETITIA JAMES, Attorney General of the State of New York in her official capacity, and | ) |
| BILL DE BLASIO, Mayor of the City of New York, in his official capacity, | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN REPLY TO DEFENDANTS'
MEMORANDA OPPOSING PLAINTIFFS' APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**INTRODUCTION**……………………………………………………………………………….1
**DISCUSSION**……………………………………………………………………………………4
   **I.**   **LIKELIHOOD OF SUCCESS ON THE MERITS**……………………………………4
      A. Jacobson's Role…………………………………………………………………...4
      B. Free Exercise of Religion………………………………………………………….5
      C. Free Speech, Freedom of Assembly, and Expressive Association………………..12
      D. State Law Claims…………………………………………………………….....13
   **II.**   **IRREPARABLE HARM**……………………………………………………………14
   **III.**   **BALANCE OF EQUITIES AND PUBLIC INTEREST**……………………………15
   **IV.**   **RELIEF SOUGHT**…………………………………………………………………15
**CONCLUSION**……………………………………………………………………………….. 16

# TABLE OF AUTHORITIES

**Cases**

*Adams & Boyle P.C. et al. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) .............................................. 5

*Butler v. City of New York*, 20-cv-4067 (S.D.N.Y. June 5, 2020) .................................................. 13

*Calvary Chapel*, 2020 U.S. Dist. LEXIS 103234 at *12 (D. Nev. June 10, 2020) ....................... 10

*Central Rabbinical Congress of U.S. & Canada v. New York Dep't of Health*, 763 F.3d 183, 197
 (2d Cir. 2014) .............................................................................................................................. 6

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 914 n. 6 (1990 ......... 2

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999)
 ................................................................................................................................................... 10

*Geller v. de Blasio*, 2020 WL 2520711 (May 18, 2020) ............................................................... 13

*Johnson v. Perry*, 859 F.3d 156, 165 (2d Cir. 2017) ..................................................................... 12

*Litzman v. New York City Police Dep't*, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 14, 2013) ...... 9

*Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) .............................................................. 14

*Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) ..................................................................... 4

*South Bay United Pentecostal v. Newsom* -- S. Ct. ---, 2020 WL 2813056 (May 29, 2020) ......... 2

*Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012) ......................................................................... 9

*Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) .................................................. 13

**INTRODUCTION**

Defendants' opposition memos are as remarkable for what they do *not* say as for what they do. Most strikingly, Defendants Governor Andrew Cuomo and Attorney General Letitia James say not a word about the recent exemption (whether de facto or de jure) from the challenged gathering-size limits for mass protests against racism and the unjust death of George Floyd. (*See* State's Br. at pp. 1-26.) This despite Plaintiffs' reliance on the exemption as a primary comparator undermining the constitutionality and even the rationality of Defendants' gathering limits as applied to worship services. (Plaintiffs' TRO/PI Br. at pp. 1-3, 10-21.)

Apparently, Defendants concede that assembling of tens of thousands of people across the Brooklyn Bridge, for example (*see* V. Compl. ¶69, FN 8), poses no legally relevant public health risk of spreading COVID-19, and neither, therefore, can much smaller and more-socially distanced religious gatherings. *See* Hutton Decl., ECF No. 20 at ¶¶11-13 E (citing the CDC for the principle that social distancing is one of the best tools for reducing the spread of COVID-19, without mentioning gathering-size limits). Or it might be that the exemption for mass protests so obviously undermines the general applicability and content-neutrality of the gathering-size limits (including the surprisingly ongoing ban on *outdoor* gatherings of 10 or more people) that it is simply futile to argue otherwise. Whatever the reason, the silence is deafening.

