**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**REV. STEVEN SOOS et al.,**

                       **Plaintiffs,**

          **v.**

**ANDREW M. CUOMO et al.,**

                      **Defendants.**
_____

                                **1:20-cv-651**
                                **(GLS/DJS)**

**APPEARANCES:**                         **OF COUNSEL:**

**FOR THE PLAINTIFFS:**
148-29 Cross Island Parkway          CHRISTOPHER A. FERRARA,
Whitestone, NY 11357                 ESQ.

10506 Burt Circle                      MICHAEL McHALE, ESQ.
Ste 110
Omaha, NE 68114

**FOR THE DEFENDANTS:**
_Andrew M. Cuomo & Letitia James_
HON. LETITIA JAMES                ADRIENNE J. KERWIN
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224

_Bill de Blasio_
HON. JAMES E. JOHNSON          MELANIE SADOK
Corporation Counsel of the City of    ELLEN PARODI
New York                       HILARY M. MELTZER
New York City Law Department      Assistants Corporation Counsel
100 Church Street
New York, NY 10007

**FOR THE PROSPECTIVE AMICUS
CURIAE:**
*Ahuva Kleinman*
Mandelbaum Salsburg PC       RONALD D. COLEMAN, ESQ.
3 Becker Farm Road
Roseland, NJ 07068

**Gary L. Sharpe
Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Pending is an application for preliminary injunctive relief filed by plaintiffs Reverend Steven Soos, Reverend Nicholas Stamos, Daniel Schonbrun, Elchanan Perr, and Mayer Mayerfeld.[1]  (Dkt. Nos. 2, 7.)  In their most recent filing, plaintiffs seek an order restraining and enjoining defendants Andrew M. Cuomo, Governor of the State of New York; Letitia James, Attorney General of the State of New York; and Bill de Blasio, Mayor of the City of New York: (1) from enforcing any gathering limits to outdoor religious gatherings; and (2) from imposing any limitation on indoor gathering . . . for religious gatherings in parity

---

[1]  Plaintiffs' initially sought a temporary restraining order, but, at the conclusion of the return on that application, the court discussed with the parties the preferability of allowing them to supplement the record and argument, and address the application for preliminary injunctive relief without resort to a further evidentiary hearing; the court's proposed course of action was acceptable to all the parties and obviates the need to consider the application for a temporary restraining order.  (Dkt. No. 31, Attach. 1 at 38-49.)

> with the 100% occupancy allowed for favored "essential businesses," day camps and special education classes, or, alternatively, at least 50% occupancy in keeping with what is permitted for "non-essential" businesses and every other indoor activity allowed to continue under Phases Two and Three except religious activity, which alone is still arbitrarily confined to 25% occupancy.

(Dkt. No. 32 at 10.)  For the reasons explained and to the extent described below, the application for a preliminary injunction is granted.

## II. Background

For the past several months, the United States, and, indeed, the entire world, has been suffering from a global pandemic brought about by COVID-19.  The State of New York, and particularly the New York City metropolitan area, have been described as the "epicenter" of the pandemic.  *See* New York Coronavirus Map and Case Count, N.Y. Times (last visited June 26, 2020), https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html.  To date, there have been 395,168 cases, and 31,029 deaths because of COVID-19 in the State of New York. *See id.*

## A.   The Executive Orders

Beginning in March 2020, in response to the COVID-19 pandemic

besieging New York, Governor Cuomo issued a series of executive orders,

placing restrictions on New Yorkers:

(1) Order 202, issued on March 7, declared a disaster emergency in the State of New York.  (Dkt. No. 1, Attach. 1 at 1-3.)

(2) Order 202.1, issued on March 12, prohibited large gatherings of over 500 people.  (*Id.* at 4-7.)

(3) Order 202.3, issued on March 16, narrowed the prohibition on large gatherings to fifty persons.  (*Id.* at 10-11.)

(4) Order 202.6, issued on March 18, required all New York State businesses to "reduce the in-person workforce at any work locations by 50%," with exceptions for those businesses and entities that provided "essential services or functions."  (*Id.* at 17-18.)

(5) Order 202.8, issued on March 20, reduced the in-person workforces of non-essential businesses by 100%.  (*Id.* at 21-22.)

(6) Order 202.10, issued on March 23, declared a total ban on "non-essential gatherings of individuals of any size for any reason."  (*Id.* at 25-28.)

(7) Order 202.17, issued on April 15, required face-coverings to be worn "when in a public place and unable to maintain, or when not maintaining, social distance."  (*Id.* at 46.)

(8) Order 202.31, issued on May 14, extended the closure of non-essential businesses and entities, and the ban on non-essential gatherings.  (*Id.* at 69-70.)  The Order also provided that "[a]ll enforcement mechanisms by state or local governments shall continue to be in full force an[d] effect until June 13, 2020 unless later extended or amended by a future Executive Order."  (*Id.*)

(9) Order 202.32, issued on May 21, modified the previous ban on non-

essential gatherings "to permit a gathering of ten or fewer individuals for any religious service or ceremony," provided that certain social distancing and health protocols were adhered to, and ordered that "any drive-in or remote religious service may continue in excess of the ten person limit so long as there is no in-person contact between participants."  (*Id.* at 71-73.)

(10) Order 202.33, issued on May 22, permitted non-essential gatherings of ten or fewer individuals "for any lawful purpose or reason," provided that certain social distancing and health protocols were adhered to.  (*Id.* at 74.)

