# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

REV. STEVEN SOOS, REV. NICHOLAS STAMOS, JEANETTE LIGRESTI, as parent and guardian of infant plaintiffs P.L. and G.L., DANIEL SCHONBRUN, ELCHANAN PERR, MAYER MAYERFELD, MORTON AVIGDOR. )
)
)
)
)

                 Plaintiffs, )

     v. )

ANDREW M. CUOMO, Governor of the State of New York, in his official capacity; LETITIA JAMES, Attorney General of the State of New York in her official capacity; KEITH M. CORLETT, Superintendent of the New York State Police, in his official Capacity; HOWARD A. ZUCKER, M.D., New York State Commissioner of Health, in his official capacity; BETTY A. ROSA, Interim Commissioner of the New York State Education Department, in her official capacity; EMPIRE STATE DEVELOPMENT CORPORATION ("ESD"), a New York State Public Benefit Corporation; BILL DE BLASIO, Mayor of the City of New York, in his official capacity; DR. DAVE A. CHOKSHI, New York City Commissioner of Health, in his official capacity; TERENCE A. MONAHAN, Chief of the New York City Police Department, in his official capacity; RICHARD CARRANZA, Chancellor of the New York City Department of Education in his official capacity. )
)
)
)
)
)
)
)
)
)

                 Defendants. )

Case No.

1:20-cv-00651-GLS-DJS

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR  A TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

INTRODUCTION AND URGENCIES JUSTIFYING MOTION FOR TRO ............................. 1

LEGAL ARGUMENT ........................................................................................................... 5

   I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................. 5

      A.   *Jacobson* Still Does Not Justify Defendants' New Draconian Restrictions .................. 5

      B.   Defendants' Cluster Initiative Is Neither Neutral Nor Generally Applicable Under the Free Exercise Clause. ....................................................................................................... 7

      C.   The Cluster Initiative Violates Plaintiffs' Freedom of Speech and Assembly. ............ 20

   II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO. 22

   III.  THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFF'S FAVOR. ........................... 23

   IV.  THE PUBLIC INTEREST FAVORS ENTERING A TRO FOR PLAINTIFFS. ............ 23

CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Adams & Boyle P.C. et al. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) ............................................ 6

*Cent. Rabbinical Cong. Of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193-94 (2d Cir. 2014) ....................................................................................... 7

*Chestnut Hill NY, Inc. v. City of Kingston*, No. 117-cv-0095, 2017 WL 11418271, at *1 (N.D.N.Y. Feb. 22, 2017). ........................................................................................................ 5

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)................. 8

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ................................................................................... 23

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990)............... 7

*First Pentecostal Church of Holly Springs v. City of Holly Springs, Miss.*, 959 F.3d 669, 670 (5th Cir. 2020) ............................................................................................................................... 6

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) ...................................................................................................................................... 15

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) .......... 19

*Harvest Rock Church, Inc. v. Newsom*, No. 20-55907, 2020 WL 5835219, at *6 (9th Cir. Oct. 1, 2020) ...................................................................................................................................... 16

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)............................................................................ 5

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)............................ 23

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ....................... 17

*Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015). ................................................... 7

*Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) .................................................................... 6

*SEC v. American Bd. of Trade, Inc.*, 830 F.2d 321 (2d Cir. 1987)................................................. 1

*See Citron v. Vaughn*, No. 3:69-cv-13578, 2007 WL 4240856, at *9 (D. Conn. Nov. 29, 2007).. 1

*Soos v. Cuomo*, No. 1:20-cv-651, 2020 WL 3488742, at *8 (N.D.N.Y. June 26, 2020)............... 6

*Thapa v. Gonzales*, 460 F.3d 323, 336 (2d Cir. 2006).................................................... 5

*Thomas v. Collins*, 323 U.S. 516, 530 (1945)............................................................. 20

*Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970)................................. 8

*Yashica Robinson v. Att'y Gen., State of Alabama*, 947 F.3d 1171, 1179 (5th Cir. 2020)............. 6

## INTRODUCTION AND URGENCIES JUSTIFYING MOTION FOR TRO

Seven months into the era of COVID-19, and nearly four months after this Court's entry of a preliminary injunction protecting the original plaintiffs' right to religious worship, New York officials simply couldn't contain themselves. Instead of respecting plaintiffs' constitutional rights under the First Amendment and this Court's crystal clear injunction entered on June 26, 2020 (ECF No. 35 at 35) (which defendants have appealed but not sought to stay), defendants have suddenly done an about face. Out of the blue, less than one month before a Presidential Election and merely one day after promising religious communities their houses of worship could remain at 50% of capacity, defendants this week imposed a new, draconian crackdown on religious worship and education throughout much of New York City and the state—literally on the eve of Jewish high holy days which culminate today, tomorrow (October 10), and Sunday (October 11) in solemn and joyous gatherings within the sacred confines of Jewish synagogues. (First. Am. Compl. ¶¶140-153.) Yet again, Defendants have strayed way too far. Only an emergency temporary restraining order can stop their brazen lawlessness in time to protect plaintiffs' fundamental constitutional rights.[1]

This week, on October 5, 2020, Governor Cuomo announced the designation of 20 "hot spot zip codes" in which alleged "clusters" of COVID-19 had begun to appear, based only on a handful of positive test results from statistically insignificant sample sizes involving people who

