UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THE ROMAN CATHOLIC DIOCESE OF
BROOKLYN, NEW YORK,

                Plaintiff,

      -against-

GOVERNOR ANDREW M. CUOMO, in his
official capacity,

                Defendant.

**MEMORANDUM & ORDER
20-CV-4844 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff The Roman Catholic Diocese of Brooklyn, New York ("the Diocese") claims, under 42 U.S.C. § 1983, that Defendant Governor Andrew M. Cuomo's New Cluster Action Initiative, as enacted by New York Executive Order 202.68 in response to a recent spike in COVID-19 cases in certain areas of the state, violates the Free Exercise Clause of the First Amendment as applied to the Diocese's churches. The Diocese seeks a preliminary injunction to bar the enforcement of Executive Order 202.68 against it. (*See* Pl. Mot. for a Prelim. Inj. (Dkt. 3); Pl. Mem. in Supp. of Mot. ("Mem.") (Dkt. 4); Def. Mem. in Opp. to Mot. ("Opp.") (Dkt. 18); Pl. Reply (Dkt. 24).) For the reasons that follow, the motion is DENIED.

## I.  BACKGROUND[1]

### A.  The COVID-19 Pandemic in New York

In the past seven months, more than 479,000 people in New York State have tested positive for COVID-19 and more than 25,000

---

[1] The court takes the facts from the declarations and affidavits submitted, as well as witness testimony taken at an evidentiary hearing conducted on October 15, 2020. Citations to witness testimony refer to the hearing transcript that will be filed to the public docket.

people have died.[2] The most fortunate New Yorkers will remember always the devastation that the first wave of the pandemic wrought. Tens of thousands of others, disproportionately front-line workers, low income people, and people of color[3]—or a combination thereof—will not. New York today is not like the New York of October 2019, but it is also a much different, and safer place than the New York of April and May 2020. That is due, in no small part, to the response of state and local governments, as well as the efforts of non-governmental institutions, like the Diocese.

New York was among the first states hit by the pandemic and, at its worst, the state had more COVID-19 cases than any single country in the world other than the United States. (Declaration of Dr. Debra S. Blog ("Blog Decl.") (Dkt. 20) ¶ 25.) Beginning in March 2020 and continuing up to the present day, Governor Cuomo has implemented a series of executive orders to combat the virus: from a facemask mandate, to closures of certain businesses and gathering places, to efforts to reduce density and promote social distancing, to cleaning protocols, and more. (*See id.* ¶¶ 29-36.) The efforts to "flatten the curve" have worked. In March and April 2020, over ten-thousand people were testing positive for COVID-19 in New York daily. (*Id.* ¶ 37, *see also* n. 2 supra.) By June 2020, daily positive cases were in the hundreds with a positivity rate around 1%, where it has remained thus far. (*Id.*) On April 14, 2020 over one-thousand New Yorkers died of COVID-19, with a seven-day average of over nine-hundred

---

[2] *See* New York State Dep't of Health COVID-19 Tracker, https://covid19tracker.health.ny.gov (last viewed Oct. 16, 2020).

[3] *See, e.g.* Centers for Disease Control, Health Equity Considerations and Racial and Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last viewed Oct. 16, 2020).

deaths per day.[4] On October 14, 2020, eleven New Yorkers died, with a seven-day average of nine deaths per day.[5]

For all of the State's leadership, COVID-19 safety protocols have been adopted and self-enforced, primarily and necessarily, within communities. And from the beginning, the Diocese has been an exemplar of community leadership. At each step, the Diocese—a division of the Roman Catholic Church that heads 186 parishes in Brooklyn and Queens—has been ahead of the curve, enforcing stricter safety protocols than the State required at the given moment. On March 16, 2020, the Diocese cancelled all public masses, although it was not required to until days later. (Declaration of Bishop Raymond F. Chappetto ("Chappetto Decl.") (Dkt. 5) ¶ 7; Blog Decl. ¶¶ 29-32.) The Diocese's churches did not hold in-person mass again until July, a week after the State permitted. (Chappetto Decl. ¶ 10.) Before reopening, the Diocese formed a committee chaired by Joseph Esposito, a career New York City public servant who has served as Chief of the Department of the New York City Police Department and as Commissioner of the New York City Office of Emergency Management. (Declaration of Joseph J. Esposito ("Esposito Decl.") (Dkt. 6) ¶ 1.) Based on the committee's recommendations, when the Diocese's churches finally reopened, they did so with rigorous safety protocols including:

---

[4] New York Times, New York COVID Map and Case Count, https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html (last viewed Oct. 16, 2020).

[5] *Id.*

- A 25% capacity limit, which survives to this day, even though under state law, churches were permitted to increase attendance to 33% of capacity when New York City entered "Phase 4" of the state reopening guidelines on July 20, 2020. (Chappetto Decl. ¶¶ 14, 16.)

