## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| REV. STEVEN SOOS, REV. NICHOLAS STAMOS, JEANETTE LIGRESTI, as parent and guardian of infant plaintiffs P.L. and G.L., DANIEL SCHONBRUN, ELCHANAN PERR, MAYER MAYERFELD, MORTON AVIGDOR, <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW M. CUOMO, Governor of the State of New York, in his official capacity; LETITIA JAMES, Attorney General of the State of New York in her official capacity; KEITH M. CORLETT, Superintendent of the New York State Police, in his official Capacity; HOWARD A. ZUCKER, M.D., New York State Commissioner of Health, in his official capacity; BETTY A. ROSA, Interim Commissioner of the New York State Education Department, in her official capacity; EMPIRE STATE DEVELOPMENT CORPORATION ("ESD"), a New York State Public Benefit Corporation; BILL DE BLASIO, Mayor of the City of New York, in his official capacity; DR. DAVE A. CHOKSHI, New York City Commissioner of Health, in his official capacity; TERENCE A. MONAHAN, Chief of the New York City Police Department, in his official capacity; RICHARD CARRANZA, Chancellor of the New York City Department of Education in his official capacity. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:20-cv-00651-GLS-DJS |

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS ............................................................................................................................... 3

LEGAL ARGUMENT...................................................................................................... 10

    I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................. 10

       A.   Plaintiffs Have Standing to Challenge Restrictions in All Three Zones....................... 10

       B.   Defendants' Renewed Invocation of *Jacobson* Falls Flat............................................. 12

       C.   The Legal Circumstances of *Soos v. Cuomo* Have Not Materially Changed. .............. 14

       D.   Plaintiffs Are Likely to Prevail on Their Free Exercise Clause Claim. ........................ 17

       E.   Plaintiffs are Likely to Prevail on their Free Speech and Assembly Claim.................. 22

    II.    BALANCE OF EQUITIES AND IRREPARABLE HARM ........................................... 24

    III.  CONTEMPT ................................................................................................................... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014).....................................................20

*Capitol Hill Baptist Church*, 2020 WL 5995126 ..........................................................................20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993)...............17

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ......................................................12

*Denver Bible Church, et al. v. Alex M. Azar II, et al.*, No. 1:20-cv-02362, 2020 WL 6128998, at

   \*7 (D. Colo. Oct. 15, 2020) .....................................................................................................2

*Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) ....................1

*Geller v. de Blasio*, 2020 WL 2520711, at \*3 (S.D.N.Y. May 18, 2020)......................................23

*Good News Club v. Milford Central School*, 533 U.S. 98 (2001) ..................................................23

*Harvest Rock Church, Inc. v. Newsom*, No. 20-55907, 2020 WL 5835219 (9th Cir. Oct. 1, 2020)

   ....................................................................................................................................................2

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)...........................................................................12

*Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017) .......................................................23

*Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ....................................................................................11

*Litzman v. N.Y.C. Police Dep't*, No. 12-cv-4681, 2013 WL 6049066, at \*3 (S.D.N.Y. Nov. 15,

   2013) .........................................................................................................................................17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ...........................................................11

*McCullen v. Coakley*, 573 U.S 464, 479 (2014) ...........................................................................23

*Roman Catholic Archdiocese of Brooklyn v. Cuomo*, Case 1:20-cv-04844-NGG-CLP...............10

*Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-cv-4844, 2020 WL 6120167,

   at \*8, n.8 (E.D.N.Y. Oct. 16, 2020) ........................................................................................14

*South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (Roberts, C.J.,

 concurring).................................................................................................................... 12

*Thomas v. Collins*, 323 U.S. 516, 530 (1945).............................................................................. 23

*Ungar v. N.Y.C. Hous. Auth.*, 363 F. App'x 53, 56 (2d Cir. 2010) ............................................. 20

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).. 23

## PRELIMINARY STATEMENT

Once again, defendants have failed to grapple with the legal effects of their individualized exemptions for "peaceful protests" without extending equal treatment to religious gatherings in houses of worship under EO 202.68. The State defendants merely say, without explanation, "there is no evidence of selective enforcement here" (State's Br. at 3) despite EO 202.68's exemption for "essential gatherings" and Governor Cuomo's crystal-clear statements that peaceful protests are still permitted. (Plaintiffs' Opening Br. at 4 n.4.) The City defendants attempt to distance themselves from Mayor de Blasio's similar comments, and they even object that mass protests are not occurring any longer (City's Br. at 5 n.5, 17 n.13), despite at least three widely publicized mass protests in the City (including in Brooklyn) just last weekend, as discussed below. Although individualized exemptions for peaceful protests are not the sole basis of plaintiffs' case, in themselves they justify relief in all three cluster "Zones."

Defendants' opposition papers also essentially concede that the Orange Zone restrictions are unconstitutional, as recognized in this Court's June 26th Order and Opinion requiring that the original plaintiffs receive equal treatment with "Phase 2" non-essential businesses. (ECF No. 35 at 35.) The City defendants confirm that because of that Order they are requiring that houses of worship in the Orange Zone remain at no more than 50% capacity rather than enforce EO 202.68's 33% or 25-person limit in that Zone. (City's Br. at 10, 27.) Of course, "[v]oluntary cessation of the contested conduct makes litigation moot only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) (internal quotes omitted). As the City still maintains that the Orange Zone restrictions are constitutional (City's Br. at 10, n.9.), its current self-restraint does not moot plaintiffs' challenge to the Orange Zone. Furthermore, the State defendants' primary defense of the Orange Zone restrictions is that plaintiffs lack standing

to challenge them—an argument plaintiffs easily rebut below. On the merits, the State defendants do not attempt to defend the Orange Zone's less favorable treatment of houses of worship as compared to comparable non-essential businesses allowed to open at that stage (the same businesses this Court found comparable in its June 26th Opinion (ECF No. 35 at 29-30).) Thus, defendants all but concede the Orange Zone restrictions are unconstitutional in this case.[1]

Although defendants highlight two recent New York federal district court opinions upholding EO 202.68, the following discussion demonstrates that those decisions misread the circumstances surrounding this Court's prior Opinion. This Court's Opinion signals a trend of common sense analysis regarding general applicability seven months into the COVID era. Another signal is *Denver Bible Church, et al. v. Alex M. Azar II, et al.*, No. 1:20-cv-02362, 2020 WL 6128998, at *7 (D. Colo. Oct. 15, 2020), wherein a district court in Colorado held that house-of-worship occupancy limits are unconstitutional in light of exemptions for "critical" businesses. Still another sign of a changing judicial perspective is *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710, 2020 WL 5995126, at *9 (D.D.C. Oct. 9, 2020), decided earlier this month, wherein the district court relied precisely on this Court's June 26th Opinion in finding that exemptions for mass protests undermined the government's interests in enforcing religious gathering limits.

Just as significant a signal is the venerable Judge O'Scannlain's ringing dissent in *Harvest Rock Church, Inc. v. Newsom*, No. 20-55907, 2020 WL 5835219 (9th Cir. Oct. 1, 2020) (O'Scannlain, J., dissenting), finding comparability between houses of worship and essential businesses – consistently with the apparent position of half of the current bench of the U.S.

---

[1] The defendants also nowhere rebut plaintiffs' claim that Yellow Zone restrictions requiring religious school students and staff to submit to regular, invasive COVID testing is unconstitutional to the extent similarly situated activities in the Yellow Zone do not subject participants to the same requirement. (See Plaintiffs' Br. at 19.)

Supreme Court. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (dissents by Alito, Gorsuch, Kavanaugh). Thus, this Court should apply the reasoning of its June 26th Opinion here and find EO 202.68 unconstitutional as to its limits on plaintiffs' in-person religious worship and religious education.

The situation for plaintiffs remains urgent. Their next Sabbath looms in just over 48 hours, and yet their houses of worship and religious schools remain virtually or actually shuttered in the newly denominated Red Zone, while the Orange Zone offers no effective alternative. Meanwhile, EO 202.68 is not set to expire for another two weeks, and all indications are that its restrictions will have indefinite, even if varied, duration (unsurprisingly). *See* Reply Declaration of Jeanette Ligresti, ¶¶ 9-11.

In sum, EO 202.68's restrictions on religious worship and education are unconstitutional in all three zones (Red, Orange, and Yellow).

## <u>FACTS</u>

Defendant Cuomo's defense of his "Cluster Action Initiative" (Cluster Initiative), as enforced by defendant de Blasio, endlessly repeats an undefined term—"cluster"—while abusing the term "cases" to describe putatively positive COVID-19 test results involving a small number of people in Brooklyn and Queens who voluntarily submitted to testing and are not even alleged to be ill. The City and State defendants are united in their determination to replace the clearly spent pandemic with a "casedemic" involving scanty testing data which are being kept from the public because the data would "confuse" them, as de Blasio asserted during his press conference on October 19. *See* **Exhibit A** to this Reply Memorandum.

Defendants are playing hide-the-ball with their raw "casedemic" test data, the sole basis on which defendant Zucker justifies the new Red Zone in Brooklyn wherein all religious schools are closed and all houses of worship are limited to ten people, while Walmart, liquor stores, food

3

processing and meat packing plants, homeless shelters and marijuana dispensaries are fully open for business in the same invented zone. Nor is the public privy to the mysterious "nuanced process" by which Zucker determines the extent of the Orange and Yellow zones.  *See* Zucker Declaration, ECF No. 91-2 at 28 and discussion below.

As noted above, the City has parted company with the State, averring in its brief that it will obey this Court's injunction by allowing 50% capacity in houses of worship with no numerical cap in Zucker's/Cuomo's Yellow Zone, thereby ignoring Zucker's "nuances," which the State passes off as lifesaving scientific precisions rather than arbitrary dictates having no real basis in medical science.  To quote the City's conditional repentance: "[I]n an abundance of caution **to comply with this Court's preliminary injunction**…the City is not taking enforcement action against houses of worship in the orange zone unless they are at greater than 50% capacity."  ECF No. 88 at 17.    Yet, contradicting itself, the City also avers that plaintiffs have no claim against it because the City has no choice but to enforce Cuomo's executive orders as written. *See* ECF No. 88 at 3, n. 4.  But that dutiful enforcement is obviously enjoinable.

