**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

**REV. STEVEN SOOS et al.,**

               **Plaintiffs,**

               v.

**ANDREW M. CUOMO et al.,**

               **Defendants.**

**1:20-cv-651
(GLS/DJS)**

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFFS:** | |
| 148-29 Cross Island Parkway<br>Whitestone, NY 11357 | CHRISTOPHER A. FERRARA, ESQ. |
| 10506 Burt Circle<br>Ste 110<br>Omaha, NE 68114 | MICHAEL McHALE, ESQ. |
| **FOR THE DEFENDANTS:**<br>_Andrew M. Cuomo, Letitia James<br>Keith M. Corlett, Howard A. Zucker,<br>Betty A. Rosa & Empire State<br>Development Corporation_<br>HON. LETITIA JAMES<br>New York State Attorney General<br>The Capitol<br>Albany, NY 12224 | ADRIENNE J. KERWIN &<br>HELENA O. PEDERSON<br>Assistant Attorneys General |
| _Bill De Blasio, Dave A. Chokshi,<br>Terence A. Monahan & Richard<br>Carranza_<br>HON. JAMES E. JOHNSON<br>Corporation Counsel of the City of<br>New York | MELANIE SADOK<br>ELLEN PARODI<br>HILARY M. MELTZER |

| | |
|---|---|
| New York City Law Department<br>100 Church Street<br>New York, NY 10007 | Assistants Corporation Counsel |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Pending is plaintiffs Reverend Steven Soos, Reverend Nicholas Stamos, Daniel Schonbrun, Elchanan Perr, Mayer Mayerfeld, Jeanette Ligresti, as parent and guardian of infant plaintiffs P.L. and G.L., and Morton Avigdor's motion for a temporary restraining order (TRO), or, in the alternative, preliminary injunction, brought by order to show cause. (Dkt. No. 69.)

Plaintiffs seek an order restraining and enjoining defendants Andrew M. Cuomo, Governor of the State of New York, Letitia James, Attorney General of the State of New York, Keith M. Corlett, Superintendent of the New York State Police, Howard A. Zucker, M.D., New York State Commissioner of Health, Betty A. Rosa, Interim Commissioner of the New York State Education Department, Empire State Development Corporation (collectively, hereinafter "State Defendants"), Bill de Blasio, Mayor of the

City of New York, Dave A. Chokshi, New York City Commissioner of Health, Terence A. Monahan, Chief of the New York City Police Department, and Richard Carranza, Chancellor of the New York City Department of Education from enforcing certain limitations as to plaintiffs' religious gatherings and religious education of their children, or, alternatively, from enforcing such limitations in a way that is greater than what defendants have imposed on similarly situated essential and/or exempted non-essential businesses and gatherings under Governor Cuomo's Executive Order 202.68.  (*See generally id.*)

For the reasons explained below, plaintiffs' motion is denied.

## II. Background

**A.    Facts**[1]

While New York has had much success with the global pandemic brought about by COVID-19, and daily deaths and hospitalizations attributed to COVID-19 have remained essentially stagnant since June, it is still with us, and, thus, remains a difficult and overarching issue facing defendants.  Since early September 2020, the New York State Department

---

[1] For a full recitation of the underlying facts, the parties are referred to the court's June 26, 2020 Memorandum-Decision and Order.  (Dkt. No. 35.)

of Health (DOH) has observed twenty "hot spots" of positive tests for COVID-19, located in Brooklyn, Queens, Rockland County, Broome County, and Orange County.  (Declaration of Zucker (hereinafter "Zucker Decl.") ¶ 95, Dkt. No. 91, Attach. 2.)  Indeed, while the rate of positive tests in the rest of the state has been hovering around just 1%, the positivity rates in these hot spots are at least 5.5%.  *See* Luis Ferré-Sadurní & Jesse McKinley, *Cuomo Imposes Tight Virus Rules on Areas Hit by Spikes Across State*, N.Y. Times (October 6, 2020), https://www.nytimes.com/2020/10/06/nyregion/cuomo-shutdown-coronavirus.html.  And, in certain areas within those hot spots, the positivity rates have reached 8%.  (Zucker Decl. ¶ 96.)