Nor do the state Defendants or Defendant Mayor de Blasio dispute that the exemption for mass protests is a religion-preclusive individualized exemption subject to strict scrutiny under the Free Exercise Clause. (State's Br. at pp. 10-14; City's Br. at pp. 5-9; *see also* Pl.'s TRO/PI Br. at pp. 9-12.). And neither the state nor the city Defendants contend that if the gathering-size limits are subject to strict scrutiny, they advance a compelling interest. (Id.) Indeed it would be nearly impossible to do so after the exemption for the mass protests. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in [the Supreme Court's]

strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."). These omissions are staggering and ought to be viewed as dispositive in favor of the relief plaintiffs request—limited, if the Court deems it necessary, in the manner to which plaintiffs would agree, as they make clear below. *See* Point IV, Relief Requested.

Of course, what Defendants *do* say is equally troubling. Defendants state, in so many words, that the Supreme Court's 1905 decision in *Jacobson v. Commonwealth of Massachusetts* is a blank check to run roughshod over Plaintiffs' constitutional rights while generously accommodating the rights of tens of thousands of George Floyd protesters. (State's Br. 15, n. 8, 19-20; City's Br. 3, 8.) They also view the U.S. Supreme Court's recent "decision" in *South Bay United Pentecostal v. Newsom* as controlling despite (a) the Court's refusal to address the underlying merits questions now before this Court; (b) the absence in the facts presented of anything approaching an exemption for mass protests; and (c) the status of Chief Justice Roberts' lone observations as conditionally phrased dicta, at a procedural phase in the case, and certainly not a "decision of the Supreme Court" that in any way ties the judicial hands regarding the merits of this case. -- S. Ct. ---, 2020 WL 2813056 (May 29, 2020).

Worse, the state Defendants have the audacity to declare there is no irreparable harm to Plaintiffs here because only "the manner in which they may exercise [their rights] has changed"— a base euphemism that could justify untold amounts of constitutional violations if it were taken seriously and in essence a concession to plaintiffs' position, *see* Point II, on the central issue. *See, e.g., Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 914 n. 6 (1990) (Blackmun, J., dissenting) (observing that during the Prohibition era, the government's general

interest "in prohibiting the use of alcohol . . . could not plausibly have asserted an interest sufficiently compelling to outweigh Catholics' right to take communion.")

All told, Defendants have said nothing to undermine Plaintiffs' original arguments. Defendants' gathering-size limits clearly burden Plaintiffs' First Amendment rights to engage in corporate worship consistent with their sincerely held religious beliefs. And the ongoing exemption for mass protests blows a gaping hole in any semblance of the policy's general applicability and neutrality (including content neutrality), as do other key comparators like crowded drop-in centers, homeless shelters, manufacturing businesses, and more (all similarly situated activities not evaluated by Chief Justice Roberts in *South Bay*).

While Plaintiffs understand the ongoing risks of COVID-19, they are committed to following the "Temporary Recommendations" outlined in the declaration of their expert witness, Dr. George Delgado. (Delgado Dec., ECF No. 2, Ex. 1, ¶53.)[1] As the rate of infection drops well below 1.0 and Defendants exempt all manner of other (and more risky) gatherings that involve large crowds, with people in close proximity, for prolonged periods of time, the right to communal religious worship is entitled to at least equal treatment. The First Amendment allows no less. A Temporary Restraining Order (TRO) and Preliminary Injunction (PI) should thus issue.

---

[1] The city Defendants argue that the Jewish plaintiffs, as lay congregates, cannot guarantee their synagogues will abide by Dr. Delgado's social distancing and hygiene protocols. (City's Br. at p. 7, n.3.) But allowing Plaintiffs to participate only in socially-distanced religious services would still allow the state to shut down any religious services that violate social distancing. It also gives synagogues a high incentive to comply given that many other congregants likely share Plaintiffs' desire to return to congregate religious worship. Finally, this issue did not pose a problem for the Sixth Circuit U.S. Court of Appeals when it granted an injunction pending appeal to *individual congregants* to return to in-person church services so long as the individual plaintiffs "are willing to practice social distancing" and "are willing to follow any hygiene requirements." *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020).