(11) Order 202.34, issued on May 28, continued the restriction, postponement, and/or cancellation, of all non-essential gatherings of more than ten individuals, but allowed for any region that met certain public health and safety metrics to begin "Phase One reopening."  (*Id.* at 75-76.)

(12) Order 202.35, issued on May 29, ended workplace reductions and restrictions in certain regions for non-essential businesses, the "Phase Two industries," which include: professional services, administrative support, and information technology; real estate services, building and property management, leasing, rental, and sales services; retail in-store shopping, rental, repair, and cleaning; barbershops and hair salons; and motor vehicle leasing, rental, and sales.  (*Id.* at 77-78.)  The restriction on outdoor gatherings of groups of more than ten people remained in place.  (*Id.*)

(13) Order 202.36, issued on June 2, declared that any region to meet certain public health and safety metrics "may allow outdoor, low-risk recreational activities and businesses providing such activities, as determined by Empire State Development Corporation, to be permitted to operate, in accordance with Department of Health guidance."  (*Id.* at 79-80.)

(14) Order 202.37, issued on June 5, declared that "special education services and instruction required under Federal, state or local laws,

rules, or regulations, may be provided in person for the summer term in school districts." (*Id.* at 81.)

(15) Order 202.38, issued on June 6, modified Order 202.35, permitting any region to have entered "Phase Two" of New York's reopening plan to allow "non-essential gatherings for houses of worship at no greater than 25% of the indoor capacity of such location." (*Id.* at 82-83.) The restriction on outdoor gatherings of groups of more than ten people remained in place. (*Id.*)

(16) Order 202.42, issued on June 15, modified Order 202.35 and Order 202.38, permitting any region to have entered "Phase Three" of New York's reopening plan to allow "non-essential gatherings . . . [of] twenty-five (25) or fewer individuals, for any lawful purpose or reason." (Dkt. No. 33, Attach. 1 at 5.)

On June 17, 2020, Mayor de Blasio issued an "Emergency Executive Order" incorporating Governor Cuomo's executive orders, and "direct[ing] the Fire Department of the City of New York, the New York City Police Department, the Department of Buildings, the Sheriff, and other agencies as needed to immediately enforce the [orders]." (Dkt. No. 32, Attach. 3 at 1-2.)

**B.**   **The Guidance**

A document entitled "Guidance for Determining Whether a Business Enterprise is Subject to a Workforce Reduction Under Recent Executive Orders," (hereinafter, the "Guidance Document"), was published and simultaneously updated by the State of New York with the issuance of the

6

executive orders described above.  (Dkt. No. 1, Attach. 1 at 94-125, 128-38.)

From March 20 through March 24, 2020 the Guidance Document provided that "worship services" are included among the enumerated businesses that "must remain closed and are not eligible for designation as an essential business for purposes of this guidance."  (*Id.* at 98.)

From March 25 through April 7, 2020 the Guidance Document provided that although "[h]ouses of worship are not ordered closed[,] . . . it is strongly recommended not to hold congregate services," and reiterated that "worship services . . . are not eligible for designation as an essential business for purposes of this guidance."  (*Id.* at 105.)  From April 8 through April 9, 2020 "worship services" continued to be listed as among the businesses that "must remain closed and are not eligible for designation as an essential business for purposes of this guidance."  (*Id.* at 113.)

From April 10 through May 20, 2020 the Guidance Document provided:

> Pursuant to Executive Order 202.10 . . . , all non-essential gatherings of individuals of any size for any reasons (e.g. worship services, parties, celebrations or other social events) are canceled or postponed. Congregate services within houses of worship are

> prohibited.  Houses of worship may only be used by individuals and only where appropriate social distancing of, at least, six feet between people can be maintained.  Further, individuals should not gather in houses of worship, homes, or other locations for religious services until the end of this public health emergency.   If possible, religious leaders should consider alternative forms of worship, replacing in-person gatherings with virtual services, such as phone or conference calls, videoconference calls, or online streaming.

(*Id.* at 123.)

From May 21 through June 5, 2020, the Guidance Document permitted a gathering of ten or fewer people for a religious service or ceremony, provided that certain social distancing and health protocols were adhered to, and permitted "any drive-in or remote religious service may continue in excess of the ten person limit so long as there is no in-person contact between participants."  (*Id.* at 135-36.)  It further provided that "[f]aith leaders should continue to consider and use alternative forms of worship," and that "congregations of groups for religious service or ceremony in excess of ten in-person participants remain prohibited."  (*Id.*)

Guidance for "Phase Two Industries" limit indoor capacity to no more

than 50% of maximum capacity.[2]  *See, e.g.*, Reopening New York:

Essential and Phase II Retail Business Guidelines for Employers and

Employees, https://www.governor.ny.gov/sites/governor.ny.gov/files/

atoms/files/GeneralRetailSummaryGuidance.pdf; Reopening New York:

Hair Salon and Barbershop Guidelines for Employers and Employees,

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/HairSal

onsAndBarbershopSummaryGuidance.pdf.  And guidance for restaurants

in "Phase Three" limits indoor capacity to no more than 50% of maximum

occupancy, exclusive of employees.  (Dkt. No. 32, Attach. 6 at 1.)