---

[1] Plaintiffs also suggest this Court enter a sua sponte civil order of contempt against defendants for their blatant violation of this Court's June 26 Order. *See Citron v. Vaughn*, No. 3:69-cv-13578, 2007 WL 4240856, at *9 (D. Conn. Nov. 29, 2007) (noting that in *SEC v. American Bd. of Trade, Inc.*, 830 F.2d 321 (2d Cir. 1987), the Second Circuit recognized a district court's inherent authority to issue a *sua sponte* finding of civil contempt). As demonstrated in the below discussion, defendants' new, draconian imposition on plaintiffs' religious gatherings are in direct violation of this Court's June 26 Order because defendants leave countless similarly situated businesses, activities, and gatherings completely exempt from the new restrictions. Defendants have completely ignored and violated this Court's preliminary injunction entered in favor of the original plaintiffs.

are completely asymptomatic. (First. Am. Compl. ¶64.) As part of this announcement, Cuomo declared he was shutting down all public and private schools within the designated hot spots. (Id. ¶88.) He also leveled numerous threats against the "religious community" and "ultra-Orthodox" Jews in particular, demanding that they abide by the 50% of capacity rule or otherwise be subject to total closure. (Id.) He presented no evidence that New York religious gatherings have been a source of spreading COVID-19. The day ended, and plaintiffs' still had their rights, just barely.

That quickly changed. The next day, October 6, Governor Cuomo announced the rollout of an entirely different "Cluster Action Initiative." (Id. ¶64-65.) Under the Cluster Initiative, the entire state is now subject to division into "Zones" denominated Red, Orange, or Yellow based on the number of area positive COVID-19 test results. In the Red Zone, "houses of worship" are singled out and limited to 25% of capacity or no more than 10 people, whichever is less. In the Orange Zone, "houses of worship" are limited to 33% of capacity or 25 people, whichever is less. And in the Yellow Zone, "houses of worship" are limited to 50% of capacity with no upper numerical limit. (Id. ¶67.) All schools, including religious schools, must shut down in the Red and Orange Zones and can open in the Yellow Zone only so long as they subject even asymptomatic students and staff to regular and invasive weekly COVID-19 testing. (Id.)

EO 202.68, which was released the night of October 6 and codified the Cluster Initiative, provides no specific epidemiological or other criteria for defining what constitutes a "cluster," how many positive tests are required for designation as a "Red Zone" an "Orange Zone" or a "Yellow Zone," or what level of positive tests "compromises the State's containment of the virus." Moreover, "containment of the virus" as such is not defined. All of these undefined matters are left entirely to the unfettered discretion and unappealable decisions of the Department of Health, headed by defendant Zucker and answerable only to Cuomo.

Critically, all manner of essential businesses are exempted within each zone, as confirmed by the Empire State Development's concomitant interpretive Guidance Document enumerating such exemptions.[2] And an increasing number of non-essential businesses, including restaurants for in-person dining without capacity limitation, may open in the Orange and Yellow Zones, respectively. (Id.) Additionally, Executive Order 202.68 makes clear that only "non-essential gatherings" are prohibited in each zone. (EO 202.68.)[3] Thus, "essential gatherings" remain scot-free, while plaintiffs' religious worship is all but shut down. As discussed in more detail later, this disparate treatment was clearly intentional and directly targeted at religious gatherings (in a surprisingly obvious way). Here is just one highlight, from Governor Cuomo's October 6 press conference and stated with no supporting evidence at all:

> **[T]he new rules are most impactful on <u>houses of worship</u>, because the virus is not coming from non-essential businesses. *That's not what this is about*.** It may be spread by non-essential businesses. The virus is not starting in schools. It may be spread by schools. This is about mass gatherings. One of the prime places of mass gatherings are houses of worship. I understand it's a sensitive topic, but that is the truth. Period. You want to solve the problem? Acknowledge the problem.

(First. Am. Compl. ¶86.)

The burdens of this new regime on plaintiffs' religious exercise are manifold. EO 202.68 provides that anyone who promotes, organizes, or even *encourages* a prohibited religious gathering shall be subject to a civil fine of up to $15,000 *per day*. (EO 202.68.) Thus, the Jewish plaintiffs, whose synagogues are all currently in the Red Zone, once again must worship only as part of a 10-person *minyan* (if they arrive early enough to take part) and are effectively forbidden from worshipping alongside their wives and minor children, i.e., their closest and most intimate companions. (First. Am. Compl. ¶152.) Additionally, the Jewish plaintiffs, alongside infant

---

[2] https://esd.ny.gov/ny-cluster-action-initiative-guidance.
[3] https://www.governor.ny.gov/news/no-20268-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency

plaintiffs P.L. and G.L., are now prevented from adequately handing on or receiving an adequate faith-based education. (First Am. Compl. ¶¶109-112; ¶¶155-160). Indeed, P.L. and G.L. attend Good Shepherd Catholic School, which has implemented COVID-19 protocols that far exceed the requirements of the state's executive orders and the recommendations of the CDC, and has had **zero** positive COVID-19 tests since opening on September 9. (Id. ¶119-120.) Meanwhile, all manner of essential and non-essential businesses, along with essential gatherings, are allowed to remain open at varying levels while plaintiffs' religious activities must actually or virtually shut down, in blatant violation of plaintiffs' constitutional rights.

The need for relief is immediate and urgent. As described in more detail in the First Amended Complaint, this weekend marks the culmination of the Jewish high holy days, beginning this evening (Friday) with Hoshana Rabbah, continuing tomorrow (Saturday) with Shemini Atzeret, and concluding Sunday with Simchat Torah (literally translated as Happiness of the Torah), perhaps "the most joyous day of the year" for Jewish worshippers (Id. ¶¶140-149.) All of it involves religious gathering and synagogue worship in far greater numbers than the current maximum of 10 people. Plaintiffs thus seek a temporary restraining order **allowing access to their synagogues by 6 p.m. today, October 9, which marks the onset of Shemini Atzeret**.