- A mask requirement for any person entering a church.

- Strict seating protocols to keep parishioners six feet apart, including seating only in alternating pews.

- Hand sanitizer at every door as well as bulk cleaning supplies and cleaning protocols in every church.

- Prominent signage about safety protocols.

- Significant changes to the mass itself, including measures to reduce the mass's length and an order that communion would be received only by hand, meaning that the host would never be placed directly into a parishioner's mouth. Churches also eliminated altogether the wine, or Precious Blood, from communion.

(*See* Testimony of Bishop Chappetto ("Chappetto Tr.") at 13-20.) According to Bishop Chappetto, there has not been any COVID-19 outbreak in any of the Diocese's churches since they re-opened. (Chappetto Decl. ¶ 15.)

### B. New Cluster Action Initiative and Executive Order 202.68

Unfortunately, while New York has had success fighting the pandemic for the past few months, it is still with us, and positivity rates remain over 10% in 33 other states. (Blog Decl. ¶ 48.) In early October, the State noticed spiking COVID-19 positivity in certain geographic hotspots. On October 5, the State identified twenty problematic zip codes in which the average positivity rate was 5.5%, compared to 1.2% in the rest of the state. (Oct. 5,

4

2020 Stmt. of Gov. Cuomo (Dkt. 22-3) at 3.) And in discrete areas within those zip codes—areas that are now the subject of this litigation—positivity rates reached approximately 8% on October 8. (*See* Declaration of Dr. Howard Zucker ("Zucker Decl.") (Dkt. 29-1) ¶ 23.) On Tuesday, October 6, in response to those spikes, Governor Cuomo announced that a "New Cluster Action Initiative" ("Initiative") would go into effect as soon as the next day and no later than Friday, October 9. (*See* Oct. 6, 2020 Announcement ("Announcement") (Dkt. 7-4) at ECF pp. 15-17.) The Initiative was codified by Executive Order 202.68 ("EO"). (*See* EO 202.68 (Dkt. 12-1).)

Under the EO, which remains in effect, the New York State Department of Health ("DOH") is directed to "determine areas in the State that require enhanced public health restrictions based upon cluster-based cases of COVID-19" and to designate those areas as a "red zones", "orange zones", or "yellow zones" based on the state of the outbreak there. (*Id*.) Red zones are areas where there is currently an active cluster of COVID-19 cases; orange zones are "warning zones"; and yellow zones are "precautionary zones." (*Id*.)  In "red zones":

> Non-essential gatherings of any size shall be postponed or cancelled; all non-essential businesses, as determined by the Empire State Development Corporation based upon published guidance, shall reduce in-person workforce by 100%; **houses of worship shall be subject to a capacity limit of 25% of maximum occupancy or 10 people, whichever is fewer**; any restaurant or tavern shall cease serving patrons food or beverage on-premises and may be open for takeout or delivery only; and the local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise provided in Executive Order.

In "orange zones":

> Non-essential gatherings shall be limited to 10 people; certain non-essential businesses, for which there is a higher risk associated with the transmission of the COVID-19 virus, including gyms, fitness centers or classes, barbers, hair salons, spas, tattoo or piercing parlors, nail technicians and nail salons, cosmetologists, estheticians, the provision of laser hair removal and electrolysis, and all other personal care services shall reduce in-person workforce by 100%; **houses of worship shall be subject to a maximum capacity limit of the lesser of 33% of maximum occupancy or 25 people, whichever is fewer**; any restaurant or tavern shall cease serving patrons food or beverage inside on-premises but may provide outdoor service, and may be open for takeout or delivery, provided however, any one seated group or party shall not exceed 4 people; and the local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise provided in Executive Order.

In "yellow zones":

> Non-essential gatherings shall be limited to no more than 25 people**; houses of worship shall be subject to a capacity limit of 50% of its maximum occupancy and shall adhere to Department of Health guidance**; any restaurant or tavern must limit any one seated group or party size to 4 people; and the Department of Health shall issue guidance by October 9, 2020 regarding mandatory testing of students and school personnel, and schools shall adhere to such guidance.

(*Id.* (emphasis added).) DOH initially identified five counties experiencing an increase in COVID-19 cases for enhanced restrictions: Kings (Brooklyn), Queens, Broome, Orange, and Rockland. (Announcement at ECF p. 15.) All five counties are home to large Orthodox Jewish populations. (*See* Eric Levenson, Kristina Sgueglia, and Melanie Schuman, *New York Sees Uptick in*

*COVID-19 Cases in Orthodox Jewish Neighborhoods*, CNN, Sept. 30, 2020 (Dkt. 7-7).)