The City's adherence to a 50% capacity limitation without numerical cap is precisely what defendant Cuomo promised the Jewish community of Brooklyn on October 6, only hours before he announced the Cluster Initiative with its ten-person limit in the Red Zone and its 25-person limit in the Yellow Zone.  *See* Amended Complaint, ECF No. 60 at 30-31. The Court is expected to believe that what Cuomo assured the Jewish community was consistent with public safety in the morning was determined to be a deadly threat to human life by the afternoon.

### Defendants Have Failed to Rebut the Evidence of their Own Data

The State's brief argues that plaintiffs' claims respecting the Cluster Initiative "must be analyzed on the record before the Court now—not one before the Court four months ago." *See*

ECF No. 91-4 at 23.    But the record now before the Court is far more hostile to the State's position than the record on which this Court recognized already patent First Amendment violations back in June. In hundreds of pages of material, both the State and the City ignore their own officially published data showing conclusively that not only was the "curve" of the COVID-19 outbreak in New York State "flattened" back in June but that **there has been no curve at all since then.**    For the Court's ease of reference, we provide the following summary of the official data that extinguish any claim of a "health emergency" warranting draconian restrictions on houses of worship and religious schools while Walmart shoppers go their merry way:

<u>**First**</u>, the statewide death toll attributable to COVID-19 peaked in April and has been flat since June 21, when 15 people died in the entire State of New York as compared with 15 people in the entire State on October 15.  **There has been no curve to flatten for five months**, contrary to defendant Zucker's mystifying contention, ECF No. 91-2 at 15, that as of October 20 "the curve continues to flatten. *See* Exhibit E to this Memorandum.  *See* **Exhibit E** hereto, Figure 1.

<u>**Second,**</u> the City's official statistics for the both the City in general (October 17) and Brooklyn in particular (October 19), show bell curves peaking in April and remaining flat since June, with **zero** reported deaths in Brooklyn on October 19. *See* **Exhibit E**, Figure 2.

<u>**Third**</u>, the number of hospitalizations attributed to COVID-19 in Brooklyn and Manhattan, for comparison, have followed the same bell-shaped curves, with **zero** hospitalizations in Brooklyn reported on October 19 and **zero** in Manhattan.  *See* Exhibit E, Figure 3.

<u>**Fourth**</u>, in the realm of real data—as opposed to the "microclusters" Cuomo admits no one ever heard of before him, see **Exhibit B**—Brooklyn, the Bronx, Manhattan and Queens all

exhibit the same bell-shaped curves respecting deaths and hospitalizations. *See* Exhibit E, Figure 4.

**Fifth**, perhaps the data most devastating to the pretensions of the "Cluster Initiative" are that in Brooklyn **fully 91% of the deaths attributed to COVID-19 since March have occurred in the 65-or-older age group**, with **one death** since March in the 0-17 age group. *See* Exhibit E, Figure 5.

Ignoring their own demographic data, defendants have shut down all the public and private schools in their arbitrarily contrived Red and Yellow zones. Defendants' briefs offer no rationale for this patently irrational decision. And irrational it is. As the CDC advises: "The risk of complications for health children is higher for flu compared to COVID-19…. Young children are a higher risk of severe illness from flu." *See* **Exhibit D** to this Memorandum. Neither the City nor the State has ever ordered the closure of all public and private schools during the flu season, so why are they closing schools because of COVID-19? The answer is apparent from defendants' briefs, which merely cite school closures as a cover for their targeting of churches and synagogues. *See* State Br., ECF 91-4. But as Cuomo freely admits: "[T]he new rules are most impactful on houses of worship, because the virus is **not coming from non-essential businesses…. The virus is not starting in schools.** It may be spread by schools." See Amended Comp., ECF 57 at 8 & ¶ 86; Exhibit 3-6 to Amended Complaint, ECF 57 at 130.

Defendants have presented no evidence that the virus "may be spread by schools." Quite to the contrary, *The New York Times* has just reported (October 19) that **schools are not viral vectors** according to another dataset **defendants themselves created** and now ignore:

> Out of 16,348 staff members and students tested randomly by the school system in the first week of its testing regimen, the city has gotten back results for 16,298. **There were only 28 positives: 20 staff members and eight students.** And when officials put mobile testing units at schools **near Brooklyn and Queens**

neighborhoods that have had new outbreaks, **only four positive cases** turned up — **out of more than 3,300 tests conducted** since the last week of September.

*See* **Exhibit C** to this Memorandum.

In sum, defendants' own data lend no evidentiary support to the Cluster Initiative. There is no need to second-guess the defendants on this factual issue. Their own data resolve it.

### The "Casedemic" and the "Rate of Positivity" Claim

Bereft of evidence of a true public health emergency, offer a new excuse for the continued suspension of constitutional rights: the "casedemic" that replaces the pandemic. This purely statistical "emergency" is based on semi-secret COVID-19 testing data in the Red Zone and, in the Orange and Yellow zones, Zucker's aforementioned black box of a "nuanced process that takes multiple factors into account and not solely the positivity percentage." Zucker Dec., ECF No. 91-2, ¶ 120. The "positivity percentage" defendants now tout is merely the percentage of purportedly positive COVID-19 tests results administered to an unknown number of people, with the results misleadingly presented as "the positivity rate" for Brooklyn when there is manifestly no "positivity" rate for Brooklyn, or for the Red zone, but only for a relative handful of people who out of Brooklyn's 1,600,000 residents who reportedly tested positive.

In fact, the very ZIP Code lookup tool for determining whether one resides in a Red, Orange of Yellow zone admits that "A high case rate for neighborhood over the last four weeks **may be due to an increase in testing**." *See* Declaration of Jeanette Ligresti, ECF No. 69 at 64, Exhibit B. That is, what defendants call "an increase in the positivity rate" is merely an increase in the number of tests performed over the past seven days on a tiny, non-representative sample.

Furthermore, the City's own expert, Dr. Jay Varma, admits "While **it is not possible to determine the reproduction rate** [i.e., the spread of the virus] **for the zones** (due to their small size), I believe that the reproduction rate is much higher in the red zones than citywide." ECF

No. 86 at 10-11.  That is, Varma has no proof of accelerated viral transmission in the red zones as opposed to any other place. But he does have a hunch!  Contradicting his own hunch a few paragraphs earlier, however, Varma admits that "the daily average of cases [again, **not illnesses** but mere positive test results] has begun to decline, and is currently 461 as of October 12…"  Here Varma reveals that, amazingly enough, the Cluster Initiative's radical interference with constitutional rights is based **on 461 "cases" of COVID-19 in a population of 1.6 million**!  Based on this miniscule number of "cases," Varma declares that "positivity rates in the red zones have more or less flattened and begun to reverse over the last two weeks…" *Id*. at ¶¶ 22.   But, again, there is no "positivity rate" for the red zones, nor for Brooklyn, nor for New York City.

The other limited testing data released to the public show an even scantier justification for Cuomo's color-coded virtual ghettos:

- October 16: "Within the 'Red Zone' focus areas, 4,133 test results were reported yesterday, yielding **200 positives** or a 4.84 percent positivity rate."[2]

- October 17: "Within the 'Red Zone' focus areas, 4,305 test results were reported yesterday, yielding **187 positives** or a 4.34 percent positivity rate."[3]

Shutting down all the schools and virtually shuttering all the houses of worship in the imaginary "Red Zones" based on a handful of positive test results of dubious reliability—*see*

---

[2]   **Source**:     https://www.governor.ny.gov/news/governor-cuomo-updates-new-yorkers-states-progress-during-covid-19-pandemic-47

[3]  **Source**:  https://www.governor.ny.gov/news/governor-cuomo-announces-most-movie-theaters-outside-new-york-city-can-reopen-october-23

Amended Complaint, ¶¶ 56-63, ECF No. 57—is institutional madness. **Cuomo himself admits that he is being unrealistic and emotional**:

> **New York our strategy is now to discover microclusters…what is a microcluster? I've never heard that before. You're right, you've never heard it before, because it's a new term that we use in New York….Most of these other states would celebrate if they had 3%. 3% in a lot of states _would_ _be a safe zone_…**

> **Even 1%, by the way, is an absurdly low margin to operate on. And…unrealistic. I understand that, intellectually. Uh, however, emotionally, I want to set the bar very high; or very low, as the case may be.**

_See_ Exhibit B to this Memorandum.

### The Targeting of Religion

Like the defenders of draconian COVID-19 lockdown regimes in other states, defendants here recite the mantra that religious gatherings are dangerous viral vectors. _See e.g._ State's Br., ECF No. 91-4 at 22. On this score, defendants are back to Square One, or Phase 1 of New York Forward, but this time on the pretext of a few positive test results, not deaths or hospitalizations. As was the case in June, however, there is no real evidence for the claim, which is essentially an anti-religious prejudice. That ought to be obvious, as the 25,000 deaths in New York attributed to the virus—overwhelmingly among the elderly with comorbidities—can only have resulted from **all the gatherings and activities Cuomo has allowed with little or no restrictions over the past seven months,** yet defendants scour the nation for a handful of hoary anecdotes about religious gatherings in an attempt to implicate religion rather than commerce and protest in the death tolls over which they presided: e.g. a choir practice in Washington, a church service in Arkansas, a wedding in Maine or Cuomo's go-to anecdote: a wedding reception in New Rochelle seven months ago. _See_ Complaint, ECF 19 at ¶ 66.

Defendants deny that EO 202.68 and the Cluster Initiative target religion. *See* ECF No. 91-4 at 20 (State) and ECF 88 at 19 (City). But the Order does so on its face, subjecting only "houses of religion" to indoor gathering limits that effectively disband established religious congregations. *See* Declaration of Jeanette Ligresti, ECF No. 69, ¶¶ 4-23; Reply Declaration of Jeanette Ligresti, ¶¶ 7-8. Then there are Cuomo's unambiguous declarations that he attributes the hitherto unheard-of "microclusters" to the "ultra-Orthodox." *See* Amended Complaint, ECF No. 57 at 26 and Exhibit 3-2.  As one court observes, Cuomo's religious targeting is impossible to ignore:

> [T]he Governor of New York made remarkably clear that this Order was intended to target a different [not Catholic] set of religious institutions…. "[T]he cluster is a predominantly ultra-Orthodox [Hasidic] community. . . . [T]he issue is with that ultraOrthodox community."