In response to these apparent increases in COVID-19 cases, Governor Cuomo issued Executive Order 202.68, which establishes the so-called "Cluster Action Initiative."  (Dkt. No. 57 at 64-72.)  The Initiative directs the DOH to "determine areas in the State that require enhanced public health restrictions based upon cluster-based cases of COVID-19" and to divide those areas into "red zones", "orange zones", and "yellow zones", in accordance with the severity of the outbreak.  (*Id.* at 64.)

In red zones, the zones with the most severe outbreak:

4

> Non-essential gatherings of any size shall be postponed or cancelled; all non-essential businesses, as determined by the Empire State Development Corporation based upon published guidance, shall reduce in-person workforce by 100%; houses of worship shall be subject to a capacity limit of 25% of maximum occupancy or 10 people, whichever is fewer; any restaurant or tavern shall cease serving patrons food or beverage on-premises and may be open for takeout or delivery only; and the local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise provided in Executive Order.

(*Id.* at 65.)

In "moderate severity warning" zones, the orange zones:

> Non-essential gatherings shall be limited to 10 people; certain non-essential businesses, for which there is a higher risk associated with the transmission of the COVID-19 virus, including gyms, fitness centers or classes, barbers, hair salons, spas, tattoo or piercing parlors, nail technicians and nail salons, cosmetologists, estheticians, the provision of laser hair removal and electrolysis, and all other personal care services shall reduce in-person workforce by 100%; houses of worship shall be subject to a maximum capacity limit of the lesser of 33% of maximum occupancy or 25 people, whichever is fewer; any restaurant or tavern shall cease serving patrons food or beverage inside on-premises but may provide outdoor service, and may be open for takeout or delivery, provided however, any one seated group or party shall not exceed 4 people; and the local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise

5

>>provided in Executive Order.

(*Id.*)

>Finally, in "precautionary" areas, the yellow zones:

>>Non-essential gatherings shall be limited to no more than 25 people; houses of worship shall be subject to a capacity limit of 50% of its maximum occupancy and shall adhere to Department of Health guidance; any restaurant or tavern must limit any one seated group or party size to 4 people; and the Department of Health shall issue guidance by October 9, 2020 regarding mandatory testing of students and school personnel, and schools shall adhere to such guidance.

(*Id.*)

The purpose of the Initiative, according to Governor Cuomo, is to apply a "science-based approach to attack . . . clusters [of positive tests] and stop any further spread of the virus . . . [by] directly target[ing] . . . areas with the highest concentration of COVID[-19] cases." (*Id.* at 66.) State Defendants assert that the Initiative "effectively mitigates the risk of infection and reduces transmission by breaking up identified clusters, thereby reducing density in places where people gather, including houses of worship." (Dkt. No. 91, Attach. 4 at 8.)

Governor Cuomo made clear that he had houses of worship in mind

6

when creating the Initiative.  *See Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-cv-4844, 2020 WL 5994954, at *1 (E.D.N.Y. Oct. 9, 2020) ("[Governor Cuomo] made remarkably clear that [the Initiative] was intended to target a different set of religious institutions." (citing "Governor Cuomo Is a Guest on CNN Newsroom with Poppy Harlow and Jimmy Sciutto," October 9, 2020, https://www.governor.ny.gov/news/audio-rush-transcript-governor-cuomo-guest-cnn-newsroom-poppy-harlow-and-jim-sciutto)).  At the press conference to announce the Initiative, Governor Cuomo said that "the new rules are most impactful on houses of worship" and that the Initiative "is about mass gatherings," and "[o]ne of the prime places of mass gatherings are houses of worship."  (Am. Compl. ¶ 86 (emphasis omitted).)  And, during an earlier press conference, Governor Cuomo stated: "We know religious institutions have been a problem.  We know mass gatherings are the super spreader events.  We know there have been mass gatherings going on in concert with religious institutions in these communities for weeks."  (*Id.* ¶ 88.)