3

## DISCUSSION

I.  **LIKELIHOOD OF SUCCESS ON THE MERITS**

    A.    *Jacobson*'s Role

Defendants argue *Jacobson* requires that this Court *must* defer to their judgment about the proper scope of gathering-size limits at this time. (State's Br. 15, n. 8, 19-20; City's Br. 3, 8.) But *Jacobson* is hardly the absolute warrant for rights-suspension that defendants suggest. In *South Bay*, for instance, Chief Justice Roberts, writing alone, merely noted in an isolated concurrence that, under *Jacobson*, government officials have broad discretion to enact measures to protect public health during a pandemic. *Id.*, 2020 WL 2813056 at *1 (Roberts, C.J., concurring). But he said the judiciary should not second guess these judgments *only* "[w]here those broad limits are not exceeded." *Id*. Thus, it is clear that *Jacobson* does not grant government officials the absolute right to limit constitutional rights free from judicial review merely because they cry "Emergency!" Rather, as is well known by now, *Jacobson* condemns invoking a pandemic to restrict liberties where the law "has no real or substantial relation to [protecting public health], or is, beyond all question, *a plain, palpable invasion of rights* secured by the fundamental law." *Jacobson*, 197 U.S. at 28(emphasis added).

Unsurprisingly, numerous courts in recent months have recognized that *Jacobson* does not authorize arbitrary, unreasonable restrictions on various constitutional rights, even in the name of protecting the public health from COVID-19. *See, e.g.*, *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (granting injunction pending appeal against Kentucky's temporary ban on in-person services notwithstanding *Jacobson*); *First Pentecostal Church of Holly Springs v. City of Holly Springs, Miss.*, 959 F.3d 669, 670 (5th Cir. 2020) (same re: Holly Springs, Mississippi's similar restriction); *Yashica Robinson v. Atty Gen., State of Alabama.*, 947 F.3d 1171, 1179 (5th Cir. 2020) (upholding preliminary injunction against state orders restricting abortion for the purpose of

4

slowing COVID-19, and stating *Jacobson*'s "ruling was not an absolute blank check for the exercise of governmental power"); *Adams & Boyle P.C. et al. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) (same, and holding that state restriction on abortion rights was an unquestionable "plain, palpable invasion of rights" under *Jacobson*).

Here, it is still abundantly clear that *Jacobson* does not control the outcome of this case. (Pl.'s TRO/PI Br. at pp. 4-5.) But even taking *Jacobson* at face value, the underinclusivity of Defendants' limits on gatherings (especially in light of the exemption for mass protests against racism) is an unquestionable plain, palpable invasion of Plaintiffs' fundamental rights and is not substantially related to the goal of slowing COVID-19, especially where Defendants' own exemptions for secular activity show that less restrictive means are readily available and effective (i.e., social distancing and hygiene and sanitization requirements). (Hutton Dec., ECF 20, ¶¶11-13.) Defendants have thus exceeded their "broad limits," as contemplated by Chief Justice Roberts, in slowing COVID-19, rendering their gathering-size limits subject to close judicial scrutiny.

**B.      Free Exercise of Religion**

1. <u>Burdens</u>: The state Defendants argue their limitations on gatherings do not actually burden any Plaintiffs, noting that the two priest Plaintiffs in the North Country continue to say Masses, and that the three Jewish congregants in New York City "may" attend Jewish worship services as part of the 10-person minyan . (State's Br. pp. 13-14.) But Plaintiffs all have sincerely held religious beliefs to engage in *congregate* religious services. As to the priest Plaintiffs (Soos and Stamos), this includes engaging in "religious ministry and priestly mission to their flock," including by way of the in-person delivery of Sacraments to their entire congregations. (V. Compl. ¶¶86-88.) As to the Jewish congregants (Schonbrun, Perr, and Mayerfeld), this includes participating in Jewish worship services even after the 10-person minyan has already assembled,

5

as they have no way of guaranteeing before arriving whether 10 men have already assembled, and thus whether they can participate in the minyan. (V. Comp. ¶112.)