Beginning today, on June 26, outdoor graduations of up to 150

people will be allowed.[3]  *See* New York State Department of Health,

Updated Interim Guidance for Graduation Celebrations During the COVID-

19 State of Emergency (June 14, 2020), https://coronavirus.health.ny.gov/

system/files/documents/2020/06/doh_covid19_updatedgraduationguidance

_061420.pdf; Governor Announces Outdoor Graduations of up to 150 Will

---

[2]  The court takes judicial notice of the information contained on New York State's official website as such public information is "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

[3]  The court takes judicial notice of the information contained on the New York State Department of Health's official website as such public information is "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

Be Allowed Beginning June 26th (June 7, 2020), https://on.ny.gov/311
JGWN.

## C.    **The Protests**

Mass race-related protests have erupted across the nation, including
in the State of New York, in response to the death of African-American
George Floyd on May 25, 2020.  (Compl. ¶ 22.)  Protesters, sometimes in
groups of thousands, have taken to the streets of New York City as well as
other major cities in the State of New York.  (*Id.* ¶¶ 22, 61, 69.)

During this time, a "social media campaign" has encouraged theaters
in New York, which are to be closed until "Phase Four" of New York's
reopening plan, to open their lobbies and restrooms for protesters.  (Dkt.
No. 1, Attach. 1 at 160-64.)

## D.    **Responses From Cuomo and de Blasio**

### *1.    Governor Cuomo*

During a press conference held on June 1, 2020, when asked if he
would "suggest people not go out and protest," Governor Cuomo
answered:

> No, I think you can protest, but do it smartly and
> intelligently. . . .  There were protests all across the
> country.  Protest.  Just be smart about it.  With this

> virus, you can do many things now as long as you're
> smart about it, right?  You can reopen, you can go
> into a store and you can do a lot of things, just be
> smart.

(*Id.* at 146.)  When asked what the difference is "between protesting and a

business*,* say, in the city who wants to reopen smartly if it's not at the

phase yet that they're technically allowed to," Governor Cuomo answered:

> Well, that's where we're at, but it has to be a business
> where you can be smart.  Be smart, meaning socially
> distant.  You don't conduct business in a way where
> you have people within six feet.  You have to wear the
> mask.  You have to do the hand sanitizer.  That's
> where we're going to be.

(*Id.* at 146-47.)

During a press conference held on June 4, 2020, when asked about

his reopening plans, and if there was a way to "allow high school

graduation ceremonies with social distancing," Governor Cuomo remarked:

"Did you hear anything that we've been talking about for the past 96

days? . . . [Y]eah I know everybody wants to go to a high school

graduation, I get it.  Not if they're going to die."  (*Id.* at 150-52.)  When

asked how he is able to justify opening a patio for outside dining, but will

not allow high school graduation ceremonies with social distancing,

Governor Cuomo answered: "What difference does it make? . . . The issue

11

is a public health issue and you don't want people sick and dead. . . . It's about death, it's about balancing the risk versus the reward, balancing the desires and wants versus the consequences."  (*Id.* at 151-52.)

During this same press briefing, Governor Cuomo also stated, "I want to thank the protestors. . . . I stand with the protestors on the point that we need meaningful reform."  (Compl. ¶ 65 (emphasis omitted).)

When explaining the modification of non-essential gatherings for houses of worship to no greater than 25% of the indoor capacity of such location, provided in Order 202.38, Governor Cuomo explained, in part: "We are going to accelerate the opening of temples, mosques, [and] churches. . . . 25 percent occupancy is not as easy as 100 percent occupancy but 100 percent occupancy is a mass gathering and you really can't do social distancing."  (Dkt. No. 1, Attach. 1 at 140.)  He further advised New Yorkers to "[b]e smart.  It does not mean you go to a temple or a mosque and you sit right next to a person.  You have to socially distance."  (*Id.*)

   2.   *Mayor de Blasio*

On April 28, Mayor de Blasio appeared in Williamsburg at a Jewish funeral gathering, which was dispersed by the New York Police

Department (NYPD).  (Compl. ¶ 53.)  Via Twitter, Mayor de Blasio wrote:

"Something absolutely unacceptable happened in Williamsburg tonite [sic]:

a large funeral gathering in the middle of this pandemic.  When I heard, I

went there myself to ensure the crowd was dispersed.  And what I saw

WILL NOT be tolerated so long as we are fighting the Coronavirus."  (Dkt.

No. 1, Attach. 1 at 126.)  This was followed by another tweet: "My message

to the Jewish community, and all communities, is this simple: the time for

warnings has passed.  I have instructed the NYPD to proceed immediately

to summons or even arrest those who gather in large groups.  This is about

stopping this disease and saving lives.  Period."  (*Id.* at 127.)

During a June 2, 2020 media conference, when asked: "What about

the retail store owner facing imminent financial ruin or the religious person

who cannot [attend a] house of worship? What about their pain and

anger?" Mayor de Blasio replied, in part: "When you see a nation, an entire

nation simultaneously grappling with an extraordinary crisis seeded in 400

years of American racism[,] I'm sorry[,] [t]hat is not the same question[] as

the understandably aggrieved store owner, or the devout religious person

who wants to go back to services."  (*Id.* at 155-56.)

On June 4, 2020, Mayor de Blasio, without a mask, attended and

addressed a political gathering, held in memory of George Floyd.  (Compl.