While this request is urgent, the requisite analysis for this Court is simple. Defendants' new regime directly violates the terms and reasoning of this Court's June 26 Order, and the circumstances surrounding EO 202.68's promulgation reveal surprisingly obvious targeting of religion, in plain violation of the Free Exercise Clause. EO 202.68 also burdens far more speech than necessary to further the government's interests in stopping COVID-19 clusters, in direct violation of the plaintiffs' First Amendment freedom of speech and assembly. Defendants have once again gone too far. A temporary restraining order should thus issue.

4

## LEGAL ARGUMENT

As the original plaintiffs in this action previously recited (ECF No. 2-4 at 3-4), "[i]n the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Chestnut Hill NY, Inc. v. City of Kingston*, No. 117-cv-0095, 2017 WL 11418271, at *1 (N.D.N.Y. Feb. 22, 2017). To obtain a preliminary injunction, a plaintiff must show: (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (1) "a likelihood of irreparable injury in the absence of an injunction"; (3) the balance of hardships "tips in the plaintiff's favor"; and (4) the injunction is not contrary to the public interest. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks omitted). "[A] party need not show as high a likelihood of success if it can demonstrate that the balance of hardships tips *decidedly* in its favor." *New York Co. v. Singh*, No. 14-cv-5726, 2017 WL 10187669, at *1 (E.D.N.Y. July 13, 2017) (unpublished) (citing *Thapa v. Gonzales*, 460 F.3d 323, 336 (2d Cir. 2006)). Plaintiffs easily satisfy all four elements justifying a TRO.

## I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.      *Jacobson* Still Does Not Justify Defendants' New Draconian Restrictions

Nothing has occurred since this Court's original order nearly four months ago that justifies new deference to the government under *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). *Jacobson* still does not authorize violations of fundamental rights, and moreover, it still does not even apply against claims raised under the Free Speech and Free Exercise Clauses.

This Court previously recognized that the government's "broad limits" under *Jacobson* to protect its citizens from an epidemic "may not be eclipsed." *Soos v. Cuomo*, No. 1:20-cv-651, 2020

WL 3488742, at *8 (N.D.N.Y. June 26, 2020). Indeed, numerous courts have recognized as much over the past six months in striking down government restrictions of fundamental rights promulgated in the name of stopping COVID-19. *See Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (granting injunction pending appeal against Kentucky's temporary ban on in-person services notwithstanding *Jacobson*); *First Pentecostal Church of Holly Springs v. City of Holly Springs, Miss.*, 959 F.3d 669, 670 (5th Cir. 2020) (same re: municipality's similar restriction); *Yashica Robinson v. Att'y Gen., State of Alabama*, 947 F.3d 1171, 1179 (5th Cir. 2020) (upholding preliminary injunction against state orders restricting abortion for the purpose of slowing COVID-19, and stating *Jacobson*'s ruling "was not an absolute blank check for the exercise of governmental power"); *Adams & Boyle P.C. et al. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) (same, and holding that state restriction on abortion rights was an unquestionable "plain, palpable invasion of rights" under *Jacobson*).

As this Court has already put it, any *Jacobson* deference ends when the government's "decisions result in curtailment of fundamental rights without compelling reason." *Soos*, 2020 WL 3488742 at *8. That is exactly what's happened here – again – as a result of defendants' new EO 202.68 effectively locking down houses of worship and religious schools without compelling justification, which plaintiffs discuss further below.

Moreover, *Jacobson* deference does not even apply to claims raised under the Free Exercise and Free Speech Clauses. As the Second Circuit has recognized, "*Jacobson* did not address the free exercise of religion because, at the time it was decided the Free Exercise Clause of the First Amendment had not yet been held to bind the states." *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015). The same logic applies to the Free Speech Clause, and thus "*Jacobson* does not specifically control" plaintiffs' constitutional challenges here. *See also*

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting) ("It is a considerable stretch to read [*Jacobson*] as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case.").

Therefore, this court need not even consider *Jacobson* deference here. But even if it does, there is no doubt the Cluster Initiative "has no real or substantial relation to [its] objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 28.

**B.      Defendants' Cluster Initiative Is Neither Neutral Nor Generally Applicable Under the Free Exercise Clause.**

As is well known by now, the Free Exercise Clause requires that laws burdening religion be neutral *and* generally applicable—or otherwise pass through the cauldron of strict scrutiny. *See Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). The Cluster Initiative fails both prongs. It is not neutral because, on its face and in its real operation, it targets plaintiffs' religious practices. And it is not generally applicable because it fails to prohibit nonreligious conduct—such as the operation of factories, warehouses, and crowded homeless shelters—that even Governor Cuomo *admits* endanger the government's interests in stopping COVID-19 to the same or greater degree than plaintiffs' houses of worship or religious schools.

**1.      The Initiative is not neutral because it blatantly targets plaintiffs' religious practices.**

"A law is not neutral, the Supreme Court has said, if it is 'specifically directed at [a] religious practice.'" *Cent. Rabbinical Cong. Of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193-94 (2d Cir. 2014) (quoting *Smith*, 494 U.S. at 894). Lack of neutrality can be evident on the face of the statute, "for the minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

508 U.S. 520, 534 (1993). But even facial neutrality is not sufficient. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality," and "[t]he Free Exercise Clause protects against government hostility which is masked as well as overt." *Lukumi*, 508 U.S. at 534. Therefore, courts "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id.* (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970)).