At the press conference to announce the Initiative, Governor Cuomo said "the new rules are most impactful on houses of worship" and that the Initiative "is about mass gatherings" and "one of the prime places of mass gatherings are houses of worship." (Mem. at 14.) He also referenced his "love for the Orthodox [Jewish] community" and noted that the "Torah speaks about how certain religious obligations can be excused if you are going to save a life." (*Id.*) On October 9, Governor Cuomo was interviewed on CNN, where he said "the cluster is a predominantly ultra-Orthodox cluster. The Catholic schools are closed because they happen to be in that cluster. But the issue is with that ultra-Orthodox community . . . This is in the middle of Brooklyn. They will make other people sick." (Tr. of Excerpts from Gov. Cuomo Oct. 9 Interview (Dkt. 12-2).)

### C. Procedural History

The Diocese operates 26 churches in red zones and orange zones, split roughly evenly between the two. (Chappetto Decl. ¶ 18; Suppl. Decl. of Bishop Raymond F. Chappetto ("Chappetto Suppl. Decl.") (Dkt. 21) ¶¶ 3-5.) It maintains that EO 202.68 would "effectively close" those churches by limiting their capacity to 10 people in the red zone and 25 people in the orange zone. (Mem. at 22.) On Thursday, October 8, 2020, the Diocese filed a complaint demanding, among other remedies, emergency injunctive relief in the form of a Temporary Restraining Order ("TRO") and a preliminary injunction. (Compl. (Dkt. 1) at 22.)

On Friday, October 9, Judge Eric R. Komitee held an emergency oral argument in this case to consider the Diocese's TRO motion before weekly mass on Sunday, October 11. That night, he denied the motion in a short memorandum and order. (*See* Oct. 9 M&O ("TRO Denial") (Dkt. 15).) Judge Komitee identified the central question in the case as whether EO 202.68 is a "neutral,

generally applicable regulatory law" which is subject only to ordinary rational basis review under *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 880 (1990)[6], or whether the EO "single[s] out acts of worship for 'distinctive treatment,'" which triggers a strict scrutiny analysis, as discussed in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). (TRO Denial at 2.) Judge Komitee characterized the case as "a difficult decision for two reasons." (*Id.*) First, unlike the laws at issue in other COVID-related free exercise cases in the Second Circuit, EO 202.68 "contains provisions made expressly applicable to houses of worship." (*Id.* at 3.) Second, Governor Cuomo "made remarkably clear that this Order was intended to target a different set of religious institutions," namely ultra-Orthodox Synagogues, and the Diocese "appears to have been swept up in that effort despite having been mostly spared, so far at least, from the problem at hand." (*Id.*) However, Judge Komitee sided with the State and denied the TRO, citing the government's "wide latitude" to manage public health policy to combat disease, as discussed in *Jacobson v. Massachusetts*, 197 U.S. 11, 27, 31 (1905), as well as in COVID-specific decisions *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) and *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 344 (7th Cir. 2020). (TRO Denial at 4.)

Just a few hours before Judge Komitee's hearing, Judge Kiyo A. Matsumoto held a hearing in a related litigation in this district, *Agudath Israel of America et al. v. Cuomo*, 20-cv-4834 (KAM) (RML), in which Orthodox Jewish synagogues and rabbis challenged EO 202.68 both facially and as applied to the Orthodox Jewish community. The court denied the plaintiffs' request for a TRO in that case, as well. In a ruling from the bench, relying on

---

[6] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

8

*Jacobson* and its progeny, as well as the State's "medical, epidemiological and other expertise in formulating" the EO, Judge Matsumoto concluded that the regulation was not intended to burden religious practice and that it passed rational basis review. (Tr. of Oct. 9, 2020 Hr'g in *Agudath Israel of America et al. v. Cuomo* ("*Agudath Israel*, Hr'g Tr.") (Dkt. 19-1) at 50.)

## II. LEGAL STANDARD

In general, a court "may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014). However, to obtain a preliminary injunction against a duly enacted government action, a plaintiff cannot rely on a "fair ground for litigation" and must show a likelihood of success on the merits. *Id.* "This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995). The moving party must also show that the balance of the equities tips in its favor and that an injunction would be in the public interest. *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## III. DISCUSSION

At this stage, the court finds that the Diocese has met its burden to show irreparable harm. However, under the appropriate rational basis standard of review, the Diocese cannot demonstrate

9

a likelihood of success on the merits. And even if strict scrutiny applied, it would not be in the public interest to grant an injunction while the parties develop a record sufficient for the court to decide the issue on the merits.

### A.   Irreparable Harm

The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Further, "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (emphasis in original).