*Roman Catholic Archdiocese of Brooklyn v. Cuomo*, Case 1:20-cv-04844-NGG-CLP, Doc. 15 at 3 (but denying TRO).

Finally, the Reply Declaration of plaintiff Morton Avigdor, a synagogue president and a leader in Brooklyn's Jewish community, documents Cuomo's and de Blasio's targeting of Orthodox Jews with a veritable army of inspectors and law enforcement agents over the past few days in furtherance of what might more aptly be termed the Ultra-Orthodox Initiative.  *See* Avigdor Reply Dec., ¶ 4-10.

## **LEGAL ARGUMENT**

## I.   **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

### A.   **Plaintiffs Have Standing to Challenge Restrictions in All Three Zones.**

The State's argument that Plaintiffs lack standing to challenge restrictions in the Orange and Yellow Zones (State's Opp. Br. at 10-12) is clearly without merit, in part given defendants' assumed and total authority to unilaterally adjust the cluster zones at will.

Standing "requires a litigant to show 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,'" *Hassan v. United States*, 441 F. App'x 10, 11 (2d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, standing requires "a claim of specific present objective harm or a threat of specific future harm," *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 170 (2d Cir. 1999) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).

Here, EO 202.68 provides that "[t]he Department of Health shall determine areas in the State that require enhanced public health restrictions based upon cluster-based cases of COVID-19 at a level that compromises the State's containment of the virus." (EO 202.68.)[4] In an attempt to clarify those muddy those waters, defendant Zucker states that "[t]here is no specific percentage or threshold to determine when an area should be designated as an Orange Zone or a Yellow Zone, as it is a nuanced process that takes multiple factors into account and not solely the positivity range." (Zucker Dec ¶120, Doc. 91-2.) He also states that in consultation with experts, the Department can readily "decide[] whether the Red Closure Zone will be extended, *modified*, or terminated altogether." (Id. ¶107(emphasis added).) Cuomo himself recently confirmed this authority: "We're going to watch the micro cluster data. We can adjust what is in that cluster. We can make it a little bigger. We can make it a little smaller. We can relax some regulations. We can increase regulations. We'll do that based on the data."[5]

Given the constantly fluctuating "data" and the executive branch's assumed authority to unilaterally modify the cluster Zones at will, plaintiffs face at least a "substantial risk," and likely

---

[4] https://www.governor.ny.gov/news/no-20268-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency

[5] New York Gov. Andrew Cuomo Press Conference Transcript October 18, at 19:15, https://www.rev.com/blog/transcripts/new-york-gov-andrew-cuomo-press-conference-transcript-october-18 (last visited Oct. 20, 2020).

more than that, of soon finding themselves in the Orange or Yellow Zones. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (noting Supreme Court has found standing "based on a 'substantial risk' the harm will occur"). This is especially true for plaintiffs Schonbrun, Perr, Mayerfeld, Avigdor, G.L., and P.L., who are all immediately proximate to the Orange Zone and in close proximity to the Yellow Zone. Notably, they are also all *currently* prohibited from sending their children to, or attending, in-person religious education in the Orange Zone as an alternative to their (shuttered) Red-Zone schools, or from properly attending houses of worship in the Orange Zone given the strict 25-person limit on houses of worship there (while non-essential businesses operate at full capacity) and, in any case, their inability to drive or use mass transit on the Sabbath. Plaintiffs clearly have standing to challenge the restrictions in the Orange and Yellow Zones.[6]

**B.      Defendants' Renewed Invocation of *Jacobson* Falls Flat.**

As they must, defendants attempt to justify their new Cluster Initiative by pointing to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) as an end run around plaintiffs' constitutional rights. But their arguments are still no more compelling now than they were four months ago. But as this court recognized in June, even under Chief Justice Roberts's reading of *Jacobson* in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (Roberts, C.J., concurring), courts must not second guess government responses to an emergency **only** when government's "broad limits are not exceeded." (Doc. 35 at 21.) This court is not alone in that assessment. Just last week, the U.S. District Court for the District of Colorado held that religious

---

[6] Plaintiffs also maintain that while plaintiffs Soos and Stamos are not in close proximity to any cluster Zone, they remain vulnerable to, and at a substantial risk of, being restricted within a cluster Zone in the North Country if Zucker, Cuomo, and company feel an uptick in positive cases nearby constitutes a "cluster" justifying a restrictive zone based on "nuanced process[es]" and "multiple factors." (Zucker Dec. ¶120, Doc. 91-2.)

12

gathering restrictions in Colorado violated the Free Exercise Clause, rejecting the notion courts must always defer to the government because of COVID. *Denver Bible Church, et al. v. Alex M. Azar II, et al.*, No. 1:20-cv-02362, 2020 WL 6128998, at *7 (D. Colo. Oct. 15, 2020).[7] Indeed, "*Jacobson* itself says that 'no rule . . . ' to safeguard public health and safety may 'contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument.'" *Id*. at *7 (quoting *Jacobson*, 197 U.S. at 25).

Both the City and State defendants miss this point. Rather, they hyper-focus on *Jacobson*'s language that judicial scrutiny is warranted in a time of epidemic if the challenged policy "has no real or substantial relation to" the purpose of protecting the public. (State's Br. at 14; City's Br. at 8.) Although it is clear defendants' Cluster Initiative is not substantially related to this goal (per the Statement of Facts, the following discussion and plaintiffs' earlier papers), *Jacobson* also authorizes judicial scrutiny if the regulation is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Thus, even assuming *Jacobson* applies (*but see* Plaintiffs' Opening Br., at 8), a violation of fundamental rights has occurred here.

This is why nothing has changed since this Court's June 26th Order that would suddenly warrant *Jacobson* deference—contrary to the State defendants' vehement protestations (State's Br. at 15-16.) The scheme of regulations at issue then, and those at issue now, both involve blatant violations of the Free Exercise Clause and thus unquestionable invasions of plaintiffs' fundamental rights.[8] Indeed, blind deference **is even less justified now**, four months later, as

---

[7] The Colorado defendants have filed a motion for stay of the preliminary injunction in the Tenth Circuit U.S. Court of Appeals, which remains pending as of this morning (Oct. 21, 2020). *Denver Bible Church et al. v. Alex Azar et al.*, 20-1377 (10th Cir. Oct. 19, 2020).

[8] The City defendants argue this Court should ignore recent federal court decisions setting aside *Jacobson*, because the COVID regulations there "prohibited a woman's right to an abortion

even under *Jacobson* "courts may become more stringent in their review" where emergency restrictions become indefinite and "fundamental rights are implicated." *Denver Bible Church, et al.*, 2020 WL 6128998, at *8. Therefore, this Court should once again find "that the broad limits of [*Jacobson*'s] executive latitude have been exceeded" here. (ECF 35 at 21-22.)[9]

### C.     The Legal Circumstances of *Soos v. Cuomo* Have Not Materially Changed.

The defendants, and two recent decisions upholding defendants' new Cluster Initiative, maintain that the circumstances at issue in this Court's June 26th Opinion and Order (ECF No. 35; aka *Soos v. Cuomo*, No. 1:20-cv-651, 2020 WL 3488743 (N.D.N.Y. June 26, 2020) (*Soos I*)) were materially different from those at issue now. Thus, they believe the reasoning in *Soos I* is inapposite here. In reality, the circumstances are eerily similar, and this Court's reasoning remains directly on point.

For example, the City defendants argue that *now*, unlike in *Soos I*, "gatherings in houses of worship are given more favorable treatment than many other non-essential businesses." (City's Br. at 5, n.5); *see also Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-cv-4844, 2020 WL 6120167, at *8, n.8 (E.D.N.Y. Oct. 16, 2020) (noting that *Soos I* was

---

altogether," whereas the regulations here purportedly still permit ersatz religious exercise. (City's Br. at 11.) This argument rehashes the trite notion that restricting plaintiffs from worshipping in person among more than 10 or 25 people is not an actual inhibition on their religion (*see also* City Br. at 18 (offensively stating plaintiffs simply "prefer" to worship with more than 10 in person)). This Court already and easily rejected that notion in the first round of this case. (ECF 35 at 29 ("[I]t is readily and reasonably inferable from their allegations that the 25% indoor capacity limitation would continue to burden their free exercise of religion.").) The City's argument is thus no basis for applying *Jacobson* deference here.

[9] It is worth recalling that *Jacobson* was the pinnacle citation justifying the Supreme Court's now universally rejected decision in *Buck v. Bell* upholding a mandatory sterilization policy. 274 U.S. 200, 207 (1927) ("The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed 643, 3 Ann. Cas. 765. Three generations of imbeciles are enough.").

premised in part on the fact "houses of worship were treated less well than comparable non-essential businesses"); *see also Agudath Israel of America, et al. v. Cuomo*, 20-cv-4834 (E.D.N.Y. Oct. 9, 2020) (Kerwin Decl., Ex. B at 66) (stating that *Soos I* is distinguishable because "now houses of worship have been afforded more lenient treatment by the executive order than their secular and comparable counterparts within each respective cluster zone").

But this is simply not true. In *Soos I*, all plaintiffs received better treatment than what the defendants here are quick to say are truly comparable activities—e.g., movie theaters, concert halls, theatrical performances, etc. All of those allegedly comparable activities **were closed** in *Soos I*, as at that time New York had not even reached "Phase 4" of its reopening plan (ECF No. 35 at 28-29), and even then only activities such as "low-risk indoor arts and entertainment" could open.[10] Indeed, movie theaters are being allowed to reopen for the first time during COVID only on Oct. 23rd, only at 25% capacity, and only outside of New York City.[11] Thus, it's clear that even in *Soos I* houses of worship received better treatment than certain arguably comparable, non-essential businesses. Appropriately, that did not stop this Court from holding the regulations at issue then to be unconstitutional. (See Plaintiffs' Opening Br. at 19-20.)