Plaintiffs assert that there is no evidence that "Orthodox Jewish or other religious gatherings or any religious school posed a particular threat to public health in terms of undefined 'clusters,' and no evidence that even

7

a single hospitalization or death in [the] 'Red Zone' had occurred because of religious gatherings as opposed to other gatherings." (*Id.* ¶ 89.) In plaintiffs' view, the zones were "gerrymander[ed]" specifically to target the Orthodox Jewish community. (*Id.* ¶ 160.)

Soos and Stamos are Catholic priests in the North Country region of New York, (*id.* ¶¶ 13-14), and, thus, not currently subject to the Initiative. However, plaintiffs contend that, because the zones are ever-changing, they could find themselves residing in one of them in the near future. (*Id.* ¶¶ 104-05.) G.L., P.L., Schonbrun, Perr, Mayerfeld, and Avigdor all reside and worship in the red zone. (*Id.* ¶¶ 5, 75.)

G.L. and P.L. are Catholics who attend Catholic school and mass in Brooklyn, where they reside with their parents. (*Id.* ¶ 15). Plaintiffs allege that, because it is in the red zone, their Catholic school is closed despite following State protocols and having zero positive tests. (*Id.* ¶¶ 118-20.)

Schonbrun, Perr, Mayerfeld, and Avigdor are Orthodox Jewish congregants who attend synagogues in Brooklyn, New York, where they reside. (*Id.* ¶¶ 16-19.) Avigdor is the President of Congregation Ahavas Dovid, an Orthodox Jewish synagogue in Brooklyn. (*Id.* ¶ 19.) The synagogue prayers required by their religion must have a minimum quorum

8

of ten adult males, called the "*minyan*." (*Id.* ¶ 130.)  Because of this requirement, in conjunction with the fact that they reside and worship in the red zone, Schonbrun, Perr, Mayerfeld, and/or Avigdor can only attend services if they are part of the *minyan*, and their female and non-adult male family members are always prevented from attending such services.  (*Id.* ¶ 153.)  Further, Mayerfeld, Schonbrun, and Perr have children who attend Jewish schools in the red zone, which have been ordered closed pursuant to the Initiative.  (*Id.* ¶¶ 156-59.)

## B.     Procedural History

Plaintiffs commenced this action on June 10, 2020 by filing a verified complaint and an application for a TRO by order to show cause.  (Dkt. Nos. 1, 2, 7.)  The court set an expedited briefing schedule and motion return via video conference.  (Dkt. No. 8.)  Shortly after the video conference, the court issued a Memorandum-Decision and Order, granting plaintiffs' motion and enjoining and restraining defendants Governor Cuomo, Mayor de Blasio, and Attorney General James: (1) from enforcing any indoor gathering limitations against plaintiffs greater than imposed for Phase Two

industries,[2] provided that plaintiffs follow social distancing requirements as set forth in the applicable executive orders and guidance; and (2) from enforcing any limitation for outdoor gatherings provided that participants in such gatherings follow social distancing requirements as set forth in the applicable executive orders and guidance.  (Dkt. No. 35 at 37-38.)

Plaintiffs then amended their complaint, adding new plaintiffs and defendants, as well as allegations with respect to school closures and student testing requirements brought about by the Initiative.  (*See generally* Am. Compl.)  On the same day, plaintiffs also moved for injunctive relief, (Dkt. No. 58), which the court denied with leave to renew due to plaintiffs' failure to properly serve the new defendants, (Dkt. No. 59).

Plaintiffs allege four enumerated causes of action: (1) a violation of the Free Exercise Clause of the First Amendment pursuant to 42 U.S.C. § 1983; (2) a violation of the First Amendment rights of speech, assembly, and expressive association pursuant to 42 U.S.C. § 1983; (3) a violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; and (4) "Ultra Vires State Action in Violation of Federal and

---

[2] Phase Two industries included: professional services, administrative support, and information technology; real estate services, building and property management, leasing, rental, and sales services; retail in-store shopping, rental, repair, and cleaning; barbershops and hair salons; and motor vehicle leasing, rental, and sales.  (Dkt. No. 1, Attach. 1 at 77-78.)