Additionally, these Plaintiffs have been prevented from participating in worship or religious services with their family members, who, as women and children, generally are not eligible for the minyan. (V. Compl. ¶¶129 (Schonbrun continually prevented from bringing son to synagogue); 148 (Perr unable to have Bar Mitzvah for son and continually prevented from attending synagogue with his wife and four daughters); and 162 (Mayerfeld continually prevented from bringing wife and daughter to synagogue services).) (*See also* Mayerfeld Dec. ¶¶6-9.) As a result, these Plaintiffs are unable to fulfill their parental obligations to incorporate their children into their religious traditions and to enjoy the companionship of worshiping with their spouses. While these burdens alone do not make Plaintiffs' case, they are legally cognizable and trigger First Amendment scrutiny of Defendants' gathering-size limitations.[2]

2. <u>General Applicability</u>: The state Defendants' rely on an unduly narrow rule taken from a district court case that was clarified on appeal in the controlling Second Circuit decision in *Central Rabbinical Congress of U.S. & Canada v. New York Dep't of Health*, 763 F.3d 183, 197 (2d Cir. 2014) on which plaintiffs relied in their opening brief. In *Central Rabbinical Congress* the Court made it clear that general applicability and neutrality *are two separate requirements* of the Free Exercise Clause. *Id.*

---

[2] The state Defendants argue the three Jewish Plaintiffs lack standing to assert claims on behalf their wives and children. (State's Br. p. 13, n. 7.) But Plaintiffs assert standing on their own behalf, not on behalf of their wives and children. The burdens on their wives and children are relevant, however, to the extent their inability to attend worship services deprives Plaintiffs' of their sincerely held religious beliefs to participate in and attend congregate worship or religious services, including with their wives and children.

6

Concerning the separate and distinct requirement of general applicability, the state Defendants studiously avoid a single mention of their gigantic exemption (whether de facto or de jure) for mass protests against racism. They merely announce the conclusion, in one cursory sentence, that the gathering limits are generally applicable because "on their face, and when considered in connection with the ongoing pandemic, [they] protect the entire public at large." (State's Br. at p. 11.) This *ipse dixit* is unsupported by legal or factual analysis—especially the fact of permitted and praised mass protests that undermine their entire "social distancing" regime, which they nonetheless continue to clamp down on religious gatherings a few people in a synagogue or park.

It seems the state Defendant's intended explanation is in an earlier section arguing that the Supreme Court's "decision" in *South Bay* controls this case. (Id. at p. 8.) It's true Chief Justice Roberts, not the Court, *individually opined* that houses of worship in California were similarly situated to places like concert halls, theatrical performances, and movie showings, "where large groups of people gather in close proximity for extended periods of time," and not to places like grocery stores. *South Bay*, 2020 WL 2813056 at *1 (Roberts, C.J., concurring). But the state Defendants argue that "[t]he same is true in New York"—while *completely ignoring* the exemption for mass protests, which post-date the decision in *South Bay* and obviously involve "large groups of people" who "gather in close proximity for extended periods of time." *Id*. The state Defendants also overlook other key comparators like manufacturers, drop-in centers, and homeless shelters, which also often involve large groups of people in close proximity for extended periods of time, and which went undiscussed in the Supreme Court's interlocutory decision in *South Bay*.

The city Defendant, on the other hand, does acknowledge the issue of mass protests and argues, inexplicably, that they do not undermine restrictions on gatherings. (City's Br. at pp.8-9.)