¶ 71.)  Neither the ten-person limit on outdoor gatherings, nor the social

distancing protocols, were adhered to.  (*Id.*)

## E.   **Executive Orders' Effect on Plaintiffs**

### 1.   *Rev. Steven Soos and Rev. Nicholas Stamos*

Soos and Stamos are Catholic priests in the North Country region of

New York, "who offer[] Mass and provide[] the other Sacraments of the

Catholic Church to congregations located in Glens Falls, Massena[,] and

Nicholville[, New York]."  (*Id.* ¶¶ 3-4, 77, 79.)  Soos and Stamos have been

forbidden from offering Mass and the other Sacraments beyond an ever-

changing maximum number of people.  (*Id.* ¶¶ 85-96.)  Because of the

limitations proscribed in the executive orders, Soos and Stamos are forced

to either turn away parishioners who wish to attend Mass—a weekly

obligation that Catholics face "under pain of mortal sin"—or to hold more

Masses per day than are possible.  (*Id.* ¶¶ 86-93.)  Likewise, the

percentage-based capacity limit prevents Soos and Stamos from holding a

daily Mass for Massena students when they return to school.  (*Id.* ¶ 95.)

The permitted "drive-in" Masses are of little help to Soos, Stamos,

and their congregation.  (*Id.* ¶ 97.)  Congregants are prohibited by the

executive orders from leaving their vehicles at these drive-in Masses,

which prevents congregants from kneeling while receiving Holy

Communion, as is commanded by the Catholic religion.  (*Id.*)  Thus, the

orders effectively "prohibit reception of Holy Communion itself—the very

essence of the Mass—except under threat of prosecution and fines."  (*Id.*)

And although full outdoor masses are possible at the large churches at

which Soos and Stamos hold Mass, the executive orders "make[] that

impossible."  (*Id.* ¶ 100.)

Finally, the executive orders burden the Catholic practices of Holy

Matrimony and of "outdoor burial services" where Soos and Stamos are

forced to bar a certain amount of family members and friends from

attending a wedding or a"graveside as their loved ones are laid to rest."

(*Id.* ¶¶ 96, 101.)

2.   *Daniel Schonbrun, Elchanan Perr, and Mayer Mayerfeld*

Schonbrun, Perr, and Mayerfeld are Orthodox Jewish congregants

who attend synagogues in Brooklyn, New York, where they reside.  (*Id.*

¶¶ 5-7, 103.)  "The synagogue prayers required by their religion must have

a minimum quorum of ten adult males (age thirteen or older), called the

*minyan*."  (*Id.* ¶ 104.)  Because of this requirement, in conjunction with the

executive orders, even though Schonbrun, Perr, and/or Mayerfeld can attend services if they are part of this quorum, their female and non-adult male family members are always prevented from attending the services. (*Id.* ¶ 108.)

The permittance of drive-in synagogue services is of no help to these plaintiffs either, because "the *minyan* must all be present in the same room, not in various motor vehicles," and "[m]oreover, any type of operation of a vehicle is prohibited on the Sabbath, which is the day the main weekly services take place."  (*Id.* ¶¶ 109-10.)

Schonbrun is a congregant of Chabad of Marine Park in Brooklyn, whose Rabbi decided to remain open in mid-March, notwithstanding the executive orders.  (*Id.* ¶¶ 117-18.)  On one occasion, the congregation was holding a prayer service outside when a police officer arrived and informed them that they were conducting an "illegal gathering," despite the fact that only eight congregants were present, and they "were at least 20 feet apart from each other."  (*Id.* ¶¶ 121-22.)  When the congregants refused to disperse, the police officer threatened them with fines and arrest.  (*Id.* ¶ 123.)  Shortly thereafter, more police officers arrived on the scene, where they remained until they were certain that all members of the congregation

had left the area.  (*Id.* ¶¶ 124-26.)

Because of the executive orders, and the accompanying fear of arrest and harassment from community activists and the police for violating them, "Schonbrun and his fellow congregants missed many religious services, including during Passover."  (*Id.* ¶ 128.)  Further, Schonbrun's son has not been able to attend synagogue services for months, as he is not yet old enough to be part of a *minyan*.  (*Id.* ¶ 129.)  "Schonbrun now lives in constant fear of police intervention in what remains of Jewish worship under the ten-person limit."  (*Id.* ¶ 130.)

Perr is a member of a congregation in the Flatbush-Midwood section of Brooklyn, where "even before 'congregate worship' was prohibited . . . police were advising members of the Jewish community . . . that synagogues must close outright."  (*Id.* ¶¶ 134-35.)  Thus, Perr attended another synagogue, Congregation Zichron Aryeh Leib.  (*Id.* ¶ 136.)  Perr and his fellow congregants were subject to "constant police presence and interference," which caused them to live in fear and took from them the "tranquility of worship."  (*Id.* ¶¶ 137-39, 144.)

At one point, Perr "observed that [the] synagogue had been locked and that there was a notice on the door from the Health Department that

the synagogue had been closed and that no services could be conducted there."  (*Id.* ¶ 141.)  On that same day, the police "broke up" a Jewish funeral that Perr attended, at which social distancing protocols had been followed.  (*Id.* ¶ 142.)  Perr was also unable to hold a Bar Mitzvah for his son, and his wife and children have been unable to attend synagogue services since March, due to the executive orders and the aforementioned quorum requirement.  (*Id.* ¶ 148.)