Here, the Cluster Initiative violates facial neutrality because EO 202.68 explicitly targets plaintiffs' religious practices by singling out "houses of worship" for completely unique burdens in the Red, Orange, and Yellow Zones. EO 202.68 also targets plaintiffs in its real operation and intent, based on a number of blatant public admissions by defendants, as discussed below.

First, the Red, Orange, and Yellow Zones single out "houses of worship" for totally unique burdens because of their religious nature. In the Red Zone, only "houses of worship" are restricted to 25% of capacity or 10 people maximum, whichever is less. (EO 202.68 at 2.) Although non-essential businesses and schools in this zone must close (*see id.*), "essential gatherings" are completely permitted without limitation. (EO 202.68 at 2 (stating that only "non-essential" gatherings must close in the Red Zone).)[4] Further, the attendant Guidance Document makes clear that all manner of similarly situated *essential* businesses may remain open without any limits on

---

[4] This may or may not be a change from Governor Cuomo's initial rollout of the Cluster Initiative on October 6th, when the announcing press release and chart stated that "Mass Gatherings" would be "Prohibited" in the Red Zone, limited to "10 people maximum, indoor or outdoor" in the Orange Zone, and limited to "25 people maximum, indoor or outdoor" in the Yellow Zone. *See* "Governor Cuomo Announces New Cluster Initiative Action," October 6, 2020, https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative. Of course, the press release did not specify (as EO 202.68 now does) whether the "Mass Gatherings" limits apply to "essential gatherings." According to EO 202.68, they do not.

rate of occupancy. (Guidance Doc., *supra* n.2.) These include nursing homes and "congregate care" facilities, packed airplanes and public transportation busses, food processing centers and other manufacturers, retail stores, and homeless shelters. Thus, the Red Zone imposes a totally unique burden on gatherings for a *religious* purpose (i.e., a 10-person limit on worship) that doesn't apply at all to any other secular activity period, including similarly situated activities or gatherings (e.g., "essential gatherings," congregate care facilities, airplane travel, factories, drop-in centers, homeless shelters) that are carried out for non-religious purposes. *See Lukumi*, 508 U.S. at 533 ("[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.") This is a blatant violation of facial neutrality.

The Orange and Yellow Zones have the same problem. The Orange Zone requires only "houses of worship" to remain at 33% of capacity or 25 people maximum, whichever is lower, while exempting essential gatherings, essential businesses, and even non-high-risk non-essential businesses (i.e., *most* businesses). (EO 202.68 at 2.) And the Yellow Zone requires only "houses of worship" to remain at 50% of capacity, while imposing no such limits on schools, essential gatherings, essential businesses, and all non-essential businesses.

All three zones, then, impose express burdens "specifically directed at [a] religious practice," *Cent. Rabbinical Cong. of U.S. & Canada*, 763 F.3d at 193 (quoting *Smith*, 494 U.S. at 878), i.e., gatherings for the purpose of *worship*, and thus fail the test of facial neutrality.

Second, even if the Cluster Initiative were facially neutral, it still targets plaintiffs' religious practices in its real motivation and operation. This is readily apparent from the below circumstances, which show that the real object of the Cluster Initiative is to restrict religious gatherings.

Start with Governor Cuomo's press conference on October 5th. There, in announcing he would be closing all schools in 20 "hot spot zip codes," he leveled specific and prolonged threats at religious communities, and at Orthodox Jews in particular, without any actual evidence or data that religious communities or Orthodox Jews have been a unique source of spreading COVID-19 at all, let alone more than other similarly situated activities. For example, Cuomo stated, without any evidence, that "[w]e know religious communities have been a problem. . . . We know there have been mass gatherings going on in concert with religious institutions in these communities for weeks." (First Am. Compl. ¶88.) He then displayed two photographs purporting to show recent mass gatherings of Orthodox Jews—except one of the photos was taken 14 years ago, in 2006, during the funeral of a revered and popular rabbi. (Id. ¶90.) This was the only evidence Cuomo presented during the press conference.

During the same press conference, Cuomo went on to specifically threaten "religious institutions," and no one else, stating that "religious institutions . . . whether it's the Jewish community, whether we're talking about Black Churches, whether we're talking about Roman Catholic Churches," could remain at 50% of capacity as long as they "followed the rules." (Id. ¶88.) He then said "[i]f you do not agree to enforce the rules, then we'll close the institutions down. I am prepared to do that." (Id.) He also declared that he would be meeting with "ultra-Orthodox community" the following day, and that "I have to say to the Orthodox community tomorrow, 'If you're not willing to live with these rules, then I'm going to close the synagogue.'" Cuomo did not make any similar threats to or declarations of intent to meet with purveyors of any other types of activities or industries in New York. (Id.)

Cuomo also expressly revealed his defiance of this Court's June 26th Order by declaring and complaining that Jews "are only supposed to have 50 outdoors," (First Am. Compl. at ¶91),

10

when in fact this Court's Order forbade Cuomo and the other defendants from imposing *any* limits on the number of people gathered for religious worship outdoors. (ECF No. 35 at 35.)

Later during the same press conference, Cuomo was asked how he had the legal authority to "close down religious institutions" in light of this Court's June 26th Order requiring equal treatment with Phase 2 Industries. (First Am. Compl. ¶91.) As part of the response, Melissa DeRosa, Secretary to Governor Cuomo, stated that under the Court's order, new restrictions would be OK as long as New York is not applying "a different standard than *any other business*," in which case "you're not saying a religious institution is being treated differently than *any other institution* because the law would be applied evenly throughout." (Id.) (Emphasis added.) In other words, the point of closing down non-essential businesses was an attempt to ensure the legality of imposing draconian restrictions on houses of worship.