On the other hand, some courts have held that plaintiffs forced to modify their religious practice due to COVID-19 regulations have failed to show irreparable harm. In *Agudath Israel*, Judge Matsumoto held that in light of "the fact that the Orthodox community has previously complied with the total lockdown and has continued to comply with the Phase Four restriction . . . the injuries that it brings to the Court's attention are not irreparable, they are unfortunate. . . . They can continue to observe their religion but there will have to be modifications." (*Agudath Israel*, Hr'g Tr. at 66.) Other courts have collapsed the irreparable harm inquiry with the inquiry into likelihood of success on the merits. *See Legacy Church, Inc. v. Kunkel*, __F. Supp. 3d.__, 2020 WL 3963764, at *99 (D.N.M. July 13, 2020) ("courts must interpret the 'irreparable harm' factor in conjunction with whether the movant is likely to succeed on the merits"); *Carmichael v. Ige,* __F. Supp. 3d.__, 2020 WL 3630738, at *11 (D. Haw. July 2, 2020) ("[a]n alleged constitutional infringement will often alone constitute irreparable harm, but not if the constitutional claim is too tenuous.").

The court finds that the Diocese has adequately alleged that the State unconstitutionally infringed on its religious practice to establish irreparable harm for the court's current purposes.

### B. Likelihood of Success on the Merits

#### 1. Applicable Law

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The most important question before the court is which standard of review to apply in order to determine the Diocese's likelihood of success on the merits. The Diocese argues that the correct standard is strict scrutiny, which the court employs when a plaintiff mounts a challenge on free exercise grounds to "[a] law burdening religious practice that is not neutral or not of general application[.]" *Lukumi*, 508 U.S. at 546. To survive strict scrutiny, a law must be narrowly tailored to address a compelling government interest, *id.* at 531-32, and the State would need to show that its regulation is "the least restrictive means" to achieve its end, *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). In contrast, the State argues for rational basis review, which courts employ in free exercise challenges to a "neutral, generally applicable law." *Smith*, 494 U.S. at 881. Under that standard, "legislation is presumed to be valid and will be sustained if the [burden imposed] by the statute is rationally related to a legitimate state interest." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007). In the alternative, the State argues that EO 202.68 can survive a strict scrutiny analysis, although the Supreme Court has instructed that, "[a] law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 531.

To know whether rational basis review or strict scrutiny is appropriate, courts must distinguish laws that are "neutral and generally applicable" from those which are "specifically directed at . . . religious practice." *Smith*, 494 U.S. at 878. In *Lukumi*, a

11

Florida municipality enacted ordinances against ritual animal sacrifice that "were gerrymandered with care to proscribe religious killings of animals" only by Santeria church members, and which were therefore subject to strict scrutiny analysis and struck down. *Lukumi*, 508 U.S. at 542. Similarly, in *Central Rabbinical Congress of United States & Canada v. New York City Department of Health & Mental Hygiene*, the Second Circuit applied strict scrutiny to a New York City Board of Health regulation targeting metzitzah b'peh, a practice of certain Hasidic groups where a mohel who performs a circumcision stanches the infant's wound with his mouth. 763 F.3d 183, 194 (2d Cir. 2014). Although, in theory, the regulation applied to anybody who used "direct oral suction" during a circumcision, the agency admitted that "the burdens of the Regulation fall on only a particular religious group—and in fact *exclusively* on members of one particular subset of that religious group." *Id.* at 196 (emphasis in original.) On the other hand, in *Smith*, the Court rejected the argument that the Free Exercise Clause required that adherents of a Native American church that ingested peyote as a sacrament be exempt from an Oregon statute that prohibited the use of peyote in secular or religious practices. *Smith*, 494 U.S. at 874. When laws are not targeted at specific religious groups or specific types of religious practice, "[t]he teaching of *Smith* is that a state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Centr. Rabbinical Cong.*, 763 F.3d at 196 (citing *Smith*, 494 U.S. at 888).

Since the onset of COVID-19 in the winter of 2020, some public health authorities have identified religious gatherings as environments well suited to the transmission of the virus. (*See, e.g.* Allison James et al., *Morbidity and Mortality Weekly Report*, Centers for Disease Control and Prevention ("CDC") (May 22, 2020) ("May 22 MMWR") (Dkt. 20-21) at 3 ("Faith-based organizations that are operating or planning to resume in-person operations,

including regular services, funerals, or other events, should be aware of the potential for high rates of transmission of [COVID-19].").) Among the other problematic features of religious gatherings, congregants arrive and leave at the same time, physically greet one another, sit or stand close together, share or pass objects, and sing or chant in a way that allows for airborne transmission of the virus. (*See* CDC Guidance, Considerations for Communities of Faith, (May 23, 2020) (Dkt. 20-28).) As a result, a number of states and localities have adopted specific regulations for houses of worship, along with regulations for other gathering places such as businesses, restaurants, and schools. In turn, a number of those laws have been challenged on free exercise grounds and courts have been confronted with the issue before the court now: Is a law that expressly regulates religious gatherings, including provisions that apply only to houses of worship, "specifically directed at religious practice" like the ordinances in *Lukumi*? Or, if the law regulates houses of worship in a manner that is equally or less restrictive than regulations applied to similar secular gatherings, is it a neutral and generally applicable public health regulation that burdens religious practice only incidentally in the course of protecting the community from the dangers of COVID-19 transmission?