Of course, just like in Phases 2 and 3 in *Soos I* (see ECF No. 35 at 28-29), here "houses of worship" are singled out under EO 202.68 for disfavored treatment relative to "essential gatherings" and essential businesses in the Red Zone; relative to non-high-risk non-essential businesses (including retail and offices) (see ECF No. 35 at 30) in the Orange Zone; and relative

---

[10] New York Forward, Phase Four Industries, https://forward.ny.gov/phase-four-industries (last visited Oct. 20, 2020).
[11] Governor Andrew Cuomo, "Governor Cuomo Announces Most Movie Theaters Outside of New York City Can Reopen on October 23," https://www.governor.ny.gov/news/governor-cuomo-announces-most-movie-theaters-outside-new-york-city-can-reopen-october-23 (last visited Oct. 20, 2020).

to all non-essential businesses and schools in the Yellow Zone. Thus, plaintiffs continue to receive the same type of disfavored treatment at issue in *Soos I*. The result should be the same.

Additionally, the State defendants say that *Soos I* hinged on evidence of selective enforcement that does not exist now. *See also Diocese of Brooklyn*, 2020 WL 6120167, at *8 n.8 (stating that *Soos I* "found that the state selectively enforced the restrictions," whereas there is no evidence of selective enforcement now). In reality, *Soos I* hinged on the creation of a system of "individualized de facto exemptions" that undermined the law's general applicability. (ECF No. 35 at 25, 31-33); The same system exists under EO 202.68, as it exempts "essential gatherings" in all three Zones and both Cuomo and de Blasio have expressly condoned "peaceful protests" as authorized under the Cluster Initiative. (Plaintiffs' Opening Br. at 4.)[12]  Accordingly, in recent days defendants have not enforced the Cluster Initiative against numerous protests and demonstrations across New York City—including demonstrations in Manhattan against Judge Amy Barrett and President Trump,[13] through the "streets of New York City" against the death of Breonna Taylor,[14] and in Brooklyn to blame Cuomo for thousands of deaths in New York nursing homes as a result of COVID-19.[15] Once again, the defendants have authorized a system

---

[12] Although the City defendants dispute that de Blasio has condoned protests (City Br. at 17, n. 13), his words speak for themselves, and there is no evidence of enforcement against peaceful protests, while there is abundant evidence of it against religious gatherings and religious schools. (*See generally supra*; Avigdor Decl.) The City is also simply incorrect when it says (bewilderingly) that "mass protests are no longer occurring." (City Br. at 5, n.5.)

[13] Ellen Moynihan, Larry McShane, "The second Women's March of 2020 opposes Barrett nomination, promotes anti-Trump voter turnout," New York Daily News, Oct. 17, 2020, https://www.nydailynews.com/new-york/ny-womens-march-election-20201017-2snx4tjsynb7dem4uv2nfxfqti-story.html (documenting hundreds of demonstrators marching through Manhattan on October 17).

[14] WLKY Louisville, "Until Freedom, Louisville protestors spearhead march for Breonna Taylor in New York," Oct. 17, 2020, https://news.yahoo.com/u-spacecraft-touches-asteroid-surface-001507091.html (documenting protests through "streets of New York City" on October 17).

[15] Spectrum News NY 1, Protestors Rally in Brooklyn, Blame Cuomo for Thousands of Nursing Home Covid-19 deaths, Oct. 18, 2020, https://www.ny1.com/nyc/all-

of individualized exemptions that requires EO 202.68 to pass through strict scrutiny, just like the restrictions at issue in *Soos I*. (*See* ECF No. 35 at 25 ("Case law within this Circuit supports the notion that individualized de facto exemptions can demonstrate that a challenged law is not generally applicable, and is therefore subject to heightened scrutiny. *See Litzman v. N.Y.C. Police Dep't*, No. 12-cv-4681, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013)).) In sum, the circumstances at issue in *Soos I* and here are materially the same. Strict scrutiny thus applies.

### D.      Plaintiffs Are Likely to Prevail on Their Free Exercise Clause Claim.

Defendants' objections to the free exercise claim in this motion all fail. Their arguments illegitimately collapse the general applicability requirement into the neutrality requirement; ignore the individualized exemptions for peaceful protests (which are comparable to indoor gatherings); refuse to recognize especially comparable essential businesses in the Red Zone; and refuse to acknowledge evidence that closing non-essential businesses was a pretext for restricting houses of worship, and particularly for targeting "ultra-orthodox: Jews. For at least all of these reasons, EO 202.68 is neither generally applicable nor neutral.

#### 1.      General Applicability:

Both sets of defendants frame the rule against non-general applicability as prohibiting only laws whose very object is to burden religion. (State's Br. at 17; City's Br. at 12.) The City even goes so far as to say that "analysis of whether a law is underinclusive is an attempt to ferret out the improper targeting of religion." (City's Br. at 19.) This is simply incorrect, as it would collapse the general applicability requirement into the neutrality requirement, while the Supreme Court treats them as two separate inquiries. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (treating the general applicability analysis as "a second

---

boroughs/news/2020/10/18/protesters-rally-in-brooklyn--blame-cuomo-for-thousands-of-nursing-home-covid-19-deaths.

requirement of the Free Exercise Clause"). Thus, here the issue is not **solely** whether the Cluster Initiative targets plaintiffs' religious exercise, but also whether their religious exercise receives equal treatment with similarly situated activities relative to the government's interests.

As to the individualized exemption for peaceful protests (a de facto "essential gatherings"), it's clear these activities involve large gatherings, with people in close proximity, for extended periods of time—the same type of conduct Chief Justice Roberts felt justified restrictions on religious gatherings, *see South Bay*, 140 S. Ct. at 1613, and the very type of gatherings "(1) with scheduled starting and end times . . . or (2) that involve people remaining in close proximity, greeting each other or singing or chanting, as comparable to religious gatherings" (State's Br. at 23). These are the criteria the State says justify virtually shutting down churches and other activities the State sees as similar, such as movie theaters. But clearly these protests involve the same characteristics, endangering the government's interest in preventing COVID "clusters" to "a similar or greater degree" as religious gatherings at 50% of capacity— even if protests are outdoors, where gatherings can be just as dangerous as indoor gatherings.[16] Thus, it is clear EO 202.68 does *not* apply to "all public gatherings of any kind," and that many exempted gatherings render the Cluster Initiative substantially underinclusive.

The defendants also protest any attempted comparison between houses of worship and essential businesses. The City says plaintiffs have no evidence "that factories, warehouses, homeless shelters, and congregate housing pose the same risk as houses of worship." (City's Br.

---

[16] *See, e.g.*, by Dartunorro Clark,  "Fauci calls Amy Coney Barrett ceremony in Rose Garden 'superspreader event," NBC News, Oct. 9, 2020, https://www.nbcnews.com/politics/white-house/fauci-calls-amy-coney-barrett-ceremony-rose-garden-superspreader-event-n1242781; Advisory Board, "Are Outdoor Gatherings Safe? Here's What Experts Say," July 17, 2020, https://www.advisory.com/daily-briefing/2020/07/17/outdoor-gathering (explaining that outdoor gatherings can be particularly dangerous where people gather in large numbers and stand close to one another and talk).

at 15.) But it is the defendants who are restricting houses of worship, and they present no evidence that houses of worship are *more* dangerous than factories, warehouses, etc. In fact, they themselves have alluded to the danger of these latter activities. (*See, e.g.*, Plaintiffs' Opening Br. at 13., Indeed, evidence abounds that food processing centers, meat packing plants, manufacturers, and factories have been a devastating locus of COVID-19 throughout the country this year, and in New York.[17]

Certain essential businesses are absolutely comparable to houses of worship, and yet, within the Red Zone, the former are exempt and the latter are heavily restricted. Once again, this type of inequality triggers strict scrutiny. *See Denver Bible Church*, 2020 WL 6128994, at *12-13) (holding that exemptions for "critical" industries such as warehouses, meatpacking plants, liquor stores, etc., rendered religious gathering restrictions underinclusive).

The Seventh Circuit got it right when it observed that "meatpacking plants and nursing homes come to mind" as places that present heightened risks of spreading COVID, and when it admitted "they have been centers of COVID-19 outbreaks." *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020). But the Seventh Circuit got it wrong when it opined homeless shelters and soup kitchens are "essential" because they must be carried out in person, whereas religious worship is not "essential" because it supposedly need not be in person. *Id*. As the Court in *Denver Bible* put it, "with due respect for . . . the Seventh Circuit, this court does not believe government officials in any branch have the power to tell churches and

---

[17] Jeff Platsky, Amy Neff Roth, Sarah Taddeo and David Robinson, "COVID-19 ravaged these New York factories. This is how it happened," USA TODAY Network New York, https://www.uticaod.com/story/news/2020/07/23/covid-19-ravaged-these-new-york-factories-this-is-how-it-happened/113423838/ (documenting multiple "clusters" of COVID-19 at factories across New York during COVID); Megan Molteni, "Why Meatpacking Plants Have Become COVID-19 Hotspots," Wired, May 7, 2020, https://www.wired.com/story/why-meatpacking-plants-have-become-covid-19-hot-spots/

congregants what is necessary to feed their spiritual needs." *Denver Bible*, 2020 WL WL
6128994 at *12; *see also Capitol Hill Baptist Church*, 2020 WL 5995126, at *5 (stating
government's suggestion that church has alternative ways to worship "ignores the Church's
sincerely held (and undisputed) belief about the theological importance of gathering in person as
a full congregation," and "'it is not for [the District] to say that [the Church's] religious beliefs'
about the need to meet together as one corporate body 'are mistaken or insubstantial.'"
(alterations in original) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014).)

Thus, as courts are beginning to recognize, and as this Court itself indicated in its June
26th Order and Opinon (*see* Plaintiffs' Opening Br. at 17-18), many essential businesses are
proper comparators with religious gatherings. Therefore, EO 202.68's exemption for such
essential businesses in the Red Zone, while imposing a draconian 10-person limit on houses of
worship in the same zone, easily qualifies as substantially underinclusive.[18]

### 2.   Neutrality:

The defendants also fail to undermine plaintiffs' showing that EO 202.68 is both facially
and operationally non-neutral.  They suggest plaintiffs' position on facial neutrality hinges on the
mere fact that "houses of worship" are treated as a distinct category in EO 202.68. Not so.
Rather, the policy lacks facial neutrality by singling out houses of worship for *completely unique*
burdens (i.e., 10 people max in the Red Zone, 25 people max in the Orange Zone) without
applying the same restrictions on comparable activity (including on essential businesses and

---

[18] The City's citation to *Ungar v. N.Y.C. Hous. Auth.*, 363 F. App'x 53, 56 (2d Cir. 2010) is
unavailing because the exemptions at issue there did not apparently undermine the purpose of
the policy at issue. (City's Br. at 18-19). And the state's emphasis that "social occasions" are
the primary problem (State's Br. at 5) ignores that Zucker states that his data on that point *excludes
New York City*. (Zucker Dec. ¶74.)

gatherings in the Red Zone, and non-essential businesses in the Orange Zone). *Cf. Lukumi*, 508 U.S. at 531 ("Neutrality and general applicability are interrelated.")