State Constitutional Rights."  (Am. Compl. ¶¶ 167-216.)

Now pending is plaintiffs' third motion for a TRO, or, alternatively, preliminary injunction.  (Dkt. No. 69.)  The court, again, set an expedited briefing schedule, (Dkt. No. 76), and held a status conference.  At the status conference, the parties were permitted to augment their arguments, but agreed that neither a factual hearing, nor additional submissions were necessary, and, thus, the factual record was fixed at that time.

### III.  Standard of Review

In general, a party seeking a preliminary injunction must show:

> (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff[s]'[] favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks and citation omitted).

### IV.  Discussion

Legal challenges to executive branch responses to the COVID-19 outbreak have been numerous and widespread, even reaching the United

States Supreme Court.  Chief Justice Roberts concurred in a decision to deny injunctive relief with respect to a California-based limitation for religious gatherings, explaining:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement.  Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38, 25 S.Ct. 358, 49 L.Ed. 643 (1905).  When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974).  Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020).  *Newsom*, following the guidance of *Jacobson*, instructs courts to refrain from Monday-morning quarterbacking the other co-equal, elected branches of government when those branches are responding to difficulties beyond those that are incidental to ordinary governance.  *See id.*  Chief

Justice Roberts recognized, however, that there are "broad limits" which may not be eclipsed. *See id.* To determine whether the broad limits have been exceeded, which *Newsom* did not address, the court turns to Free Exercise Clause jurisprudence[3] within the framework of the applicable standard of review.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. If neutral and generally applicable, laws challenged as burdening the right to freely exercise religion are presumed valid and subject to rational basis review; otherwise, such laws are subject to strict scrutiny. *See Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) ("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny.").

> In addressing the constitutional protection for free exercise of religion, [the Supreme Court's] cases establish the general proposition that a law that is neutral and of general applicability need not be

---

[3] While this Memorandum-Decision and Order focuses on plaintiffs' free exercise claim, *Jacobson* and its progeny applies in equal force to all of plaintiffs' claims, which are unlikely to succeed on the merits, *see infra*.

13

> justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Lukumi*, 508 U.S. at 531-32 (citation omitted).

"Although a law targeting religious beliefs as such is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533 (citations omitted). "To determine the object of a law, [the court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

"The general applicability requirement prohibits the government from 'in a selective manner impos[ing] burdens only on conduct motivated by religious belief.'" *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014) (quoting *Lukumi*, 508 U.S. at 543). "It 'protect[s] religious observers against

14

unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.'" *Id.* at 196-97 (quoting *Lukumi*, 508 U.S. at 542-43). "While '[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.'" *Id.* at 197 (quoting *Lukumi*, 508 U.S. at 542). "A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Id.* at 197 (citing *Lukumi*, 508 U.S. at 535-38).

"Individualized exemptions are [another] way in which a law can fail to be generally applicable." *Douglas Laycock & Steven T. Collis, Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 10 (2016). In *Smith*, the Supreme Court explained that, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. at 884 (citation omitted).

Plaintiffs argue that strict scrutiny applies because the Initiative, on its

15

face, targets religion and excludes "essential" businesses, and that the Initiative does not pass strict scrutiny because it is "substantially under-inclusive" and there is no evidence that religious gatherings pose a uniquely big risk to the spread of COVID-19.  (Dkt. No. 69 at 8-22.)  In response, defendants contend that rational basis applies because the Initiative regulates all gatherings and businesses in the hot spots, and it treats religious services and gatherings more favorably than their comparators.  (Dkt. No. 88 at 11-20; Dkt. No. 91, Attach. 4 at 17-23.) Defendants further assert that, even if strict scrutiny applies, plaintiffs are unlikely to succeed on the merits because the Initiative is narrowly tailored to advance the compelling government interest of stopping the spread of COVID-19 and preventing another outbreak.  (Dkt. No. 88 at 20-21; Dkt. No. 91, Attach. 4 at 23-26.)