7

In particular, the city Defendant argues the mass protests are allowed only as a "temporary relaxation in enforcement" as a result of "public safety considerations," but that "the limitation remains in effect." (Id. at p. 8.) But the notion that the limitation is still in effect as to mass protests is simply untrue. Just this past Saturday thousands of people gathered for a "Black trans lives" rally outside the Brooklyn Museum in New York City, with no evidence the rally was forbidden.[3] A photo of the rally is below:



Indeed, the City's own brief cites to a New York City public health document dated June 8, 2020 titled "How to Protest Safely During the COVID-19 Pandemic" and gives all indications that protests are *allowed* and not that they are prohibited under a "temporary relaxation." (City's Br. p. 8, n. 5.) What's more, the city Defendant acknowledges its restrictions must be consistent with state directives (City's Br. at 2), and just this past Saturday Governor Cuomo stated at his regular press briefing that "You can protest" as long as you follow social distancing guidelines.[4]

---

[3] Doha Madani, "Rally for Black trans lives draws enormous crowd in Brooklyn," NBCNews.com, June 14, 2020, https://www.nbcnews.com/feature/nbc-out/rally-black-trans-lives-draws-packed-crowd-brooklyn-museum-plaza-n1231040.
[4] New York Governor Cuomo Holds Briefing, NBC News, June 14, 2020 (14:08), https://www.youtube.com/watch?v=O9bvSFzqfl0.

8

That the general gathering-size limits are still in place does not mean an unwritten exemption for mass protests is irrelevant. Courts have recognized that *de facto* exemptions qualify as individualized exemptions and undermine a policy's general applicability. *See, e.g.*, *Litzman v. New York City Police Dep't*, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 14, 2013) (holding that de facto exemption to beard limitation policy undermined policy's constitutionality); *see also Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012) ("What poses a problem is not the adoption of an anti-discrimination policy; it is the implementation of the policy, permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral manner to [Plaintiff].")

Additionally, it goes without saying that the city Defendant's newly minted "public safety" rationale for allowing the protests is wholly inconsistent with Mayor de Blasio's recent public statements. In particular, Mayor de Blasio recently said that mass protests against racism are allowed, while religious services are not, because the former involve "an entire nation simultaneously grappling with an extraordinary crisis seeded in 400 years of American racism[,] . . . [and] it's about a . . . deep American crisis[,] . . . [and] [t]his is a powerful, painful historical moment." (V. Comp. Ex. P.) That's a gratuitous value judgment in favor of the protests, not an allowance out of concern for public safety, contrived after the fact with a litigation motive that is plainly apparent: to provide cover for both the Mayor and the Governor's expedient exemptions from their obviously *not* generally applicable rule.

But even taking the public safety rationale at face value, exemptions for public safety, good though they may be, ultimately mean that the gathering limitations "regulate[] religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it," thus rendering the policy "substantially underinclusive" and,

9

therefore, non-generally applicable. *Central Rabbinical Congress of U.S. & Canada*, 763 F.3d at 197. Indeed, as then-Judge Alito once opined for the Third Circuit, an internal police-department policy forbidding police officers from wearing beards was non-generally applicable to the extent it exempted growing a beard for medical reasons. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999) Good though a medical exemption may be, it undermined the department's interest in police uniformity and thus required that a limitation on growing religious beards must undergo strict scrutiny. *Id*. at 365-366 (stating also that "when the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny"). The same is true here, where the government has made a value judgment favoring mass protests (whether for historical, public safety, or any other reasons) over religious gatherings and must therefore survive strict scrutiny.[5]

  The city Defendant further argues "one key difference" between religious services and protests is that the latter occur outdoors. (City's Br. at p. 7, n.4.) But this argument completely overlooks the "Open Your Lobby" campaign discussed in Plaintiff's opening memo. (Pl.'s TRO/PI Br. at p. 12.) This movement involves theaters, concert halls, and other similar entities across the state opening their lobbies to protestors to rest, charge phone batteries, snack, etc., without any limitations on gathering sizes, and with express instructions to not let police in. (Pl.'s TRO/PI Br. at 12.) The city Defendant cites no evidence that these activities fall outside Defendants'