Mayerfeld mainly attended two different synagogues, Shaarei Zion and Congregation Bnai Torah, where he and his fellow congregants were subject to repeated "harassment" and surveillance by the police, allegedly at the behest of Mayor de Blasio and Governor Cuomo.  (*Id.* ¶¶ 153-57.)  Accordingly, Mayerfeld attempted to hold services in his own backyard.  (*Id.* ¶ 158.)  However, he was subjected to harassment and "bullying" from his neighbors, which he alleges was "incited by . . . [Mayor] de Blasio, who vowed to crack down on the Jewish community for failing to observe [Governor] Cuomo's ban on religious gatherings."  (*Id.* ¶¶ 159-60.)  As is the case with Schonbrun and Perr, Mayerfeld's family has been unable to attend synagogue services due to the executive orders' capacity limit and his religion's quorum requirement for such services.  (*Id.* ¶¶ 162-63.)

## F.   Procedural History

Plaintiffs commenced this action on June 10, 2020 by filing a verified complaint and an application for a temporary restraining order by order to show cause.  (Dkt. Nos. 1, 2, 7.)  The court set an expedited briefing schedule and a motion return via video conference.  (Dkt. No. 8.)  At the conclusion of the return, the court afforded the parties an opportunity to supplement the record and submit additional argument, which they all did. (Dkt. Nos. 31-33.)

Plaintiffs allege four enumerated causes of action based on the circumstances described above: (1) a violation of the Free Exercise Clause of the First Amendment pursuant to 42 U.S.C. § 1983; (2) a violation of the First Amendment rights of speech, assembly, and expressive association conduct pursuant to 42 U.S.C. § 1983; (3) a violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; and (4) "Ultra Vires State Action in Violation of Federal Rights." (Compl. ¶¶ 164-210.)

## III.  Standard of Review

> A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or  .  .  .  sufficiently  serious  questions  going  to  the

>merits to make them a fair ground for litigation and a
>balance of hardships tipping decidedly in the
>plaintiff[s'] favor; (2) a likelihood of irreparable injury
>in the absence of an injunction; (3) that the balance of
>hardships tips in the plaintiff[s'] favor; and (4) that the
>public interest would not be disserved by the issuance
>of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir.

2015) (internal quotation marks and citation omitted).

## IV. Discussion

Legal challenges to executive branch responses to the COVID-19

outbreak have been numerous in the wake of the virus.  Recently the

Supreme Court weighed in on a California-based limitation for religious

gatherings of "25% of building capacity or a maximum of 100 attendees."

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613

(2020).  Chief Justice Roberts concurred in a decision to deny injunctive

relief, explaining:

>The precise question of when restrictions on particular
>social activities should be lifted during the pandemic
>is a dynamic and fact-intensive matter subject to
>reasonable disagreement.  Our Constitution
>principally entrusts "[t]he safety and the health of the
>people" to the politically accountable officials of the
>States "to guard and protect."  *Jacobson v.
>Massachusetts*, 197 U.S. 11, 38 (1905).  When those
>officials "undertake[] to act in areas fraught with

20

> medical and scientific uncertainties," their latitude
> "must be especially broad." *Marshall v. United States*,
> 414 U.S. 417, 427 (1974).  Where those broad limits
> are not exceeded, they should not be subject to
> second-guessing by an "unelected federal judiciary,"
> which lacks the background, competence, and
> expertise to assess public health and is not
> accountable to the people.  *See Garcia v. San
> Antonio Metropolitan Transit Authority*, 469 U.S. 528,
> 545 (1985).

*Newsom*, 140 S. Ct. at 1613-14.  *Newsom*, following the guidance of

*Jacobson*, instructs courts to refrain from Monday-morning quarterbacking

the other co-equal, elected branches of government when those branches

are responding to difficulties beyond those that are incidental to ordinary

governance.  *See id.*  Chief Justice Roberts recognized, however, that

there are "broad limits" which may not be eclipsed.  *See id.*  To determine

whether the aforementioned broad limits have been exceeded, which

*Newsom* did not address, the court turns to Free Exercise Clause

jurisprudence within the framework of the applicable standard of review.

Having carefully reviewed the relevant issues, and with a firm

understanding that the executive branch response to the pandemic has

presented issues with a degree of complexity that is unrivaled in recent

history, it is plain to this court that the broad limits of that executive latitude

have been exceeded.  That is not to say that Governor Cuomo or Mayor de

Blasio have utterly failed in their reaction to COVID-19.  To the contrary,

the State of New York, at the moment anyway, is among the best situated

states in terms of infection and mortality rates.  While there is more clarity

every day with respect to the best practices for slowing the spread of

COVID-19, there is wide and reasonable disagreement about exactly how

to implement rules and regulations to achieve those ends, and, as is

particularly present in this case, even more so with respect to reopening in

a way that promotes safety, economic viability, and the enjoyment of all the

rights that the people of this country and the State of New York are

guaranteed.  As the Chief Justice recognized in *Newsom*, it is not the

judiciary's role to second guess the likes of Governor Cuomo or Mayor de

Blasio when it comes to decisions they make in such troubling times, that

is, until those decisions result in the curtailment of fundamental rights

without compelling justification.

## A.    **Success on the Merits**[4]

    If neutral and generally applicable, laws challenged as burdening the

_____

    [4]  Plaintiffs argue that each of their four causes of action is likely to succeed on the
merits.  (Dkt. No. 2, Attach. 4 at 6-23.)  Because each of the prongs is met with respect to
plaintiffs' Free Exercise Clause claim, the court need not, and does not, analyze the
remainders.

right to freely exercise religion are presumed valid.  *See Employment Div.,*

*Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990); *see*

*also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

520, 546 (1993) ("A law burdening religious practice that is not neutral or

not of general application must undergo the most rigorous of scrutiny.").