Remarkably, Governor Cuomo confirmed as much the following day at his October 6th press conference. There he announced the new Cluster Initiative and his decision to impose new 10- and 25-person limits on religious communities in the Red and Orange Zones, respectively, notwithstanding his previous comments to leave them at 50% of capacity if they "follow[ed] the rules." In promulgating his new rules, Governor Cuomo expressly stated that his real object was to restrict religion, not businesses:

> **[T]he new rules are most impactful on <u>houses of worship</u>, because the virus is not coming from non-essential businesses. *That's not what this is about*.** It may be spread by non-essential businesses. The virus is not starting in schools. It may be spread by schools. This is about mass gatherings. One of the prime places of mass gatherings are houses of worship. I understand it's a sensitive topic, but that is the truth. Period. You want to solve the problem? Acknowledge the problem.

(First Am. Compl. 86.) For Governor Cuomo, then, "houses of worship" are the problem, despite failing to present any evidence supporting his claim. *Cf. Lukumi*, 508 U.S. at 534 ("The record in

this case compels the conclusion that suppression . . . of the Santeria worship service was the object of the ordinances.").

Never mind the fact EO 202.68 plainly exempts "essential gatherings" by prohibiting only "non-essential gatherings" (EO 202.68 at 2), or that it allows, without limitation, countless forms of essential businesses in the Red Zone, and non-essential businesses in the Orange Zone, where people congregate in a similar fashion as they do at religious gatherings (including, ironically enough, in "congregate care facilities"). (Guidance Doc., *supra* n.2.)[5]  What's more, Governor's Cuomo's anti-religious targeting was further cemented by his comments at the beginning of the same October 6th press conference, where he admitted COVID-19 has spread "in factory settings around the country, [and] in produce plants, [and in] apple plants in New York."[6] The video monitor playing alongside Cuomo's statements then displayed an image of a newspaper headline stating: "82 of 179 workers at Oswego apple processing plant have the coronavirus."[7] Yet Cuomo's Guidance Document plainly exempts food processing plants and all manner of other essential and known super-spreaders like factories, meat-packing plants, and more.

An additional fact is relevant here. On the morning of October 6th, Governor Cuomo reportedly told leaders of the Jewish community that they could remain at 50% of capacity as long

---

[5] *See, e.g.*, Noah Y. Kim, "What is the Risk of Catching Coronavirus on a Plane?" KHN & POLITIFACT Healthcheck, September 10, 2020 (noting that Harvard University professor of exposure assessment science Joseph Allen stated that airplanes, where social distancing is almost impossible, are "excellent vectors for viral spread").

[6] "New York Governor Andrew Cuomo Press Conference Transcript October 6," Rev, at 01:25, https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomo-press-conference-transcript-october-6.

[7] Governor Cuomo Announces Cluster Action Initiative, Oct. 6, 2020, at 00:02:17, https://www.youtube.com/watch?v=k-cxgfudHUo&feature=emb_logo.

they committed to helping him stop the spread of COVID-19 in their respective communities.[8] Hours later, he announced his Cluster Initiative imposing substantially more restrictive limits on many houses of worship in Queens, Brooklyn, and elsewhere. (First Am. Compl. ¶99) (describing eyewitness account confirming the event and expressing feelings of betrayal on behalf of the New York Jewish community). Such a drastic about face demonstrates a particular lack of respect and even hostility toward the Jewish and religious community, consistent with his stated theory that houses of worship, and not numerous other similarly situated gatherings and activities, are the ultimate problem.

There is also "significant evidence of . . . improper targeting of [religious worship] in the fact that [EO 202.68] proscribe[s] more religious conduct than is necessary to achieve [its] stated ends." *Lukumi*, 508 U.S. at 538. This is clearly seen in that only one day before  rolling out the Cluster Initiative, Governor Cuomo said 50% of capacity in houses of worship is a sufficient limit to prevent COVID-19 clusters as long as religious communities properly abided. To then move to a 10-person limit one day later, on October 6th, while still allowing essential and even non-essential businesses, essential gatherings, schools, and other activities to operate at varying degrees of greater freedom reeks of overbreadth and punitive intent, rather than narrow tailoring to the scope of the actual problem. As the Supreme Court has put it, "[t]he neutrality of a law is suspect if First Amendment freedoms are curtailed" (here, religious gatherings) "to prevent isolated collateral harms" (mass gatherings) "not themselves prohibited by direct regulation" (e.g,. all mass gatherings period, including essential gatherings, essential businesses, etc.). *Lukumi*, 508 U.S. at 539. Thus, EO 202.68 clearly fails the test of neutrality.

---

[8] Julia Marsh, Bernadette Hogan, and Aaron Feis, "Cuomo pulls back pledge of less-severe COVID-19 restrictions to Jewish leaders," New York Post, Oct. 7, 2020, available at https://nypost.com/2020/10/07/cuomo-pulls-back-vow-of-less-severe-covid-19-rules-to-jewish-leaders/.