In May, the Supreme Court provided guidance on that question in *South Bay*. There, the Court declined an application to enjoin a California order that limited attendance at places of worship to 25% of a building's capacity or 100 attendees, whichever was fewer. *South Bay*, 140 S. Ct. at 1613. Chief Justice Roberts, concurring in the denial of the application, found that "those restrictions appear consistent with the Free Exercise Clause." *Id.* He reasoned:

> Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances,

13

where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

*Id.* at 1613-14.

Since *South Bay*, nearly every court to consider the issue has followed suit and applied a rational basis analysis to free exercise challenges to COVID-related restrictions on religious gatherings. For example, in *Elim Romanian Pentecostal Church v. Pritzker*, the Seventh Circuit confronted a challenge to an Illinois law that limited gatherings in places of worship to 10 people, while closing completely all places of public amusement (including theme parks, theaters, concert halls, and country clubs). 962 F.3d 341 (7th Cir. 2020). The law exempted essential services providing food, shelter, social services, and other life necessities to those in

14

need (including religious organizations to the extent they offered such services) from the 10-person limit. *Id.* at 343. The court rejected the plaintiff's contention that houses of worship were more akin to grocery stores or meat-packing plants, which were deemed essential, finding that "movies and concerts seem a better comparison group, and by that standard the discrimination has been in favor of religion. While all theaters and concert halls in Illinois have been closed since mid-March, sanctuaries and other houses of worship were open, though to smaller gatherings." *Id*. at 347. As in *South Bay*, as long as the restriction was part of a larger effort to regulate like public spaces, and as long as religious gatherings were not comparatively disadvantaged, the court held that the law was subject to rational basis review and did not run afoul of the Free Exercise Clause.

Similarly, in *Calvary Chapel Lone Mountain v. Sisolak*, __ F. Supp. 3d.__, 2020 WL 3108716 (D. Nev. June 11, 2020), the court declined to apply strict scrutiny where houses of worship were subject to the same 50-person cap as comparable secular activities like "lectures, museums, movie theaters, specified trade/technical schools, night-clubs and concerts," *id*. at *4, even as casinos were permitted to operate at 50% capacity. Likewise in *Legacy Church, Inc. v. Kunkel*, __ F. Supp. 3d__, 2020 WL 3963764, at *1, *80 (D.N.M. July 13, 2020), the court declined to apply strict scrutiny to a restriction limiting mass gatherings, including religious gatherings, to 25% of maximum occupancy while allowing restaurants, gyms, and pools to operate at 50% capacity. The court found the restriction was neutral because it did not target houses of worship due to "their religious nature,

15

but because they involved masses of people in closed spaces and in close proximity." *Id.* at *81.[7]

---

[7] *See also Harvest Rock Church, Inc. v. Newsom*, __F.3d__, 2020 U.S. App. LEXIS 31226, 2020 WL 5905327 (9th Cir. Oct. 1, 2020) (affirming district court's denial of preliminary injunction of EO restricting in-person worship services under *South Bay*); *Murphy v. Lamont*, No. 20-cv-694, 2020 WL 4435167 (D. Conn. Aug. 3, 2020) (finding challenged restrictions on religious gatherings were neutral and subject to rational basis review); *Ass'n of Jewish Camp Operators v. Cuomo*, No. 20-cv-687, 2020 WL 3766496 (N.D.N.Y. July 6, 2020) (denying preliminary injunction after finding the restriction would survive either rational basis or strict scrutiny review); *Antietam Battlefield KOA v. Hogan*, __F. Supp. 3d__, 2020 WL 2556496 (D. Md. May 20, 2020) (upholding restriction on religious gatherings); *Calvary Chapel of Bangor v. Mills*, No. 20-cv-156, 2020 WL 2310913 (D. Me. May 9, 2020) (upholding order restricting indoor religious gatherings to no more than 10 people); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758 (E.D. Cal. 2020) (upholding stay-at-home order despite free exercise claim); *Cassell v. Snyders*, __F. Supp. 3d__, 2020 WL 2112374 (N.D. Ill. May 3, 2020) (upholding stay-at-home order after applying rational basis review to free exercise claim); *Lighthouse Fellowship Church v. Northam*, __F. Supp. 3d__, 2020 WL 2110416 (E.D. Va. May 1, 2020) (upholding restriction on religious gatherings after applying rational basis review); *Gish v. Newsom*, No. EDCV 20-755, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) (upholding prohibition on religious gatherings under *Jacobson* and rational basis standards); *Carmichael v. Ige*, __F. Supp. 3d__, 2020 WL 3630738 (D. Haw. July 2, 2020) (finding quarantine restrictions would survive either rational basis or strict scrutiny review); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125 (6th Cir. 2020) (upholding order closing certain business and not others after applying rational basis review); *In re Abbott*, 954 F.3d 772 (5th Cir. 2020) (applying *Jacobson* to uphold order postponing non-emergency medical procedures including abortions); *Elmsford Apt. Assocs., LLC v. Cuomo*, __F. Supp. 3d__, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) (upholding eviction moratorium); *McCarthy v. Cuomo*, No. 20-cv-2124, 2020 WL 3286530 (E.D.N.Y. June 18, 2020) (upholding gathering restriction after applying intermediate scrutiny); *Slidewaters LLC v. Wash. Dep't of Lab. & Indus.*, No. 20-cv-210, 2020 WL 3130295 (E.D. Wash. June 12, 2020) (upholding order closing certain businesses); *Pro. Beauty Fed'n of Cal. v. Newsom*, No. 20-cv-4275, 2020 WL 3056126 (C.D. Cal. June 8, 2020) (upholding order closing non-essential businesses); *Talleywhacker, Inc. v. Cooper*, __F. Supp.