Further, the State defendants say that "no public statement by a State official can change" that EO 202.68 is neutral on its face, and that the only thing that "controls" is the "language of [officials'] orders." (State's Br. at 21.) That is wildly off base.[19] The Supreme Court plainly says that facial neutrality is not sufficient, and courts must "survey meticulously" the circumstances of a law's enactment if it burdens religious exercise. *Lukumi*, 508 U.S. at 534, 540 ("Relevant evidence includes . . . the specific series of events leading to the enactment or . . . **statements made by members of the decisionmaking body**.").

As Plaintiffs explained in their Opening Memo, Cuomo made numerous statements in conjunction with the Cluster Initiative's rollout that indicate a pretext of neutrality and a true object of targeting religious practice—perhaps because he felt many of the Jewish faithful were not obeying the requirement (effectively established by this Court's June 26 Order) to maintain 50% of capacity in houses of worship. (Pls. Opening Memo at 11.) Neither the defendants nor the courts in *Brooklyn Diocese* or *Agudath Israel* give appropriate attention to Cuomo's statements that the Cluster Initiative is "not about" non-essential businesses or schools but is rather an "ultra-Orthodox Jewish" problem. They also give no attention to his Secretary's statement that the way New York could impose new restrictions on churches and synagogues and still comply with this Court's June 26 Order is by also shutting down non-essential businesses. (Id. at 12-16.) Thus, evidence of improper targeting abounds, giving this Court plenty of ground to also find that EO 202.68 is not neutral and, for yet another reason, subject to strict scrutiny.

---

[19] The State also says it "is undisputed" that the defendants had no object of regulating religious practice here. (City's Br. at 21.) As is clear from this memo and plaintiffs' earlier papers, that claim is very much disputed.

3.      **Strict Scrutiny:**

Because EO 202.68 is not generally applicable and not neutral, it still fails strict scrutiny

for all the reasons stated in Plaintiffs' Opening Brief. (Id. at 20-22.) Additionally, The defendants

say they are only targeting the problem neighborhoods, but they omit that they are not targeting

(or further restricting at all) numerous essential businesses allowed to operate in the Red Zone,

and the numerous non-essential businesses that may open in the Orange and Yellow Zones – not

to mention the exemption for essential gatherings in all three zones. Although the "First

Amendment's protections do not require the government to ignore reality and common sense"

(State's Br. at 24), they do require the government to treat religious exercise as equally important

(and protected) as similarly situated exempted activities. *See Denver Bible*, 2020 WL 6128994,

at *13 ("[P]rimary and secondary education, convenient access to food and home supplies, and

certain kinds of manufacturing[]—[t]hese *are* important interests—critical and necessary even.

But the People, through the Constitution, have resolved that the free exercise of religion is at

least as critical and necessary.").

Pursuing the Cluster Initiative only against some gatherings, and not others, undermines

the government's assertion of a compelling interest, and it is the antithesis of narrow tailoring.

EO 202.68 cannot survive strict scrutiny.

E.      **Plaintiffs are Likely to Prevail on their Free Speech and Assembly Claim.**

Nothing in defendants' briefs undermines the strength of plaintiffs' additional claim to

protection under the Free Speech and Assembly Clauses of the First Amendment. This is so for

the following reasons.

First, the State defendants are again wildly off base in asserting that gathering for

religious worship is not a form of free speech (or, apparently, freedom of assembly). (State's Br.

at 16, n. 15.) The Supreme Court itself has treated religious conduct and worship as speech. *See Good News Club v. Milford Central School*, 533 U.S. 98 (2001). Assembling among one's congregation to pray (including audibly) and worship is literally an exercise of the freedom of assembly, a "cognate" right with freedom of speech and analyzed in the same way under the First Amendment. *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Further, the Supreme Court has recognized that the freedom of speech "guarantee extends not only to the right to speak, but also to the right to listen and receive information." *Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976)). Thus, restricting plaintiffs from attending worship among more than 10 people, and thus from partaking in in-person worship in many instances, is a direct infringement on their freedom of speech and assembly.

Second, the City, too, is off base in relying on "*Geller I*" for the position that EO 202.68 is content-neutral. (City's Br. at 22.) That case applied an *outdated* rule for determining content-neutrality. In particular, *Geller I* stated that a law is content-neutral as long as its ultimate *purpose* is not related to the content of the expression. *Geller v. de Blasio*, 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020). As the Supreme Court clarified recently, "although a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary."  *Reed v. Town of Gilbert*, 576 U.S. 155, 165-66 (2015). Even where the purpose is benign, a facial distinction that "defin[es] regulated speech by its function or purpose" is a content-based regulation subject to strict scrutiny. *Id*. at 163 (internal quotes omitted). Put another way, a law "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S 464, 479 (2014).

Here, EO 202.68's regulation of "houses of worship," while exempting "essential gatherings" (including peaceful protests) regulates speech by its function or purpose (i.e., religious speech is restricted) and requires enforcement authorities to evaluate the content of the message before taking action (*religious* gatherings are restricted, while essential gatherings by the same people for *other* expressive purposes, even indoors, are permitted). (See Plaintiffs' Opening Br. at 4 n.4.) Thus, EO 202.68 is a content-based restriction subject to strict scrutiny, which it fails.

Even if EO 202.68 is subject only to intermediate scrutiny, it burdens far more speech than necessary to accomplish its interests and is thus not narrowly tailored for the reasons discussed in Plaintiffs' opening brief (Id. at 23-24.)

## II.     BALANCE OF EQUITIES AND IRREPARABLE HARM

Because plaintiffs are likely to win on the merits, the equitable factors also tilt in their favor for the reasons discussed in their earlier brief. (Plaintiffs' Opening Br. at 24-25.) Plaintiffs clarify that *the threat* of $15,000 fines has virtually shut down their respective synagogues to most worshipers and has irreparably prevented them from properly celebrating Jewish high holy days and their recent and upcoming Sabbaths.

## III.     CONTEMPT

The State defendants argue they have complied with this Court's June 26 Order, but they plainly have not. The Orange Zone in particular is a blatant violation of the Order, because it opens many comparable non-essential (Phase 2) businesses without giving equal treatment to houses of worship. (ECF No. 35 at 35 (requiring equal treatment with Phase 2 businesses).) They also argue there is no evidence of enforcement action in violation of that Order, but the original plaintiffs' synagogues are now threatened with a $15,000 fine if they let plaintiffs worship among more than 10 people, in direct violation of the June 26th Order. Defendants also say no

region of the State remains in Phase One or Phase Two, but that's misleading, since Phase Two businesses generally stay in Phase Two, while Phase Three businesses are allowed to open if a region enters Phase Three, and so on. Clearly Defendants are violating the June 26th Order, and contempt would be an appropriate remedy.

## **CONCLUSION**

For the foregoing reasons, this court should grant plaintiffs' motion for a temporary restraining order and preliminary injunction.

Dated: October 21, 2020

Respectfully submitted,

s://Christopher A. Ferrara
_____
Christopher A. Ferrara, Esq.
(Bar No. 51198)
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
Special Counsel , Thomas More Society
*Counsel for Plaintiffs*

/s/ Michael McHale_____
Michael McHale
10506 Burt Cir. Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org
Counsel for Thomas More Society
*Counsel for Plaintiffs*



**DE BLASIO TELECONFERENCE WITH PRESS: OCTOBER 19, 2020**

https://www.facebook.com/NYCMayor/videos/829053441196589

Transcript beginning at 34:30

**Q&A SEGMENT:**

**MODERATOR:** We have time for two more today.  The next is Henry from Bloomberg

**HENRY/BLOOMBERG:** Hello Mr. Mayor how are you doing today?

**MAYOR DE BLASIO:**  I'm good.  How have you been?

**HENRY/BLOOMBERG:**  I'm okay.  Um…you know, the report that you gave today lacks any data about these areas, and I can't determine whether or not the city is doing better or worse.  The average infection rate has risen to 1.62%, and that's higher than it was during your last report October 15th, when it was 1.49%.  So, um, without the data from Brooklyn and even from this area in Central Queens, uh, what are we supposed to do?  Do you have any numbers that would suggest one trend over another?

**MAYOR DE BLASIO:** Yeah, absolutely.  Henry, first of all, the city-wide data which we're going over regularly, I think when I've said the word levelling off over and over again, that's exactly right.  The number you see today is kind of in the middle of where we've been the last week or two.  The highest I remember for a rolling average, 7-day average, is about 1.75.  As you said, we were down 1.49.  We're right in the middle there, and what it means is some stabilizing.

Now remember, if you're around one and a half percent, give or take, that puts us far ahead of the vast majority of the country.  Um, we got used to be down closer to 1%.  We want to go back there and even go far beyond that.  But right now, city-wide, we do see a leveling off and it's at a number that certainly signals something good.  Um, in terms of the communities, as I said, it's something we continue to assess.  With the State we want a lot more testing; it's one of the things we all would like to see more to get a clearer picture.  Uh, but again, I remain hopeful that in all the red and orange areas, that we're talking a matter of weeks that we can resolve these issues, particularly if people go out and get tested. Go ahead.

**HENRY/BLOOMBERG:**  Um, okay, Mr. Mayor, uh, I've requested for several weeks now ZIP code-by-ZIP Code breakdown of the 7 day or even a 14 day average, a daily report that would be posted on the web. Uh, the Health Department says this is possible, they haven't delivered it yet; the Press Office is actually asking me to renew my request directly to your office and to you, because the Health Department Press Office is a little bit frustrated about getting this done also.  Can you give us a commitment that the public will be able to see on a granular ZIP Code basis what the rolling average is, whether it's a 7 or a 14-day average?  Uh, you have the data.  Why can't it be released publicly?