Whether rational basis or strict scrutiny review applies here is of no consequence, though, because, as explained below, plaintiffs' claims are unlikely to succeed under *Jacobson* and its progeny, pursuant to either standard of review.  *See Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 20-CV-4844, 2020 WL 6120167, at *8-11 (E.D.N.Y. Oct. 16, 2020) (denying a motion for a preliminary injunction precluding

16

enforcement of the Initiative, and noting that the motion would be denied applying either standard of review).

The free exercise of religion is a foundational principle of this country, and one of the oldest and most important rights all Americans enjoy. Consequently, governments ought to be especially careful when restricting religious practice. But whether the court agrees or disagrees with the Initiative, or that the underlying data and science necessitates a reinstatement of gathering restrictions, is not the fundamental question; rather, it is whether the Initiative exceeds the broad deference afforded to the elected branches of government to manage the spread of deadly diseases under *Jacobson* and *Newsom*. The court is not convinced that it does.

The Initiative and the surrounding circumstances do not present the issues that existed in June when the court granted plaintiffs' request for a preliminary injunction. (*See generally* Dkt. No. 35.) Under the Initiative, religious gatherings are treated more favorably than their comparators, which "the State identifies [as] gatherings (1) with scheduled starting and ending times, such as public lectures, concerts, or theatrical performances, or (2) that involve people remaining in close proximity, greeting each other

or singing or chanting." (Dkt. No. 91, Attach. 4 at 23 (citing Zucker Decl. ¶¶ 93-94)); *see also Newsom*, 140 S. Ct. at 1613 (holding that worship services are comparable to "lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time").

In the red zone, while non-essential gatherings are prohibited, non-essential businesses have to reduce their in-person workforce by 100%, and restaurants can only offer takeout and delivery service, houses of worship can remain open at up to 25% capacity, or ten people, whichever is fewer. (Dkt. No. 57 at 65.) In the orange zone, while non-essential gatherings are limited to ten people and certain non-essential businesses must reduce their in-person workforce by 100%, houses of worship can remain open at up to 33% capacity, or twenty-five people, whichever is fewer. (*Id.*) Finally, in the yellow zone, while non-essential gatherings are limited to twenty-five people or fewer, houses of worship can remain open at up to 50% capacity. (*Id.*)

To find in plaintiffs' favor under these circumstances would be to second-guess the State's medical experts and scientific and public health findings with respect to what constitutes an "essential" business, which

would run afoul of *Jacobson* and its progeny.  *See Cuomo*, 2020 WL 6120167, at *9.  Indeed, the State has arguably shown that, according to their medical and public health experts, religious gatherings pose a unique risk to the spread of COVID-19, and, thus, "although the [Initiative] establishes rules specific to religious gatherings, it does so because they are gatherings, not because they are religious."  *Id.*  According to Zucker, the State looks "solely at the data and do[es] not take into account who or what are located in th[e] zone[s]—whether it is a non-essential business, school (religious or otherwise), yeshiva, church, synagogue, or a car dealership."  (Zucker Decl. ¶ 119.)

    Accordingly, for purposes of the pending motion, the court is satisfied that the Initiative was guided by science and data, and not a mere desire to target religion, and thus, the Initiative does not exceed the "broad limits" described in *Newsom*.  Additionally, plaintiffs' claims are unlikely to succeed on the merits even applying strict scrutiny review because the injunction is not in the public interest.  *See Cuomo*, 2020 WL 6120167, at *11 ("[I]f [the Initiative] is improperly enjoined, the enormity of the potential harm to the entire public, including to [the plaintiffs], is overwhelming.  In light of that danger, it would not be in the public interest to do so."); *see*

19

*also Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("[T]he court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." (internal quotation marks and citation omitted)).

The court therefore agrees with defendants, (Dkt. No. 88 at 6-25; Dkt. No. 91, Attach. 4 at 10-28), in that plaintiffs have not shown that their claims are likely to succeed on the merits, or that the public interest would not be disserved by the issuance of an injunction, and plaintiffs' motion must be denied.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' application for a TRO or preliminary injunction (Dkt. No. 69) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

October 30, 2020
Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
U.S. District Judge