---

[5] For this reason Plaintiffs disagree with last week's decision in *Calvary Chapel v. Sisolak* distinguishing outdoor protests from religious services on the rationale that the former are allowed only because "enforcement could result in greater harm than that sought to be avoided by the Directive." *Calvary Chapel*, 2020 U.S. Dist. LEXIS 103234 at *12 (D. Nev. June 10, 2020). But in New York the allowance for mass protests is not simply a "choice between which regulations or laws shall be enforced," *id*., but an affirmative exemption undermining the general applicability of the gathering-size policies. Thus, the argument collapses into the aforementioned argument that exemptions for even good secular reasons, but which nonetheless undermine the government's interest in slowing COVID-19, render the policy non-generally applicable.

exemptions for mass protests. Critically, no Defendant explains why *outdoor religious services* are not similarly situated to the protests and thus deserving of an exemption from the 10-person rule, which still applies outdoors even in Phase 3 regions like the North Country. Indeed, all Plaintiffs in this case are willing and able to have outdoor religious services and thus should be free of the 10-person limit restricting their ability to do so. *But see*, Mayerfeld Declaration at ¶¶ 3-5 (respecting Sabbath services versus daily prayer services).

  3. <u>Neutrality</u>: The state Defendants argue the gathering restrictions are neutral because in the early stages of the spread of COVID-19 in New York, religious gatherings were allowed up to 50 people for in-person gatherings while other businesses, entities, and schools were required to close. (State's Br. at pp. 20-21.) But, perhaps unsurprisingly, they do not mention Mayor de Blasio's tweet and threats directed exclusively at the Jewish community. (V. Compl. ¶¶53-54.) They also fail to acknowledge the Executive Order guidelines (a) specifically singling out "congregate services" for unique prohibitions and warnings, (V. Compl. ¶¶51-52), (b) imposing a 25% of capacity limit on indoor services in the North Country that specifically singles out religious services for disparate treatment relative to essential businesses and activities authorized in Defendants' original orders and subject to no limitations on percent of capacity (V. Comp. ¶36); and (c) a more favorable capacity limit of 50% for other favored businesses—double that permitted for religion—in New York's phased-in reopening plan. (Kerwin Dec., ECF No. 17, ¶¶25, 30.)

  In addition, the blatantly arbitrary nature of the restrictions on religious gatherings reveals a lack of neutrality. At his press briefing last weekend, for example, Governor Cuomo stated out of one side of his mouth that "[i]f you have large gatherings of people who are not socially distanced, who are not wearing masks, you *will* have an increased spread of the virus," (Cuomo Press Briefing Transcript, **Ex. A** at p. 26) (emphasis added), and out of the other side that as to the

whether the virus has spread as a result of the mass protests, "[w]e *don't know* what happened at the protests and we're still waiting to find out." (Id. at p. 33.) Meanwhile, there is evidence that New York City officials tasked with tracing those infected with COVID 19 *have been ordered to refrain from asking residents whether attended a Black Lives Matters rally*, which could of course undermine the expedient exemption for these officially favored rallies.[6] At the same time, New York City officials are welding shut gates at a park in a Jewish neighborhood ostensibly to prevent children from playing outdoors and possibly spreading the virus.[7]

This type of bald favoritism—bending over backwards to protect mass protests while obstinately maintaining that even socially-distant religious gatherings will certainly cause harm—lacks any basis in scientific evidence and betrays a lack of neutrality toward religion. Strict scrutiny should apply for this reason, too.

### C. Free Speech, Freedom of Assembly, and Expressive Association.

Plaintiffs concede the state Defendants' point that the right of expressive association is not necessarily analyzed in unison with the rights of free speech and assembly. (State's Br. at p. 2.) But it remains true that the right of peaceable assembly is a "cognate" right with the freedom of speech and can be analyzed together therewith. *Johnson v. Perry*, 859 F.3d 156, 165 (2d Cir. 2017). To that end, the state Defendants' one-paragraph free speech analysis completely omits any reference to the Supreme Court's decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), which made crystal clear that a regulation of speech based on its function or purpose is content

---

[6] Eric A. Blair, "COVID-19 Tracers in NYC Ordered Not Ask Those Who Test Positive If They Attend Protests," Gateway Pundit, June 15, 2020, https://www.thegatewaypundit.com/2020/06/covid-19-tracers-nyc-will-not-ask-test-positive-attended-protests/.