> In addressing the constitutional protection for free exercise of religion, [the Supreme Court's] cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.  Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied.  A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Lukumi*, 508 U.S. at 531-32 (citation omitted).

"Although a law targeting religious beliefs as such is never

permissible, if the object of a law is to infringe upon or restrict practices

because of their religious motivation, the law is not neutral."  *Id.* at 533

(citations omitted).

> To determine the object of a law, [the court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A

23

> law lacks facial neutrality if it refers to a religious
> practice without a secular meaning discernable from
> the language or context.

*Id.*

"The general applicability requirement prohibits the government from 'in a selective manner impos[ing] burdens only on conduct motivated by religious belief.'" *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014) (quoting *Lukumi*, 508 U.S. at 543). "It 'protect[s] religious observers against unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.'" *Id.* at 196-97 (quoting *Lukumi*, 508 U.S. at 542-43). "While '[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.'" *Id.* at 197 (quoting *Lukumi*, 508 U.S. at 542). "A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Id.* at 197 (citation omitted); *see Lukumi*, 508 U.S. at 543.

24

"Individualized exemptions are [another] way in which a law can fail to be generally applicable."  Douglas Laycock & Steven T. Collis*, Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 10 (2016).  In *Smith*, the Supreme Court explained that, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason."  494 U.S. at 884 (citation omitted).  Case law within this Circuit supports the notion that individualized de facto exemptions can demonstrate that a challenged law is not generally applicable, and is therefore subject to heightened scrutiny.  *See Litzman v. N.Y.C. Police Dep't*, No. 12 Civ. 4681, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013).  Along these lines, when the challenged law does not carve out an exemption on its face, the history of enforcement is relevant to the existence of an exemption.  *See Stormans, Inc. v. Selecky*, 854 F. Supp. 2d 925, 956-57 (W.D. Wash. 2012), *rev'd on other grounds sub nom. Stormans, Inc. v. Wiesman*, 794 F.3d 1064 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2433 (2016).

Plaintiffs argue that the limitations and restrictions placed on them by the executive orders and the Guidance Document (hereinafter collectively referred to as "challenged laws") are not neutral or generally applicable,

25

and, therefore, strict scrutiny applies.  (Dkt. No. 2, Attach. 4 at 8.)  More specifically, they assert that the challenged laws are not generally applicable because they are "substantially underinclusive—that is [they] 'fail[] to prohibit nonreligious conduct that endangers [the government's interests] in a similar or greater degree than [the prohibited religious activity] does.'"  (*Id.* at 9 (citations omitted).)  Plaintiffs further claim that mass race protests have been granted "an individualized exemption" and that "the government may not refuse to extend that system to cases of religious hardship without compelling reason."  (*Id.* at 9-10 (citation omitted).)  That outdoor graduation ceremonies of 150 people or less or indoor special education services at summer schools without limitation are allowed also shows the unequal treatment and disfavoring of religion in plaintiffs' view.  (Dkt. No. 32 at 9.)

Finally, plaintiffs assert that the challenged laws fail strict scrutiny even though general efforts to prevent the spread of COVID-19 are "compelling interests of the highest order" because defendants cannot show that their interest in applying the restrictions to these plaintiffs, who abide by all social distancing and hygiene rules, is compelling.  (Dkt. No. 2, Attach. 4 at 16-17.)

The State argues, in overly-simplistic fashion, that the challenged laws only incidentally impose a burden on religious exercise, and they are neutral and generally applicable, and therefore, only rational basis need be shown, which is self-evident: preventing the spread of COVID-19.  (Dkt. No. 18 at 11-12.)  The State was silent with respect to the mass race protests in its written submissions until it filed a supplemental memorandum of law following the return on the motion.  (Dkt. No. 33, Attach. 4.)[5]  In that supplement, the State argues that Governor Cuomo's "political speech" cannot support a de facto exemption vis-à-vis the mass race protests.  (*Id.* at 5.)

The City initially responded with respect to only the ten-person indoor/outdoor limitation that was applicable in New York City during Phase 1.  (Dkt. No. 19, Attach. 7 at 2.)  It argues, like the State, that the challenged laws are neutral and generally applicable, but, unlike the State, the City initially acknowledged the mass race protests and contended that

---

[5]  The State argues, for the first time and in a submission to which plaintiffs have had no opportunity to respond, that, Governor Cuomo enjoys absolute legislative immunity and, in an argument much more fully developed than in its original papers, that, because of sovereign immunity, he and Attorney General James are not proper defendants.  (Dkt. No. 33, Attach. 4 at 7-10.)  Because it was not raised in time for plaintiffs to offer any response to it, the court will not consider the legislative immunity argument at this juncture.  The same is true of the new sovereign immunity argument.  The State is, of course, free to raise those arguments later in the litigation.

they are not comparable because protests occur outside and religious activity typically occurs inside.  (Dkt. No. 19, Attach. 7 at 7, note 4.)  Further the City asserts, relying on *Calvary Chapel Dayton Valley v. Sisolak*, 2020 U.S. Dist. LEXIS 103234 (D. Nev. June 11, 2020), that the enforcement of the challenged laws against protesters creates safety concerns and, absent clear patterns of unconstitutional selective enforcement, the court should not second guess the State's determinations.  (*Id.* at 8.)  In its supplemental submission, the City contends that the orthodox Jewish plaintiffs "may no longer seek redress for their alleged injuries" because, as of June 22, New York City has entered Phase 2, which lifts the ten-person indoor/outdoor limitation and imposes a 25% indoor capacity limitation. (Dkt. No. 31, Attach. 6 at 1-2.)  The City also amplifies its contention, explained for the first time during the motion return, that a de facto exemption has not been created for mass race protesters.  (*Id.* at 3-6.)