EO 202.68's application to religious schools is likewise not neutral. After all, religious schools must completely shut down in the Red and Orange Zones, and must ensure all students submit to frequent mandatory testing in the Yellow Zone. (EO 202.68 at 2.) Here, EO 202.68 "may be treated as a [whole] for neutrality purposes," since "[i]t would be implausible to suggest that" its application to houses of worship, but not to schools, "had as [its] object the suppression of religion." *Lukumi*, 508 U.S. at 540 (holding that ostensibly neutral ordinance should be grouped together with clearly non-neutral ordinances since they were all passed the same day in response to the Santeria religion and all had the same ultimate object). This is especially true where courts in recent months have viewed schools as an appropriate comparator with houses of worship for purposes of determining a law's general applicability under the Free Exercise Clause. *See, e.g.*, *Cassell v. Snyders*, No. 20-cv-50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020) ("A more apt analogy is between places of worship and schools. . . . [E]ducation and worship are both activities where people sit together in an enclosed space to share a communal experience, exacerbating the risk of contracting the coronavirus." (citing and quoting *Gish v. Newsom*, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020)). Thus, shutting down schools adds to the appearance of legal neutrality in nearly shutting down houses of worship. Therefore, EO 202.68 is not neutral as to any of the plaintiffs in this lawsuit and must therefore pass strict scrutiny (which it fails, as discussed below).

2. **The Cluster Initiative is not generally applicable because it exempts numerous gatherings, activities, and businesses that are at least as harmful to the government's interests.**

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. As the original plaintiffs recited recently (ECF No. 2-4 at 9), a law is not generally applicable if it is substantially underinclusive—that is, when it "fail[s] to prohibit nonreligious conduct that

endangers [the government's interests] in a similar or greater degree than [the prohibited religious activity] does." *Lukumi*, 508 U.S. at 543; *see also Central Rabbinical Congress of U.S. & Canada v. New York Dep't of Health*, 763 F.3d 183, 197 (2d Cir. 2014) (stating that a law is not generally applicable if it "is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it"). Finally, there is a rule against individualized exemptions providing that when an otherwise general rule allows an "individualized government assessment of the reasons for the relevant conduct" as a basis for granting an exemption, the rule must undergo strict scrutiny. *Smith*, 494 U.S. at 884.

Based on the earlier discussion of EO 202.68's lack of neutrality, its lack of general applicability in all three Zones is essentially self-evident. But a few key comparisons are in order.

First, after this Court's June 26th Order granting a preliminary injunction for the original plaintiffs, the Seventh Circuit U.S. Court of Appeals acknowledged, in a similar context, that "we do not deny that warehouse workers and people who assist the poor or elderly may be at much the same risk as people who gather for large, in-person worship." *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020). Unfortunately, however, the Seventh Circuit erroneously dismissed these comparators on the notion that these activities "must be carried on in person," while religious activities allegedly must not be. *Id.* Specifically, the Seventh Circuit stated that "it is hard to see how food production, care for the elderly, or the distribution of vital goods through warehouses could be halted," and that meanwhile, religious services could be streamed online. *Id*. But this was an entirely impermissible value judgment that simply undervalued the equal importance of in-person religious worship. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.) ("[W]hen the government makes a

value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.") Thus, the takeaway here is that even the Seventh Circuit has recognized certain exempted essential businesses are legitimate comparators with religious worship. Exempting the former but not the latter triggers strict scrutiny.

This Court recognized as much in its June 26th Order, where it ruled that Defendants' then-current regulations failed strict scrutiny "for the reasons articulated in plaintiffs' memorandum of law," at ECF No. 2-4 at 16-18. (ECF No. 35 at 33). In that memorandum, plaintiffs noted the then-current orders failed to advance a compelling interest because they left "appreciable damage to the government's supposedly vital interest unprohibited." (ECF No. 2-4 at 17.) Plaintiffs specifically pointed to exemptions for "all essential businesses from the gathering size limits, including manufacturers, retail outlets, big box hardware stores, charitable and social service organizations (including crowded drop-in centers), and more." (Id. at 17-18.) By agreeing with that analysis, this Court has already recognized that exemptions for such essential businesses "fail[] to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Central Rabbinical Congress of U.S. & Canada*, 763 F.3d at 197.

Defendants' new Cluster Initiative expressly exempts the same similarly situated essential activities in all three Zones. (*See generally* Guidance Document, *supra* n.2.) Indeed, it even appears houses of worship would incur no occupancy restriction whatsoever if they used their premises to provide a homeless shelter, a food bank, or other "critical human services" which provide "direct care or support" of individuals in the community." (*See* Guidance Document.) *Cf. Harvest Rock Church, Inc. v. Newsom*, No. 20-55907, 2020 WL 5835219, at *6 (9th Cir. Oct. 1, 2020) (O'Scannlain, J., dissenting) ("California's framework would plainly permit a church in Tier 1 county to host a group for some non-religious purpose, but the *same* church would be prohibited

from hosting an event for the *same* people in the *same* setting for the *same* length of time simply if it were for purposes of religious worship. It is difficult to conceive of a more obvious form of discrimination against religious activity than that.").

EO 202.68 is thus substantially underinclusive as to its purposes in all three zones, including the Red Zone (which exempts essential gatherings and essential businesses), the Orange Zone (which adds exemptions for numerous non-essential businesses (any that are not "high risk")), and the Yellow Zone (which adds exemptions for all remaining non-essential businesses and indoor dining and schools without capacity limitations).  EO 202.68 must therefore survive strict scrutiny (which it cannot).