The Diocese urges the court to rely on a pair of Sixth Circuit decisions that applied strict scrutiny to strike down a Kentucky executive order prohibiting religious mass gatherings. *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020); *see also Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020). However, those cases predated *South Bay*. Likewise, the two district courts that have applied strict scrutiny to enjoin regulations on free exercise grounds post-*South Bay* are readily distinguishable.[8]

_____

3d__, 2020 WL 3051207 (E.D.N.C. June 8, 2020) (upholding order closing certain businesses while allowing others to remain open after applying rational basis review); *Best Supplement Guide, LLC v. Newsom*, No. 20-cv-965, 2020 WL 2615022 (E.D. Cal. May 22, 2020) (upholding order closing non-essential businesses); *Open Our Oregon v. Brown*, No. 20-cv-773, 2020 WL 2542861 (D. Or. May 19, 2020) (upholding order closing non-essential businesses); *Geller v. De Blasio*, __F. Supp. 3d__, 2020 WL 2520711 (S.D.N.Y. May 18, 2020) (upholding order restricting non-essential gatherings); *Henry v. DeSantis*, __F. Supp. 3d__, 2020 WL 2479447 (S.D. Fla. May 14, 2020) (upholding order closing certain businesses); *McGhee v. City of Flagstaff*, No. 20-cv-8081, 2020 WL 2308479 (D. Ariz. May 8, 2020) (upholding stay-at-home order).

[8] *See Soos v. Cuomo*, 20-cv-651, 2020 WL 3488742 (N.D.N.Y. June 26, 2020); *Capitol Hill Baptist Church v. Bowser*, 20-cv-2710, 2020 WL 5995126 (D.D.C. Oct. 9, 2020). In *Soos*, Judge Sharpe granted a preliminary injunction to Catholic priests and Orthodox Jewish congregants against an earlier iteration of New York's capacity restriction on religious gatherings. *Soos*, 2020 WL 3488742, at *1. That decision was premised on two circumstances that differ from this case. First, the court held that houses of worship were treated less well than comparable non-essential businesses, and second, the court found that the state selectively enforced the restrictions. *Id.* at 10-13. As discussed *infra*, here the court does not find EO 202.68 treats like gatherings better than houses of worship, and there is no evidence of selective enforcement as between religious and secular activities. In *Capitol Hill Baptist*, Judge McFadden enjoined enforcement of a District of Columbia ordinance that forbid a congregation from meeting outdoors, when the District allowed mass protests in the wake of the murder of George Floyd, among other events. *Capitol Hill Baptist*, 2020 WL 5995126, at *12. Like *Soos*, *Capitol Hill Baptist* rested on

### 2. Analysis

Consistent with *Smith*, and *Lukumi*, the court must determine whether EO 202.68 was fashioned for the purpose of containing the spread of COVID-19 in public spaces in general or whether it was to curtail religious practice. In conducting that analysis, the court must also bear in mind that the State is afforded latitude to confront public health emergencies, as discussed in *Jacobson* and its progeny.[9] Of course, *Jacobson* does not grant the state license to "contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." 197 U.S. at 25.

The reasoning of the Chief Justice in *South Bay* and the Seventh Circuit in *Elim* are instructive. Where religious gatherings are treated alike or better than secular comparators, it would be inappropriate for the court to apply strict scrutiny. Under EO

---

disfavored treatment for religious gatherings as compared to comparable activities, specifically, comparable outdoor activities. *Id.* at *8.