**MAYOR DE BLASIO:**  Henry, look, we've got an unusual situation here and we've been open about it, and I said there's been a lot of communication with the State.  The State determined a different approach.

That has certainly made it important to be careful about the information we put out so it doesn't create confusion, and it doesn't create a situation where there's two different interpretations going on publicly that make it hard for people to know where to go.

So we're being very, very clear on the big picture, what people need to know, that the decisions are gonna be made, the city working with the State; uh, we'll have more to say later this week on whether there's any immediate restrictions that can be adjusted.

As I said I think it's going to a few more weeks in most areas.  Um, but I do not want to put out information that then causes you and everyone to constantly be further confused by the differences of the information.

What I'd like us to do going forward is get consistent on this ZIP Code measure.  I think it is the easiest way to do things going forward, and we'll certainly have that conversation with the State, and I'd like to get to the point that you're talking about; but I want to be very mindful in this moment where so many people are concerned and worried about, you know, their lives, their livelihood, that we give clear and consistent and not, information, not information that might confuse further.



#abc7ny #cuomo #covid
Gov. Cuomo COVID update
15,436 views • Streamed live on Oct 12, 2020                    190    37    SHARE    SAVE    ...

Streamed October 12, 2020

Partial transcript beginning at 14:25:

New York our strategy is now to discover microclusters…what is a microcluster?  I've never heard that before.  You're right, you've never heard it before, because it's a new term that we use in New York. We do more testing than any other state, so we have more data.  We also are obsessive about getting the incoming case #'s from the hospital.  You map those cases and you find the greatest predominance of cases in a geographic area.  That is a microcluster.  For us, the greatest number of cases in a microcluster is relative only to us in New York.

In other words, we have a 1% just about infection rate.  We find a 2% cluster, to us, that's a microcluster.  To other states, that's nothing.  Because, relatively, our numbers are so much lower.  So, we say, in our microclusters, we have an infection rate of 3 or 4%, okay?  Today, for example, the microcluster is 3.7%, alright?  Red Zone.  You look at the chart we sent out.  3.7%?

Illinois, statewide, is 4.2.  Texas is 7.6.  Ohio is 3.7.  Michigan is 3.3.  North Carolina is 6.  Jersey's 3.  Florida's 11.  Virginia is 4.8.  Right?  Georgia's 6.  Pennsylvania's 7.  Arizona's 6.

How can you call a hot spot, a microcluster…a microcluster or a hotspot if it is lower than all these other states?  It's not a national hotspot.  Nationwide those numbers are better than many states.  Only relative to New York do we consider it a microcluster.  Only when you're at 1% does 3% seem like it's an issue.  Most of these other states would celebrate if they had 3%.  3% in a lot of states would be a safe zone.

In New York, it's a microcluster.  And we're going to be doing more of this.  Wherever we find a concentration of cases relative to our norm.  That is a microcluster.  It is only relevant to New York!  Because every other state is in a much different situation.

So, when we say, Red Zone microcluster, Brooklyn, Queens…Yes!  But that is not, it's not accurate to say New York State has hot spots, which is a term we use in the state. But it's not nationwide a hotspot; it's nationwide a cool spot compared to where other states are.  And it's because we're this diligent that we keep the number down.

I spoke to Governors all day long.  They say, how do you stay at 1%?  I say, when I see 2 cases on the same block, I run to that block.  That's how.  So, yes, hotspot.  Even though it's a lower percentage than many other states.  Okay?

Uh, I just want to make sure we're clear.  Because we're going to continue to do this.  We're getting more refined in our targeting.  And as we go into the Fall, and the numbers nationwide are going up, we want to purposefully keep our numbers down.

Even 1%, by the way, is an absurdly low margin to operate on.  And…unrealistic.  I understand that, intellectually.  Uh, however, emotionally, I want to set the bar very high; or very low, as the case may be.  But that's what that chart will show you.  And I just want to put this conversation, uh, in some sort of, uh, since it's read, since it's read nationally, it has to be in the national focus.

Look at the New York State infection rate compared to other states.  We're 1.1.  Right?  Uh, and again, our hotspots are doing better than many states.  Today's numbers, the hotspot number is 3.7.  That's actually down.  But this is a holiday weekend.  So, again, take this with a grain of salt.  The state is 1.05.  So we're at 1.  The state, if you add in the microclusters, the Red zones, it's at 1.1.  Now that number is also misleading, because it oversamples areas that you know have an abnormally high rate.  Okay?

Some of you reporters are political reporters.  If I released a poll, and said normally Democrats in a poll are 44%, this poll has 60% Democrats.  You would say, yeah, but then it's skewed.  Yes, uh, we don't do weighting in these polls.  But, I'm telling you, we take, we've been oversampling the microclusters because we want to know what's going on there.  We are, if you add that oversample into the statewide sample, it skews the statewide sample.  Uh, and that's 1.1.  But if you like to report skewed results, uh, then you can be my guest.

Twelve New Yorkers passed away, 878 were hospitalized.  Uh, that is up 58.  The largest single identifiable addition is from the microclusters.  Uh, the hospitalization rate is 78.  Remember we were at 18,000 hospitalized.  So the hospitalization number to us is more relevant as an indicator for where people are, where the cases are coming from again.  Right?  We can do it, testing tells you where the cases are.  Hospitalizations tell you where the serious cases are.  And that's why we track the hospitalizations the way we do.  185 in ICU, 86 intubated, uh, and that's basically it.

By region, 1.1 New York City.  That's, uh, a problem.  That's Brooklyn and Queens.  Capital Region .9.  Central New York 1.4.  Finger Lakes .8.  Long Island 1.2.  Mid-Hudson 1.9.  That's Rockland-Orange.  Mohawk Valley .4.  North Country .2.  Southern Tier .9.  Western New York 1.1.  Uh, Western New York is better than it's been, but, uh, we'd like to see that at 1.  Uh, Orange is 2.3. Rockland is 4. Broome…we have that one cluster is 3.  Brooklyn is 1.2.

Okay, Operator, Questions?

# Surprising Results in Initial Virus Testing in N.Y.C. Schools

**The absence of outbreaks, if it holds, suggests that the city's efforts to return children to classrooms could serve as an influential model for the nation.**

10/19/2020, 6:52 PM



Students line up to have their temperatures checked before entering P.S. 179 in the Kensington neighborhood of Brooklyn on Sept. 29.Credit...
Mark Lennihan/Associated Press

**By Dana Rubinstein and J. David Goodman**
Oct. 19, 2020Updated 10:13 a.m. ET

For months, as New York City struggled to start part-time, in-person classes, fear grew that its 1,800 public schools would become vectors of coronavirus infection, a citywide archipelago of super-spreader sites.

But nearly three weeks into the in-person school year, early data from the city's first effort at targeted testing has shown the opposite: a surprisingly small number of positive cases.

EXHIBIT C

Out of 16,348 staff members and students tested randomly by the school system in the first week of its testing regimen, the city has gotten back results for 16,298. There were only 28 positives: 20 staff members and eight students.

And when officials put mobile testing units at schools near Brooklyn and Queens neighborhoods that have had new outbreaks, only four positive cases turned up — out of more than 3,300 tests conducted since the last week of September.

New York City is facing fears of a second wave of the virus brought on by localized spikes in Brooklyn and Queens, which have required new shutdown restrictions that included the closure of more than 120 public schools as a precaution, even though few people in them have tested positive.

But for now, at least, the sprawling system of public schools, the nation's largest, is an unexpected bright spot as the city tries to recover from a pandemic that has killed more than 20,000 people and severely weakened its economy.

If students can continue to return to class, and parents have more confidence that they can go back to work, that could provide a boost to New York City's halting recovery.

The absence of early outbreaks, if it holds, suggests that the city's efforts for its 1.1 million public school students could serve as an influential model for school districts across the nation.
In September, New York became the first big urban district to reopen schools for in-person learning.

Roughly half of the city's students have opted for hybrid learning, where they are in the building some days, but not others. The approach has enabled the city to keep class sizes small and create more space between desks.

Since then, large school districts across Florida have opened for in-person learning, too. Some wealthier districts in the New York suburbs declined to take this step, worried that it was too risky and logistically challenging.

Coronavirus Schools Briefing: It's back to school — or is it?

The city's success so far could put much more pressure on other districts that have opted for only remote instruction to start considering plans to bring their children back as well.

"That data is encouraging," said Paula White, executive director of Educators for Excellence, a teachers group. "It reinforces what we have heard about schools not being super spreaders."

So far, it is also good news for Mayor Bill de Blasio, who has staked much of his second-term legacy on reopening schools for in-person learning during the pandemic.

While public health experts said the data was encouraging, they also cautioned that it was still early.

In general, maintaining low levels of infection at schools would depend on how well New York City does in holding off a broader spread in the population.

Also, some experts have called for much more frequent random testing in all schools — something that city officials are considering — in order to increase the odds of discovering an outbreak early.

So far, most coronavirus testing for school workers has taken place at city-run sites outside the purview of the education department.

Out of 37,000 tests of staff members at city sites, 180 were positive, a city official said.

According to separate data reported to the state by local school districts, 198 public school students in New York City have tested positive since Sept. 8. (Gov. Andrew M. Cuomo in early September ordered those conducting coronavirus tests to collect school information on children, but so far compliance has been spotty, state officials said.)



Credit...Brendan Mcdermid/Reuters

The city's new schools testing regimen, which began Oct. 9, calls for 10 to 20 percent of the school population to be tested once a month, depending on the size of the school. The city is applying this testing to its 1,600 traditional public schools; the city's 260 charter schools are not included.

Some researchers have questioned the efficacy of that approach, saying it could miss a large outbreak. "It's great that New York City is doing some level of random testing," said Dr. Ashish Jha, dean of the Brown University School of Public Health. "It's not at the level that would be ideal."

One study recommended testing half the students twice a month.

Michael Mulgrew, president of the teachers union, said the city is looking to increase testing to as much as three times a month citywide. Such frequency, he said, would be "much more valuable" in terms of keeping the virus in check.