[7] Breitbart, "Watch: Orthodox Jews Cut Open Bill De Blasio's Locked Parks," June 15, 2020, https://www.breitbart.com/faith/2020/06/15/watch-orthodox-jews-cut-open-bill-de-blasios-locked-parks/.

based and subject to strict scrutiny. (State's Br. at p. 14.) Nor does it mention *McCullen v. Coakley*, 573 U.S. 464, 470 (2014), which clarified that if a regulation of speech requires "enforcement authorities to examine the content of the message," then it is content-based. As Plaintiffs explained in their opening memo, both of these principles apply here and render the gathering limits content-based and subject to strict scrutiny. (Pl.'s TRO/PI Br. at pp. 19-20.)

The city Defendant invokes two recent cases, *Geller v. de Blasio*, 2020 WL 2520711 (May 18, 2020), and *Butler v. City of New York*, 20-cv-4067 (S.D.N.Y. June 5, 2020) rejecting free speech challenges on behalf of non-Black-Lives-Matters protest activity. But only one of these cases was decided after the mass protests against racism began, and there is no indication in the court transcript the Defendant provides that the court closely evaluated the application of *Reed* and *McCullen*. (Peroti Dec., ECF No. 19, Ex. 4.) The city Defendant also cites numerous other cases in other states rejecting free speech and assembly challenges during COVID-19 lockdowns. (State's Br. at p. 4.) But the latest of these decisions was May 20, 2020, still five days before George Floyd's tragic deaths and the mass protests that New York and every major city in the United States allowed as a result. (Id.) But exempting the latter protest or a Black Trans Lives Matter protest at the Brooklyn Museum, but not other protests or religious mass gatherings, obviously involves a content-based exemption triggering strict scrutiny.

D.  **State Law Claims**

Notably, the state Defendants make only an oblique reference to Eleventh Amendment immunity, (State's Br. at p. 19) without acknowledging that "the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so," and that "[t]he State can waive the defense." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). The state Defendants have done just that here by including only an oblique reference to the rule and failing to develop any argument that Eleventh Amendment immunity applies. *See Norton v.*

13

*Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived.").

Tellingly, the state Defendants never rebut Plaintiffs' argument that New York Executive Law § 29-a of Article 2-B of the Executive Law only authorizes the Governor to *suspend* law, not unilaterally create it. The state never once cites or wrestles with this statute despite it being the basis of Plaintiffs' claim. (State's Br. at pp. 20-21.) The state effectively concedes Governor Cuomo's lack of authority to impose gathering restrictions on churches under Executive Law § Article 29-a. The state Defendants then hinge their rebuttal to Plaintiffs' separation-of-powers claim on their belief that the Governor is authorized by state law (again without dealing with Executive Law § 29-a).  Thus their arguments collapse in on one another and extinguish the Governor's longstanding position that Executive Law § 29-a authorizes him to unilaterally impose restrictions on religious services.

## II.     IRREPARABLE HARM

The state Defendants argue Plaintiffs have shown no irreparable harm because the gathering limits merely require them to alter the "manner in which they may exercise" their rights, rather than outright prohibiting them from exercising their rights.  Here, first of all, the state Defendants virtually stipulate they are burdening plaintiffs' religion by compelling them *to change the manner in which they worship*.  They have thus conceded that strict scrutiny is required.

At best, Defendants are begging the question. Plaintiffs have sincerely held religious beliefs counseling congregate worship with and for their flock, fellow congregants, and family. The gathering limits outright prohibit them from doing so consistent with those beliefs, and the State has no place telling Plaintiffs what actually suffices for realizing them. The state Defendants criticize Plaintiffs for not submitting any declarations demonstrating how they have been hindered. (State's Br. at pp. 24-25.) But Plaintiffs filed a *verified* complaint, with each plaintiff swearing

14

under oath and penalty of perjury that the many particular facts stated therein are true, *including*, as discussed above, how the gathering limits prevent them from ministering to their flock, from attending synagogue when 10 men have already assembled, and from attending synagogue with their family in accord with their parental duty and desire for companionship. The gathering limits have thus *directly limited* Plaintiffs' First Amendment rights and clearly inflicted irreparable harm.