In light of the developments and natural progression of the challenged laws since the motion return, the restrictions and limitations at issue are: (1) a 25% indoor capacity limitation for Phases 2 and 3; (2) a twenty-five-person outdoor gathering limit in Phase 3 locations; and (3) a ten-person outdoor gathering limit in Phase 1 and 2 locations.  And the

28

City's argument that Schonbrun, Perr, and Mayerfeld "may no longer seek redress" because their region has gone into Phase 2, (Dkt. No. 31, Attach. 6 at 1-2), is rejected.  While it is true that their allegations are tailored to the ten-person indoor/outdoor limitation that existed when this matter was commenced, it is readily and reasonably inferable from their allegations that the 25% indoor capacity limitation would continue to burden their free exercise of religion.

Assuming, without deciding, that the challenged laws are neutral, plaintiffs have demonstrated a likelihood of success on the merits with respect to their free exercise claim because it appears that the challenged laws are not generally applicable, and that they would fail strict scrutiny.

1.    *25% Indoor Capacity Limitation*

On its face, the 25% indoor capacity limitation applies only to houses of worship.  *See* N.Y. Executive Order No. 202.38.  Indeed, that limitation is the only one of its kind in the tangle of executive orders and the Guidance Document that have been issued in response to the pandemic; in other words, no other secular entity, save for those that remain closed in their entirety until Phase 4 or beyond, are limited to only 25% capacity.  The "nonessential businesses," dubbed "Phase 2 industries" by executive order,

that enjoy a 50% capacity limitation are, however, not justifiably different than houses of worship.  (Dkt. No. 32, Attach. 1 ¶ 18.)

For example, offices, retail stores that are not inside of shopping malls, and salons were permitted to open at 50% capacity beginning in Phase 2.  To a greater or lesser degree, the Phase 2 industries involve the congregation of people for a length of time.  And restaurants in Phase 3 locations are permitted to open at 50% capacity indoors.  Restaurant patrons sit and congregate with family and friends in close proximity for a lengthy period of time, and have close contact with their hosts and servers. Face coverings may be removed while seated.  (Dkt. No. 32, Attach. 6 at 1.)  Additionally, special educational services will be permitted during "the summer term in school districts" with no indoor capacity limitations.

All of this is to demonstrate that these secular businesses/activities threaten defendants' interest in slowing the spread of COVID-19 to a similar or greater degree than those of plaintiffs', and demonstrate that the 25% indoor capacity limitation on houses of worship is underinclusive and triggers strict scrutiny review.[6]

---

[6] There is also an arguable basis to find a de facto exemption in light of the open lobbies social media campaign.  In light of the court's conclusion that the 25% indoor capacity limitation is not generally applicable because it is underinclusive, it need not reach the individualized exemption argument.  Admittedly, the basis of such an argument here is on far

    *2.*       *Twenty-Five-Person Outdoor Limitation in Phase 3*; *Ten-Person*

               *Outdoor Limitation in Phases 1 and 2*

Despite the State's claim that enforcement power rests with local

authorities in an effort to show that selective enforcement against mass

race protesters is not a de facto exemption imposed by Governor Cuomo

or Attorney General James, (Dkt. No. 33, Attach. 4 at 5-7), Governor

Cuomo clearly has authority over the New York State Police and broad

powers of enforcement, *see* N.Y. Exec. Law § 223 (explaining that the

superintendent of state police and its members "shall . . . be subject to the

call of the governor and are empowered to co-operate with any other

department of the state or with local authorities").  And, in any case,

Governor Cuomo's comments, which applauded and encouraged

protesting and discouraged others from violating the outdoor limitations,

likely demonstrate the creation of a de facto exemption.

Mayor de Blasio is a "local authority" with clear enforcement power

and has at his disposal one of the largest municipal police departments in

the world, (Dkt. No. 1, Attach. 1 at 127), and has also actively encouraged

-------------------

shakier footing, given the lack of acknowledgment or endorsement by defendants, than it is
with respect to the mass race protests discussed below.

participation in protests and openly discouraged religious gatherings and

threatened religious worshipers as set forth above.  The City's argument

that temporary selective enforcement of the challenged laws with respect to

mass race protests is a matter of public safety based on the rationale of

*Sisolak*, 2020 U.S. Dist. LEXIS 103234, would perhaps be legitimate but for

Mayor de Blasio's simultaneous pro-protest/anti-religious gathering

messages, which clearly undermine the legitimacy of the proffered reason

for what seems to be a clear exemption, no matter the reason.  Governor

Cuomo and Mayor de Blasio could have just as easily discouraged

protests, short of condemning their message, in the name of public health

and exercised discretion to suspend enforcement for public safety reasons

instead of encouraging what they knew was a flagrant disregard of the

outdoor limits and social distancing rules.  They could have also been

silent.  But by acting as they did, Governor Cuomo and Mayor de Blasio

sent a clear message that mass protests are deserving of preferential

treatment.

Another case of individualized exemption seems even more obvious.

The State has specifically authorized outdoor, in-person graduation

ceremonies of no more than 150 people beginning today, June 26.  This is

an express exemption from the ten- or twenty-five-person outdoor limits that apply across Phases 1, 2, and 3, and the State must extend a similar exemption to plaintiffs absent a compelling reason to the contrary.  *See Smith*, 494 U.S. at 884.  And there is nothing materially different about a graduation ceremony and a religious gathering such that defendants' justifications for a difference in treatment can be found compelling.