Moreover, EO 202.68's lack of general applicability also applies to the religious schools attended by the Jewish plaintiffs' children and P.L. and G.L.. Religious education is an extension of their religious worship and provides daily education and growth in the Jewish and Catholic faiths, respectively. (First Am. Compl. ¶107-113; ¶155-160.)  *Cf. Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ("The religious education and formation of students is the very reason for the existence of most private religious schools."). Because their schools are located in a Red Zone, Defendants' Cluster Initiative imposes severe burdens on plaintiffs' religious exercise Given that schools are similarly situated to churches, *see Cassell*, 2020 WL 2112374 at *10, Defendants' exemptions for the aforementioned activities, businesses, and gatherings render the total bans on in-person education in the Red and Orange Zones substantially underinclusive. As to the Yellow Zone, the government's demand that schools therein conduct weekly COVID-19 testing of even a-symptomatic students and personnel on a regular basis, without imposing the same requirement on the aforementioned numerous similarly situated

activities, is also substantially underinclusive. Therefore, EO 202.68's restrictions on religious schools must also survive strict scrutiny.

One other point bears mentioning. Contrary to Ms. DeRosa's apparent belief at the October 5th press conference, the Cluster Initiative is not saved by its attempt to shut down non-essential businesses in the Red Zone in attempt to create the appearance of general applicability. "[T]he State cannot evade the Free Exercise Clause merely by linking its severe restrictions on worship attendance to those imposed on one or two categories of comparable secular activity," but rather must "justify its decision to treat more favorably a host of other comparable activities which so evidently raise the State's same express concerns about the disease." *Harvest Rock Church*, 2020 WL 5835219, at \*5 (O'Scannlain, J., dissenting); *see also Calvary Chapel v. Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2613-14 (2020) (Alito, J., dissenting) ("[I]t does not suffice to point out that *some* secular businesses . . . are subject to the lesser . . . occupancy cap. The legal question is not whether religious worship services are all alone in a disfavored category, but why they are in the disfavored category to begin with."). Thus, Defendants' decision to shut down some businesses, but not countless others, under EO 202.68 fails to save the Cluster Initiative from non-general applicability.

Finally, EO 202.68's exemption for "essential gatherings," without further definition, is an individualized exemption that must include religious gatherings (even indoors), or otherwise pass strict scrutiny. As the original plaintiffs previously recited (ECF No. 2-4 at 10), the Supreme Court has explained that a law withholding unemployment benefits when someone quits or refuses work "without good cause" creates a mechanism for individualized exemptions triggering strict scrutiny where *religious* reasons are not deemed "good cause." *Smith*, 494 U.S. at 884. This is true as well for a law punishing anyone who kills an animal "unnecessarily" where the government's

application of the "test of necessity devalues religious reasons for killing by judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 437.

Here, as under Defendants' previous orders, the analogous mechanism is the phrase "*essential* gatherings." EO 202.68 forbids only "non-essential gatherings" in all three Zones, thus plainly allowing "essential gatherings" without further definition. Insofar as this exemption requires an individualized government assessment of the reasons for the relevant conduct (i.e., gatherings) in order to be exempt, *see Smith*, 494 U.S. at 884, religious gatherings must qualify as essential. Otherwise EO 202.68 must survive strict scrutiny.

### 3. The Cluster Initiative fails strict scrutiny.

As the original plaintiffs previously recited (ECF No. 2-4 at 16-18), where a law fails to meet the Free Exercise requirements of *Smith*, "[t]he compelling interest standard that [courts] apply . . . is not water[ed] . . . down but really means what it says." *Lukumi*, 508 U.S. at 546 (internal quotation marks omitted) (ellipses and last alteration in original). "A law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id*. at 547 (internal quotation marks omitted). And the Second Circuit has recognized that "a policy's underinclusiveness suggests that the proffered interest is not quite as compelling as the government claims." *Williams v. Annucci*, 895 F.3d 180, 189-90 (2d Cir. 2018).

Here, it is not enough for defendants to say they have a general compelling interest in stopping Covid "Clusters" in the newly restricted New York zones. Rather, the applicable compelling interest test "scrutinize[es] the asserted harm of granting specific exemptions to particular claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (noting the state's asserted "paramount" interest in education in *Wisconsin v. Yoder*, 406 U.S. 205 (1972) did not equate to a compelling interest in requiring Amish claimant to comply

with compulsory education law). Here, the original plaintiffs remain committed to abiding by proper social distancing and hygiene practices, and infant plaintiffs P.L. and G.L.'s Catholic school has implemented Covid-19 protocols that far exceed the requirements under the executive orders and the recommendations of the CDC. Meanwhile, all manner of similarly situated businesses, activities, and gatherings remain allowed to varying greater degrees as discussed above. (*See, e.g.*, Delgado Dec., ECF No. 2-1 at ¶45 (stating that risk of contracting COVID-19 in a manufacturing facility is only 25% that of contracting it in a house of worship); and at ¶52 (stating that risk of contracting COVID-19 in a supermarket is only 12% that of contracting it in a house of worship)). It is therefore simply untenable to say Defendants have a compelling interest in applying the Cluster Initiative to these particular, socially distant, hygienic, and COVID-19-conscience plaintiffs.

In addition, as made clear above, the Cluster Initiative's voluminous exemptions "leave[s] appreciable damage to" the government's interests "unprohibited." *Lukumi*, 508 U.S. at 547. Such underinclusiveness shows that a more narrowly tailored approach providing equal treatment for houses of worship with other exempted activities is indeed possible. *See, e.g.*, *Annucci*, 895 F.3d at 193 (holding that prison's failure to explain more favorable treatment of "analogous nonreligious conduct" in refusing to grant a religious dietary accommodation to inmate led the court "to suspect that a narrower policy that burdens [inmate] to a lesser degree is in fact possible"). Therefore, defendants cannot show that applying the Cluster Initiative to plaintiffs, but not to analogous nonreligious conduct, furthers a compelling interest. EO 202.68 thus fails strict scrutiny.