[9] In *Jacobson*, the Supreme Court declared that "a community has the right to protect itself against an epidemic of disease which threatens its members," 197 U.S. at 27, and that in such cases judicial scrutiny is limited to whether the state's action "has no real or substantial relation to" the object of protecting the public or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. *Jacobson* did not discuss the Free Exercise Clause because it was decided prior to the incorporation of the First Amendment against the states in *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). However, it is the seminal case regarding the state's powers in the face of a public health emergency. *See, e.g. South Bay*, 140 S. Ct. at 1613 (citing *Jacobson* for deference to state COVID-19 regulations); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (citing *Jacobson* for the proposition that religious grounds are not sufficient for an exemption from a mandatory vaccination law); *see also Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (holding that *Jacobson* foreclosed a due process claim against mandatory vaccination for public school students, and on a related free exercise challenge, "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.").

202.68, religious gatherings are treated more favorably than similar gatherings, which the State defines as "public gatherings with scheduled starting and ending times such as public lectures, concerts or theatrical performances" and which remain closed entirely. (State Opp. at 13.) In red zones, schools, restaurants, and non-essential businesses are closed entirely, while religious gatherings are permitted with significant capacity limitations. In orange zones, houses of worship are afforded more leeway than schools, restaurants, and high-risk businesses—many of which share salient public health characteristics with religious services. *See Elim*, 946 F.3d at 346 ("[worship services] seem most like other congregate functions that occur in auditoriums, such as concerts and movies. Any of these indoor activities puts members of multiple families close to one another for extended periods, while invisible droplets containing the virus may linger in the air. Functions that include speaking and singing by the audience increase the chance that persons with COVID-19 may transmit the virus through the droplets that speech or song inevitably produce."); *see also South Bay*, 140 S. Ct. at 1613 (holding that worship services are comparable to "lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time."). Unlike the ordinances in *Lukumi* and *Central Rabbinical Congress*, which singled out practices of particular religious ceremonies, EO 202.68 targets public gatherings based on COVID-19 transmission risk factors. In other words, although the EO establishes rules specific to religious gatherings, it does so because they are gatherings, not because they are religious. Accordingly, strict scrutiny does not apply.

Neither of the Diocese's two principal arguments for applying strict scrutiny is persuasive. First, in order to argue that EO 202.68 treats religious gatherings worse than secular comparators, the Diocese urges the court to second guess the State's judgment about what should qualify as an essential business. To

do so would violate the principle of *Jacobson*, reiterated in *South Bay*, that "when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement" and left to the political branches of the states, not the judiciary, to decide. *South Bay*, 140 S. Ct. at 1613. In addition, the essential businesses referenced are distinguishable from religious services in key ways: they do not involve people arriving and leaving simultaneously, and they do not involve people packed in closely, or greeting each other, or singing or chanting.[10] But the first point is the more important one: on an emergency preliminary motion, the court should not and will not parse the reasonable distinctions that the State has made, in very difficult circumstances, between essential and non-essential businesses. The court is therefore satisfied that EO 202.68 does not discriminate against religious gatherings, even if some businesses face less onerous restrictions.

Likewise, the excerpts from the Governor's public comments do not transform a neutral law into a religiously targeted one. The evidence shows that Governor Cuomo is clearly aware and concerned that EO 202.68 burdens religious practice, and particularly the religious practice of Orthodox Jews, but awareness that the burden of a law falls unequally does not establish that the law was designed to target religious groups. Indeed, as the Governor reportedly told a group of Jewish community leaders, although the policy is a "very blunt" instrument, its purpose

---

[10] The Diocese urges that its churches are following protocols to address each of these concerns and the court believes them. However, in normal circumstances, a Catholic mass would involve these potentially dangerous activities. (*See* Testimony of Bryon Backenson at 87.) The State's concern about the risks associated with large gatherings of religious observance in general is at issue and those concerns are founded. There is documented evidence of COVID-19 spread at religious services, and in fact, the first COVID-19 cluster in New York was likely the product of a religious gathering. (*See* May 22 MMWR; *see also* Decl. of Howard Zucker in *DiMartile et al. v. Cuomo* (Dkt. 20-37) ¶ 14.)

is to "get the numbers down in the zip codes." (Third Suppl. Decl. of Randy Mastro (Dkt. 28) ¶ 4.) The court reads the Governor's statement to say that EO 202.68 is targeted temporarily at all gatherings in the areas where there are spikes in COVID-19 positivity rates, not at religious gatherings in particular.

The evidence submitted by the state corroborates that the purpose of EO 202.68 is to intervene and enforce heightened protocols in certain geographic areas experiencing disturbing new outbreaks in order to keep the outbreaks from spreading, not to regulate religious practice. As DOH Commissioner Dr. Howard Zucker stated in his declaration, the goal of the policy is "to contain the threat of the virus spreading throughout a community and creating a larger potential super-spreader event." (Zucker Decl. ¶ 10.) To that end, the State is relying on data from the Electronic Clinical Laboratory Reporting System to generate precise maps to allow for microtargeting of neighborhoods with high positivity rates and evidence of community spread. (*Id.* ¶¶ 12, 16.) In Dr. Zucker's words: "[w]e look solely at the data and do not take into account who or what are located in that zone— whether it is a non-essential business, school, yeshiva, church, synagogue, or a car dealership—as they all face restrictions, if justified by the scientific data[.]" (*Id.* ¶ 19.) And so far, the policy appears to be working, with positivity rates in the red zones falling from 7.9% the week of September 20-26, to 4.8% as of October 15. (*Id.* ¶ 23.) For the purpose of this emergency proceeding, the court is satisfied, based on the evidence submitted, that the State's policy is guided by science, not a desire to target religious practice.[11]