A spokeswoman for the city's education department cast the discussions to increase testing as merely exploratory.

A positive test of a student or teacher causes the city to spring into action. Under the rules, one case can cause the closure of a classroom. Two or more cases in separate parts of the same school can prompt a temporary schoolwide closure. At least 25 schools have temporarily closed since classes began. But only three were closed as of Friday.

Mr. Cuomo also ordered an increase in testing in schools around hot spots — from once a month to once a week. And on Thursday, he announced that the state would send 200,000 rapid antigen tests to New York City to help in the effort.

"This is a tremendously tricky balancing act," Dr. Jay Varma, senior adviser for health to Mr. de Blasio, said in an interview. "We really chose the most conservative approach possible." 10/19/2020, 6:52 PM

The city's school testing program depends on parents consenting to having their children tested. If officials find that a given school does not have enough approved students to collect an adequate sample, students who are randomly selected for testing but whose parents refuse consent could be forced to study remotely.

So far, only about 72,000 parents have returned consent forms, the school's chancellor, Richard A. Carranza, said at a City Council hearing on Friday. That is out of about 500,000 children who are attending in-person classes at least one day a week.

As a result, more teachers and staff are represented in the early test results, even though they make up a far smaller portion of any school's population.

"If the 20 percent is truly random it should be more students," said Mark Cannizzaro, president of the principal's union, the Council of School Supervisors and Administrators.

City officials expect more students to soon consent to the testing. But the overrepresentation of adults in school-based testing was not necessarily an issue, Dr. Varma said.

"One of the lessons that has come out of analyses in the U.K., Germany and Australia," he said, "is that adults are at higher risk of potentially introducing infection into a school."

The emerging scientific consensus is that younger children do not spread the virus as easily as older children and adults.

The closure of some classrooms and schools was expected, a built-in component of the city's exceedingly cautious approach to positive cases, officials said.

But it has led to confusion and a feeling among some parents of being in the dark about what is happening inside their children's schools.

In Brooklyn, Public School 116, an elementary school, closed for three days after three teachers and a student tested positive.

"They did not say why, they just said that it was contained and that the investigation was closed," said Marlene Rossi, president of the P.T.A. at the school.

Parents were not informed of the closure by email until late the night before, said Assemblywoman Maritza Davila, who represents the area. "Some of them do not even have internet," she added.

City officials said contact tracing and case investigations had determined that the three teacher cases in P.S. 116 were connected, and that the one student had been learning remotely and therefore became infected outside of the school. That allowed them to isolate the infected staff members, quarantine their contacts and reopen the school.

The process is meant to be rapid, head off outbreaks and, if possible, avoid lengthy closures. While more than two dozen schools have been closed because of positive tests, most reopened relatively quickly.

EXHIBIT C

The city learns of positive tests either during the random testing or, more commonly for the moment, when a staff member or student alerts the school.

Positive test results are funneled to city employees from the Education Department and other agencies, and a team is assigned to work with the school, to get rosters of students and staff if needed and to begin contact tracing.

Joanna Smulakowski, whose son goes to in-person classes two to three times a week at Public School 24 in the Riverdale neighborhood of the Bronx, said she was impressed with the school's safety precautions.

One day, she saw officials turn away two students running fevers, before they even entered the building.

"I feel safe," Ms. Smulakowski said. "And my friends who are sending their kids to school, they also feel safe."

10/19/2020, 6:52 PM

**EXHIBIT D**



CDC — Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

A-Z Index

Advanced Search

## Influenza (Flu)

Seasonal Influenza (Flu) > Symptoms & Diagnosis

🏠 Seasonal Influenza (Flu)

About Flu

Who is at High Risk for Flu Complications

This Flu Season

Prevent Flu

Flu Vaccines Work

### Similarities and Differences between Flu and COVID-19

## People at High-Risk for Severe Illness

### Similarities:

**Both COVID-19 and flu** illness can result in severe illness and complications. Those at highest risk include:

- Older adults
- People with certain underlying medical conditions
- Pregnant people

### Differences:

The risk of complications for healthy children is higher for flu compared to COVID-19. However, infants and children with underlying medical conditions are at increased risk for both flu and COVID-19.

**Flu**

Young children are at higher risk of severe illness from flu.

People at High Risk for Flu Complications

**COVID-19**

School-aged children infected with COVID-19 are at higher risk of Multisystem Inflammatory Syndrome in Children (MIS-C), a rare but severe complication of COVID-19.

People at Increased Risk of COVID-19 Severe Illness

Top of Page

EXHIBIT E

FIGURE 1



FIGURE 2





FIGURE 3



FIGURE 4



FIGURE 5



| BOROUGH / DEMO | Bronx | Brooklyn | Manhattan | Queens | Staten Island |
|---|---|---|---|---|---|
| 0-17 | 1 | 1 | 0 | 1 | 0 |
| 18-44 | 32 | 20 | 8 | 30 | 19 |
| 45-64 | 286 | 218 | 103 | 242 | 142 |
| 65-74 | 1021 | 712 | 394 | 738 | 452 |
| 75+ | 2273 | 1784 | 1231 | 1810 | 1532 |
| TOTALS: | 3614 | 2736 | 1737 | 2821 | 2144 |

0%

26%
91%
65%

Sources:   https://ycharts.com/indicators/new_york_coronavirus_deaths_per_day.

https://www1.nyc.gov/site/doh/covid/covid-19-data-deaths.page

https://www1.nyc.gov/site/doh/covid/covid-19-data-boroughs.page

https://www1.nyc.gov/site/doh/covid/covid-19-data-deaths.page

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| REV. STEVEN SOOS, REV. NICHOLAS STAMOS, JEANETTE LIGRESTI, as parent and guardian of infant plaintiffs P.L. and G.L, DANIEL SCHONBRUN, ELCHANAN PERR, MAYER MAYERFELD, MORTON AVIGDOR,<br><br>                          Plaintiffs,<br><br>          v.<br><br>ANDREW M. CUOMO, Governor of the State of New York, in his official capacity; LETITIA JAMES, Attorney General of the State of New York in her official capacity; KEITH M. CORLETT, Superintendent of the New York State Police, in his official Capacity; HOWARD A. ZUCKER, M.D., New York State Commissioner of Health, in his official capacity; BETTY A. ROSA, Interim Commissioner of the New York State Education Department, in her official capacity; EMPIRE STATE DEVELOPMENT CORPORATION ("ESD"), a New York State Public Benefit Corporation; BILL DE BLASIO, Mayor of the City of New York, in his official capacity; DR. DAVE A. CHOKSHI, New York City Commissioner of Health, in his official capacity; TERENCE A. MONAHAN, Chief of the New York City Police Department, in his official capacity; RICHARD CARRANZA, Chancellor of the New York City Department of Education in his official capacity.<br><br>                        Defendants. | Case No.<br>1:20-cv-00651-GLS-DJS |

**UNSWORN REPLY DECLARATION OF
PLAINTIFF MORTON AVIGDOR**

Pursuant to 28 U.S.C. § 1746, Plaintiff Morton Avigdor hereby declares under penalty of perjury as follows:

1.     I am a plaintiff in this action, and I make this reply declaration in support of my attorneys' motion for emergency injunctive relief.

2.       Both the City's brief (ECF No. 88 at 11) and the State brief (ECF No. 91 at 17-18) claim that Cuomo's and de Blasio's "Cluster Action Initiative" does not target places of worship for unfavorable treatment.   That is false, as shown by the following facts.

3.       First of all, Cuomo's own statements about the "ultra-Orthodox" being the source of his undefined "clusters" (see, e.g., Exhibit D, ECF No. 69 at p. 41: "the cluster is a predominantly ultra-orthodox cluster") and the very terms of his executive order  202.68 target our Jewish community for special restrictions on "houses of worship," including a ten-person limit in the absurd "Red Zone" which was clearly designed to gerrymander Cuomo's "health order" in an attempt to thwart challenges from Jewish congregations, which require a minimum of ten men for a service even to be held.   Of course, the ten-person limit means we can have no congregations for our synagogue services.

4.       Furthermore, as a resident of the Jewish community in Brooklyn, the President of Congregation Ahavas Dovid, and a former member the New York Department of Education's Non-Public School Committee, I am intimately familiar with community and Jewish non-public school affairs. I am aware that well over a hundred Orthodox Jewish school buildings in the Borough Park and Midwood sections are now being targeted by multiple City and State agencies for inspection.

5.       This army of inspectors has included people from the Mayor's office, the Fire Department, the Building Department and even the TBTA, to make sure our schoolchildren are not daring to use mass transit to go to their forbidden yeshivas in the Red zone ghetto Cuomo and de Blasio have erected overnight.

6.       Occasionally, there have been multiple visits by various agencies on one day. These visitors come unannounced and do not show any court order permitting their searches. Rarely do

they present their credentials. The schools and their staffs are petrified. The Jewish Emergency Service advises that over 80 schools have been targeted just for today, October 20, based on a list provided by the government.

7.   I reached out personally by telephone to a number of schools all having been interrogated by the City agencies since Cuomo launched his "Cluster Action Initiative,"  including Beth David Drav Meir, BYA, YTV, Beth Jacob, Veretsky, Masores, Ger Girls School, Bais Bracha, Satmar, Bobov 45 and Belz Chassidic groups. I have been asked by several schools to alter their names for fear of retribution by Cuomo and de Blasio.

8.   The following is a screenshot of a story published by *Yeshiva World* today, showing a list of synagogues and yeshivas targeted for harassing "enforcement" of the Red zone and Orange zone ghettos by warrantless inspections and searches:



*See*   https://www.theyeshivaworld.com/news/featured/1911762/every-yeshiva-and-business-is-a-target-another-day-of-insane-enforcement-in-boro-park-and-flatbush.html.

9.      Yeshiva World also published the following photo of an email from city official Melinda Rogers to various other officials regarding enforcement of the State's directive for closure of Jewish schools.  The email contains the following instruction:

"2) if you are not allowed into a location, but you can tell there are children on site, <u>issue the violation</u> and post it on the door. **Mention in the text of the violations what you observed, same as what folks were writing in the notes.  for [sic] eg [sic] 20 children departed bus and entered location, or several children heard chanting**."



10.     At the same time, members of the press come to take pictures of little Orthodox Jewish children with earlocks and adult men going to pray, to make sure we are all obeying Cuomo's and de Blasio's command to wear face masks and avoid more than ten people in our synagogues. This revolting spectacle is seen in the following video:



*(Click to launch VIDEO as needed)*

11.     Yet huge crowds continue to gather for the events that Cuomo and de Blasio favor, such as a rally and concert in memory of Breanna Taylor, held only three days ago in Manhattan. As one can see from the images which follow, the performers are mostly without masks on the crowded stage and the jam-packed audience is making no effort at the "social distancing" now being strictly policed as to the Jews of Brooklyn:



Breonna Taylor Rally & Concert
Manhattan, NY
October 17, 2020



Source:

https://www.instagram.com/p/CGefvu6HnAk/?utm_source=ig_embed&utm_campaign=loading

12.    The disruptions and intrusiveness since the "Cluster Action Initiative" began are intolerable.  Nothing of the kind is being done in non-Jewish neighborhoods to my knowledge.

13.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 20, 2020

Morton Avigdor

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

REV. STEVEN SOOS, REV. NICHOLAS STAMOS, JEANETTE LIGRESTI, as parent and guardian of infant plaintiffs P.L. and G.L, DANIEL SCHONBRUN, ELCHANAN PERR, MAYER MAYERFELD, MORTON AVIGDOR,

                           Plaintiffs,

            v.

ANDREW M. CUOMO, Governor of the State of New York, in his official capacity; LETITIA JAMES, Attorney General of the State of New York in her official capacity; KEITH M. CORLETT, Superintendent of the New York State Police, in his official Capacity; HOWARD A. ZUCKER, M.D., New York State Commissioner of Health, in his official capacity; BETTY A. ROSA, Interim Commissioner of the New York State Education Department, in her official capacity; EMPIRE STATE DEVELOPMENT CORPORATION ("ESD"), a New York State Public Benefit Corporation; BILL DE BLASIO, Mayor of the City of New York, in his official capacity; DR. DAVE A. CHOKSHI, New York City Commissioner of Health, in his official capacity; TERENCE A. MONAHAN, Chief of the New York City Police Department, in his official capacity; RICHARD CARRANZA, Chancellor of the New York City Department of Education in his official capacity.

                           Defendants.

Case No.
1:20-cv-00651-GLS-DJS

## UNSWORN REPLY DECLARATION OF JEANETTE LIGRESTI, PARENT AND GUARDIAN OF INFANT PLAINTIFFS PL AND GL

Pursuant to 28 U.S.C. § 1746, Jeanette Ligresti hereby declares under penalty of perjury as follows:

1.      I am the parent and guardian of infant plaintiffs P.L. and G.L., who are my children.  I make this reply declaration in support of plaintiffs' motion for injunctive relief.

2.      I understand that both the City and the State are claiming in their briefs that Governor Cuomo's and Mayor de Blasio's "Cluster Zone Initiative" is "narrowly tailored."  That claim is absurd, and if it were true, then my children's Catholic school, Good Shepherd Catholic Academy, would be open.  Instead, their school remains closed for over two weeks with absolutely no progress having been made to permit its reopening.

3.      Sunday, October 4, 2020, was the first day that my children's Catholic school began to be unfairly targeted.  On that day, Mayor de Blasio ("de Blasio") stated in a press-conference that the 11229 ZIP code (the location of plaintiff P.L. and G.L.'s Catholic school), amongst several other Brooklyn and Queens zip codes, was is in a "hotspot" and required closure **of all public and non-public schools** in those zip codes effective Wednesday, October 7th.  This was the case even though Good Shepherd had *zero* COVID cases, no outbreaks and no health concerns, with all safety protocols in place at all times.

4.      The following afternoon, on Monday, October 5, 2020, Governor Cuomo ("Cuomo") directed that **all schools in the six "hotspot" zip codes**, including all schools in the 11229 ZIP Code, close down effective the very next morning, on Tuesday, October 6, 2020. This was one day sooner than de Blasio's anticipated October 7th closure.  Good Shepherd, which P.L. and G.L. attend, thus needed to close immediately by the next morning, just **nineteen hours later**, which forced me to scramble for childcare on literally the eve of closure.

5.      On October 6, 2020, Cuomo announced that the ZIP Code hotspots would be "narrowed" by being divided into Red, Orange and Yellow zones.  **This was anything but a narrowing.  The highly restricted Red and Orange Zones, including virtually all of South**

**Brooklyn, embraces hundreds of thousands of people out of Brooklyn's population of 1.6 million**, including the vast majority of the 11229 ZIP Code.  Cuomo commanded the drastic reduction of attendance at houses of worship in both Red and Orange zones, and the closing of **all schools in both the Red and Orange zones**.  Good Shepherd was classified as being in the Red zone according to the hotspot map and continues to remain closed as of today, with no indication of when or if it will ever be permitted to reopen.

6.     On October 17, 2020, Cuomo claimed that supposed positive test results could be traced to "microclusters" in Brooklyn on a "block by block level."  (https://www.governor.ny.gov/news/governor-cuomo-outlines-new-micro-cluster-strategy-tackle-covid-19-hot-spots-arise-fall).  Yet, despite the detailed data that Cuomo claims to have, no such data is being used to reopen Good Shepherd or any other schools or houses of worship in Brooklyn.  Instead, these overly broad zones remain in effect.

7.     Because Good Shepherd operated for one month with ***zero*** positive cases and no outbreaks, and maintained strict safety protocols at all times, it follows that any cluster of concern to Cuomo or de Blasio did ***not*** originate with Good Shepherd and was ***not*** exacerbated by Good Shepherd.  So much for Cuomo's "block by block" "narrow tailoring."  Good Shepherd remains closed, while my young children remain home for over two weeks with no end in sight to these overbroad and unfair measures.  Since Good Shepherd was not the cause or a contributing factor of any cluster, and since Cuomo claims to have detailed data that can pinpoint areas of concern, there is absolutely no reason why this Catholic school should remain closed.

8.     This unacceptable, overbroad, and illogical zoning that is keeping my children's school closed is evidenced when looking at District 22, the district closest to Good Shepherd.  In this district, there are a number of schools that are forced to stay closed, such as P.S. 222 and

P.S. 207, but others that are permitted to operate, such as P.S. 312 and P.S. 236.  At this point, arbitrary lines are determining whether or not a child can go to school, with schools on one side of the arbitrary line welcoming students, while schools on the other side of the line remain closed.  Taking the elementary school P.S. 203, for instance, a school in District 22, no students are permitted to attend school there as P.S. 203 remains closed in the Orange zone.  Yet, **directly across the street**, the zone is Yellow.  That one, small, approximately 60-foot-wide city street changes whether a school is open or closed.  Interestingly, the block running along the perimeter of P.S. 203 even has houses where the front portion of the house is in the Yellow zone and the back portion is in the Orange zone.  These lines are unfairly and illogically drafted.  *See* Exhibit A to this Declaration.

9.     The "Cluster Zone Initiative" is not narrowly tailored as to **time**, either. Yesterday, on October 19, 2020, de Blasio stated that, despite improvement in the positivity rate, a "few more weeks" were needed before he could determine whether restrictions could be lifted.

*See*     https://www1.nyc.gov/office-of-the-mayor/news/719-20/transcript-mayor-de-blasio-holds-media-availability

10.     Worse, Cuomo was talking about prolonging the restrictions right though the fall:

> We're looking at the fall and the winter. The fall: you will have increased viral transmission. Everybody has said it. **We have been prepared for it, and our micro-cluster strategy is going to be our response**. It's the fall, more people come indoors, more colleges, more flare-ups. More aggressive targeting, quick on restrictions — see an ember, crush the ember. That will be the fall. The flare-ups will be different across the state. They'll come and they'll go. Flare-up: suffocate it, another flare-up somewhere else. **That's what we expect for the fall.**

*See*     https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-updates-new-yorkers-states-progress-during-covid-19-12

4

11.     Still worse, Cuomo also suggested that he will **expect all 20 million New Yorkers to be vaccinated, perhaps twice, beginning in the winter**, **and that even this will be "only the beginning of the end" of his restrictions** on our lives:

> Winter will be the season of the vaccine, we hope. We all hope and pray for a vaccine. The federal administration literally says, HHS Secretary Azar, "when we have the vaccine that's when it's over." **No. When we have the vaccine, that's only the beginning of the end. The beginning of the end.** Once you have the vaccine, step two is convincing the American people it's safe, which I think is easier said than done. Third is administering the vaccine….

> How many vaccines will we have to do? **20 million, and that's if they just require one vaccine. The vaccine's they're talking about require 2 dosages 21 to 28 days apart. So, it would be 20 million people twice, which is 40 million. But even take just 20 million, we only did 13 million tests in 7 months. How long is it going to take us to administer 20 million vaccines?**

*See* https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-updates-new-yorkers-states-progress-during-covid-19-12

12.     Despite Cuomo's revelation that the so-called "positivity rate" is only 2.91% in the Red zone as of today, October 20, 2020 (Exhibit B to this Declaration)—based on an unknown number of tests on an unknown number of people, with the data being hidden from the public—all restrictions in Brooklyn's Red and Orange zones remain in effect, and there is no method or procedure that has been instituted to reopen my children's Catholic school.

13.     My children are being deprived of a Catholic education for literally no reason other than Cuomo's latest ploy that oppresses people, seven months into an "emergency" whose definition he keeps changing and whose length he keeps extending.  My young children are no longer able to study their Catholic faith in the classroom, and one of my children will be deprived of all in-person therapy services that are received at school, all because their school was painted over with a red "paint brush."

14.     Sad to say, despite Cuomo claiming to have such detailed data of the precise locations of so-called "clusters," this data is not being used to refine the zones and open up my children's school, which did not in any way contribute to any "clusters"—a term Cuomo has never defined in this first place.

15.     Governor Cuomo's endless and constantly redefined "emergency" has been wreaking havoc in our lives for seven months. It has become tyranny, plain and simple, and I implore the Court to bring it to an end.

16.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 20, 2020

Jeanette Ligresti

6

**EXHIBIT A**



**EXHIBIT B**