### III.   BALANCE OF EQUITIES AND PUBLIC INTEREST

Here the balance tips decidedly in Plaintiffs' favor, and a TRO and PI would serve the public interest. Defendants acknowledge the virus's rate of transmission is well below 1.0. (Hutton Dec., ECF No. 20, ¶28.) **And Governor Cuomo acknowledges there has been no known spike from allowing mass protests against racism**. (**Ex. A** at 33.) (*See also* Delgado Dec., ECF No. 2, Ex. 1 at ¶17 (noting it has been more than 10 days since the first public protest and by now a surge in cases would have triggered increased hospitalizations and an increase in percentage tests positive, which has not occurred thus far in New York City).) Thus, Defendants will suffer no real harm by granting temporary and preliminary relief to Plaintiffs. And such relief would secure critical First Amendment rights, which is always in the public interest. (Pl. TRO/PI Br. at p. 24.) Thus a TRO and PI should issue.

### IV.   RELIEF SOUGHT

The state Defendants observe that Plaintiffs' prayer for relief requests that Defendants be restrained and enjoined from enforcing any limits at all on the size of Plaintiffs' religious gatherings, or, in the alternative, from enforcing any gathering limits which are "greater than Defendants have imposed on essential retail businesses and the mass demonstrations." (State's Br. p. 2) (V. Compl. at p. 47.) Plaintiffs clarify here that they also requested "[s]uch other and further relief as this Court deems just and proper." (V. Comp. at p. 48.) Plaintiffs do maintain that there should be no gathering limits on their religious services whether indoors or outdoors, as long as

15

they engage in proper social distancing and hygiene practices in accordance with the recommendations of Dr. Delgado. (Delgado Dec., ECF No. 2, Ex. 1 at ¶53.) Nor should they be required to wear masks as long as they maintain social distancing. Both of these are consistent with exemptions for essential businesses and mass protests. (See V. Compl. ¶36; State's Br. at p. 3, n.2.)

However, if this Court does not view Plaintiffs' indoor religious services as similarly situated to essential businesses, Plaintiffs believe they are entitled to the same exemption as non-essential businesses allowing up to 50% of building capacity for indoor services. (*See, e.g.*, Hutton Dec., ECF No. 20, ¶¶46, 47.) This would materially reduce the burden on Plaintiffs Soos and Stamos in the North Country, allowing them to realistically minister to their entire flock, and it would effectively allow Plaintiffs Schonbrun, Perr, and Mayerfeld to attend synagogue when not part of the minyan and with their families.

Put simply, Plaintiffs seek no gathering-size limits on outdoor religious services[8] and no gathering-size limits on indoor religious services. But if they must accept limits on indoor services, 50% of building capacity would be acceptable and accomplish satisfactory relief. And, as noted, they would follow all of the social distancing recommendations set forth in Dr. Delgado's declaration. (Delgado Dec., ECF No. 2, Ex. 1 at ¶53.)

## **CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction.

---

[8] This would be consistent with New Jersey's new exemption eliminating all gathering size restrictions on outdoor religious services, as enshrined in New Jersey Executive Order 152(2)(f). (**Ex. B** at pp. 8-9.).

Respectfully submitted,

s//Christopher A. Ferrara

_____
CHRISTOPHER A. FERRARA, ESQ.
(Bar No. 51198)
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
Special Counsel to the Thomas More Society
*Counsel for Plaintiffs*


/s/ Michael G. McHale
Michael G. McHale*
10506 Burt Cir. Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
Counsel to the Thomas More Society
*Counsel for Plaintiffs*

*Application for Full Admission Pending

17