    *3.    Strict Scrutiny*

For the reasons articulated in plaintiffs' memorandum of law, defendants' generally-stated compelling interest in controlling the spread of COVID-19 is inadequate to demonstrate that they have a compelling interest that is narrowly tailored to these specific plaintiffs.  (Dkt. No. 2, Attach. 4 at 16-18.)  The City's attempt to demonstrate otherwise is unavailing, (Dkt. No. 31, Attach. 6 at 5-6); and the State has made no attempt to do so.

**B.    <u>Irreparable Harm, Balance of Hardships, and Public Interest</u>**

Plaintiffs contend that the fear of threatened arrest, prosecution and fines demonstrate the irreparable harm necessary to support the second prong of the preliminary injunction standard, and that the deprivation of First Amendment rights is presumed to amount to irreparably injury.  (Dkt.

No. 2, Attach. 4 at 23-24.)  The State contends that, because plaintiffs are not being prevented from exercising their religious rights, and, instead, are only being required to do so in a different way, the presumption of irreparable harm does not apply.  (Dkt. No. 18 at 23-24.)  The City appears to concede that First Amendment violations are sufficient to demonstrate irreparable injuries for the purpose of a preliminary injunction.  (Dkt. No. 19, Attach. 7 at 1.)

As noted by plaintiffs and the City, the loss of plaintiffs' free exercise rights is alone adequate to demonstrate irreparable injury here.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996), *cert. denied*, 520 U.S. 1251 (1997).  Accordingly, plaintiffs have met their burden in this regard.

Plaintiffs have also satisfied the court with respect to the final two prongs.  (Dkt. No. 2, Attach. 4 at 24-25.)  The balance of hardships tips in plaintiffs' favor.  Indeed, in the absence of an injunction, plaintiffs' religious activities will be burdened and continue to be treated less favorably than comparable secular activities.  An injunction, on the other hand, does not undercut defendants' interest in controlling the spread of COVID-19, provided that plaintiffs abide by social distancing guidance.

34

"As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020); *see N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

## C. __Appropriate Remedy__

"District courts have broad authority in crafting equitable remedies such as injunctions." *Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 245 (2d Cir. 2006) (citations omitted). For the reasons explained above, appropriate injunctive relief here is a restraint on defendants from enforcement of any indoor gathering limitations against plaintiffs greater than imposed for Phase 2 industries and restraint from enforcement of any limitation for outdoor gatherings against plaintiffs. However, the court is unpersuaded that defendants should be enjoined from the enforcement of the social distancing rules as set forth in the challenges laws. The court dispenses with the security requirement of Rule 65(c) of the Federal Rules of Civil Procedure. *See Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is

35

particularly appropriate where a plaintiff alleges the infringement of a

fundamental constitutional right." (citations omitted)).

**D.**   <u>**Amicus Curiae**</u>

Ahuva Kleinman moves for leave to appear as amicus curiae.  (Dkt.

No. 27.)  "There is no governing standard, rule or statute prescribing the

procedure for obtaining leave to file an amicus brief in the district court."

*Lehman XS Tr., Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No.

12 CIV. 7935, 2014 WL 265784, at *1 (S.D.N.Y. Jan. 23, 2014) (internal

quotation marks, alteration, and citation omitted).  Indeed, "[d]istrict courts

ha[ve] broad discretion to permit or deny the appearance of amici curiae in

a given case."  *Kearns v. Cuomo*, No. 1:19-CV-00902, 2019 WL 5060623,

at *4 (W.D.N.Y. Oct. 9, 2019) (citation omitted).  "The usual rationale for

amicus curiae submissions is that they are of aid to the court and offer

insights not available from the parties.  Thus, when those purposes are not

served, typically, courts deny motions seeking leave to appear amicus

curiae."  *Id.* at *5 (internal quotation marks, alterations, and citations

omitted).

The circumstances under which an amicus brief is considered to be

an aid to the court are limited: "An amicus brief should normally be allowed

when a party is not represented competently or is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case . . . or when the amicus has unique information or perspective." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 465 n.3 (E.D.N.Y. 2019) (alterations and citation omitted). "Otherwise, leave to file an amicus brief should be denied." *Id.* (alterations and citation omitted).

Here, the need for an amicus curiae is minimal to non-existent.  The competence and skill of plaintiffs' counsel obviates the need for additional input.  Accordingly, while the efforts of the prospective amicus are admirable, her motion for leave to appear as amicus curiae, (Dkt. No. 27), is denied.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' application for a preliminary injunction (Dkts. No. 2, 7) is **GRANTED**; and it is further

**ORDERED** that defendants are **ENJOINED** and **RESTRAINED** as follows:

(1) from enforcing any indoor gathering limitations against plaintiffs

37

greater than imposed for Phase 2 industries, provided that plaintiffs follow social distancing requirements as set forth in the applicable executive orders and guidance; and

(2) from enforcing any limitation for outdoor gatherings provided that participants in such gatherings follow social distancing requirements as set forth in the applicable executive orders and guidance; and it is further

**ORDERED** that Kleinman's motion for leave to appear as amicus curiae (Dkt. No. 27) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

June 26, 2020
Albany, New York

Gary L. Sharpe
Gary A. Sharpe
U.S. District Judge

38