**C.     The Cluster Initiative Violates Plaintiffs' Freedom of Speech and Assembly.**

The original plaintiffs once again reiterate that the freedom of speech and assembly are "cognate rights" under the U.S. Constitution and can be analyzed together for purposes of this challenge. *Thomas v. Collins*, 323 U.S. 516, 530 (1945). (*See* ECF No. 2-1 at 19.) For purposes of

this motion, plaintiffs assume without conceding that the Cluster Initiative, as embodied in EO 202.68, is a content-neutral restriction of expression. They allege only that, for purposes of this motion, the Cluster Initiative is an unreasonable time, place, and manner restriction of expression and thus fails intermediate scrutiny.

As a preface, plaintiffs' worship and religious educational activities involving the proclamation of the Word of God and inculcation of religious values are quintessential protected expression. *See Good News Club v. Milford Central School*, 533 U.S. 98 (2001) (recognizing forum restriction on organization that taught Bible verses to children via stories, games, and prayer was a restriction on the freedom of speech). Thus, the Cluster Initiative's restriction on plaintiffs' religious worship must be narrowly tailored in furtherance of a significant government interest, and leave open ample alternative channels for communication." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Here, the Cluster Initiative easily fails this test.

Like the earlier restrictions challenged by the original plaintiffs, the Cluster Initiative is not narrowly tailored because it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Id*. at 486 (internal quotation marks omitted). As is made abundantly clear above, EO 202.68 imposes vastly different and more restrictive burdens on plaintiffs than all manner of other gatherings, activities, and businesses, even though plaintiffs are committed to following proper social distancing and hygiene requirements, (Original Complaint at ¶¶102, 118-19, 132-33, 151), and infant plaintiffs G.L. and P.L.'s Catholic school far exceeds the requirements of New York's executive orders and the recommendations of the CDC. In other words, the government has shown it can accomplish its interests in a more narrow way than the draconian restrictions imposed by EO 202.68. Indeed, only one day before announcing the Cluster Initiative, Governor Cuomo indicated that 50% of capacity was a reasonable and safe limit for

houses of worship. Although government need not use the least restrictive means of advancing its interests here, defendants own exemptions, statements, and actions show that the Cluster Initiative's burden on plaintiffs' religious exercise is anything but narrowly tailored.[9]

Further, the Cluster Initiative does not at all leave open ample alternative channels of communication. For the Jewish plaintiffs, the Red Zone's 10-person maximum leaves them entirely unable to worship in person if they are not part of the *minyan*, and even if they are, they cannot worship alongside their closest companions (i.e. their spouses and children). Nor can they drive outside a Cluster "Zone" to a different synagogue because they do not travel in vehicles on the Sabbath. And the Jewish plaintiffs' children, along with infant plaintiffs P.L. and G.L., are unable to receive an adequate daily religious education, a deeper appreciation for their respective faiths, and (for P.L. and G.L.) properly prepare to receive their holy sacraments as required to follow the Catholic faith. Only restoration of their right to adequately worship in person and receive a proper, in-person religious education is ample in this case. The Cluster Initiative thus violates plaintiffs' rights to freedom of speech and assembly.

Plaintiffs are thus likely to succeed on the merits of their constitutional claims.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO.

"Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020). Because the standard for obtaining a TRO is the same as that for a preliminary injunction, the same holds true. A summary analysis is thus in order.

---

[9] Defendants' draconian regime is also significantly out of proportion with their own data, as shown in the First Amended Complaint at ¶80-83, ¶55-63.

Here, restricting plaintiffs' religious exercise and freedom of speech and assembly clearly inflicts irreparable harm, as it is well established that "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And failure to abide by the Defendants' limits will result in a civil penalty of up to $15,000 *per day* for anyone who "encourages, promotes, or organizes" a forbidden gathering. (EO 202.68 at 1.) Plaintiffs will clearly suffer irreparable harm in the absence of a TRO.

## III.   THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFF'S FAVOR.

Here, the harm to plaintiffs would vastly exceed that to defendants in the absence of a TRO. Without a TRO, plaintiffs must face imminent and ongoing violations of their fundamental constitutional rights, and/or face the prospect of paying exorbitant and crippling fines. Defendants, on the other hand, would merely be required to treat plaintiffs equally with other similarly situated activities which the government voluntarily exempts, and thus would suffer no harm to any legitimate interest. *See Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ("[A]n injunction appropriately permits religious services with the same risk-minimizing precautions as similar secular activities, and permits the Governor to enforce social distancing rules in both settings."). The balance of harms thus tips decidedly in Plaintiffs favor.

## IV.   THE PUBLIC INTEREST FAVORS ENTERING A TRO FOR PLAINTIFFS.

A TRO for plaintiffs clearly serves the public interest. Indeed, "treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees." *Roberts*, 958 F.3d at 416. Here plaintiffs merely seek a TRO freeing them from EO 202.68's new draconian restrictions and providing them equal treatment with similarly situated exempted activities. And as the Second Circuit says, "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). A TRO would plainly serve it here.

## **CONCLUSION**

For the foregoing reasons, this Court should grant plaintiffs' motion for a temporary restraining order.

Dated: October 9, 2020

Respectfully submitted,

s://Christopher A. Ferrara

_____
Christopher A. Ferrara, Esq.
(Bar No. 51198)
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
Special Counsel , Thomas More Society
*Counsel for Plaintiffs*


/s/ Michael McHale
Michael McHale
10506 Burt Cir. Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
Counsel for Thomas More Society
*Counsel for Plaintiffs*

24