---

[11] The court appreciates that Mr. Backenson made time to testify at the evidentiary hearing before it on October 15. However, given the nature of this case, the Attorney General should be aware of the necessity for sworn testimony from a witness who possesses personal knowledge of the process

Finally, although the Diocese has done everything it could be expected to do and more, it is clear that there are COVID-19 risk-factors not accounted for by its protocols. Although churches instruct parishioners not to attend services if they are sick, they do not require a negative COVID-19 test result for entry, and therefore must rely on parishioners to self-police. (Chappetto Tr. at 26-27.) That is particularly problematic because it is well established that asymptomatic people—who would have no reason under the Church's own protocols to stay away—can spread COVID-19; in fact, in one Arkansas case, two asymptomatic carriers infected 35 other churchgoers. (*See* May 22 MMWR.) Further, as the Diocese's witnesses admitted, parishioners traditionally congregate outside of churches after mass to greet one another. (Chappetto Tr. at 24.) The Diocese is doing everything it can to discourage people from doing so, but it is reasonable for the State to worry whether people will abandon their normal practices when they are outdoors with nobody to enforce the guidelines. In his testimony before the court, Commissioner Esposito said that he recently had to confront a person at a Diocese church, who was only there for a Confirmation, not a regular churchgoer, and who refused to wear a mask until he was forced to after a confrontation. (Testimony of Joseph Esposito at 47-48.) That anecdote illustrates the validity of the State's concern, even in light of the Diocese's exemplary work to combat the pandemic and to make safe the operations of its churches.

Because EO 202.68 treats religious gatherings as well or better than comparable gatherings, and in light of the fact that state and local governments are more equipped than courts to determine

---

by which EO 202.68 was developed, which he does not. Given the emergency nature of this proceeding, the court employs relaxed evidentiary standards. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). As the case continues and the parties build the record, the Attorney General should be mindful of the importance of producing sworn testimony from witnesses who have personal knowledge of the relevant facts.

what is comparable, the court finds that it is a neutral, generally applicable law, subject to rational basis review. Based on the evidence proffered, the court has no reason to doubt that the policy was crafted based on science and for epidemiological purposes. Given the pandemic, EO 202.68 is clearly "rationally related to a legitimate state interest" and it is therefore exceedingly unlikely to infringe on the Diocese's First Amendment free exercise rights.

### C.   Balance of the Equities and Public Interest

If the court applies a rational basis standard of review, its analysis ends at the "likelihood of success" prong of the preliminary injunction inquiry. However, the decision to award preliminary injunctive relief is an interim step in larger litigation, and it is "often based on procedures that are less formal and evidence that is less complete than in a trial on the merits." *Mullins*, 626 F.3d at 52. Especially here, where the State's intent is at issue, the court cannot foreclose the possibility that future evidence could require it to revisit whether strict scrutiny should attach. If so, the court would require a more developed factual record to consider the question, for which both sides have made strong arguments. However, even if strict scrutiny were appropriate, the Diocese's motion for a preliminary injunction would fail because the injunction would not be in the public interest. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.").

The public interest analysis, and accordingly the balance of the equities, cuts in favor of the State, which is trying to contain a deadly and highly contagious disease. If the State is correct that allowing large religious gatherings in areas currently experiencing COVID-19 outbreaks could lead to a "second wave" that puts the entire City and State at risk, then it is not in the public interest to grant a preliminary injunction. In fact, if the court issues an injunction and the State is correct about the acuteness of the

threat currently posed by hotspot neighborhoods, the result could be avoidable death on a massive scale like New Yorkers experienced in the Spring. If the court fails to issue an injunction and the Diocese is ultimately successful on the merits, the unfortunate result will be that 26 of the Diocese's churches will have experienced extra weeks with severely curtailed in-person ceremonies. That is not meant, in any way, to downplay the seriousness of that constitutional harm, which is unlikely to be remedied. *See Id.* ("[T]he court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury."). But if EO 202.68 is improperly enjoined, the enormity of the potential harm to the entire public, including to the parishioners of the 26 relevant churches, is overwhelming. In light of that danger, it would not be in the public interest to do so.

## IV. CONCLUSION

For the reasons stated, the Diocese's motion for a preliminary injunction is DENIED.

SO ORDERED.

Dated:     Brooklyn, New York
           October 16, 2020

                                        /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge